IN THE CRIMINAL COURT
FOR WILLIAMSON COUNTY, TENNESSEE

STATE OF TENNESSEE,         )
                          )
    Plaintiff,         )
                          )   Case No. B-CR230655
VS.                      )
                          )
ROBERT COLE GORDON,     )
                          )
    Defendant.         )
_____X

_____

MOTIONS IN LIMINE

TAKEN ON AUGUST 20th, 2025

THE HONORABLE DAVID VEILE, PRESIDING

_____

*Prepared by:*
*Nathan Briggs, Official Court Reporter*
*Briggs & Associates*
*222 Second Avenue, North, Suite 340M*
*Nashville, Tennessee 37201*
*Briggscourtreporting@hotmail.com*

Case 3:24-cv-01121    Document 111-1    Filed 08/12/26    Page 1 of 314 PageID #: 2162

APPEARANCES:

FOR THE PLAINTIFF:

DALE EVANS, ESQUIRE
Assistant District Attorney General
136 4th Avenue South
Franklin, Tennessee 37064

JENNIFER DUNGAN, ESQUIRE
Assistant District Attorney General
136 4th Avenue South
Franklin, Tennessee 37064

FOR THE DEFENDANT:

GREG BURLISON, ESQUIRE
Public Defender
305 Public Square Suite 112
Franklin, Tennessee 37064

Case 3:24-cv-01121    Document 111-1    Filed 08/12/26    Page 2 of 314 PageID #: 2163

3

# TABLE OF CONTENTS

Witness                                                        Page

ERIN MISHKIN

Direct Examination by Mr. Burlison                              56
Cross Examination by Gen. Evans                                105
Redirect Examination by Mr. Burlison                          235
Recross Examination by Gen. Evans                             266
Redirect Examination by Mr. Burlison                          269
Recross Examination by Gen. Evans                             271
Redirect Examination by Mr. Burlison                          274


LIEUTENANT CHAD YOUKER

Direct Examination by Gen. Dungan                             286
Cross Examination by Mr. Burlison                             294
Redirect by Gen. Dungan                                       299

Case 3:24-cv-01121    Document 111-1    Filed 08/12/26    Page 3 of 314 PageID #: 2164

# LIST OF EXHIBITS

| Number | Description | Page |
|---|---|---|
| Exhibit 1 | Affidavit Documents | 12 |
| ID Exhibit 2 | Letters from Holy Trinity Lutheran | 81 |
| ID Exhibit 3 | Email Titled: Flaws and Sins | 85 |
| Exhibit 3 | Email Titled: Flaws and Sins | 87 |
| ID Exhibit 4 | 9/25/23 Messages | 99 |
| Exhibit 4 | 9/25/23 Messages | 103 |
| ID Exhibit 5 | General Sessions Dismissal Order | 103 |
| ID Exhibit 6 | State's Follow-Along Guide | 105 |
| Exhibit 7 | 7/15/22 Walgreens Video | 116 |
| Exhibit 8 | 7/17/22 Photographs | 126 |
| Exhibit 9 | 10/07/22 Text Messages | 139 |
| Exhibit 10 | 11/29/22 Videos | 143 |
| Exhibit 11 | Photograph of Victim's Facial Injuries | 148 |
| Exhibit 12 | 11/30/22 Bond Conditions | 150 |
| Exhibit 13 | 2/23/23 Photographs | 160 |
| Exhibit 14 | 2/23/23 Bond Conditions | 166 |
| Exhibit 15 | 2/24/23 Text Message | 166 |
| Exhibit 16 | 3/18/23 Photographs | 178 |
| Exhibit 17 | 3/18/23 Body Cam Videos | 180 |
| Exhibit 18 | 3/20/23 Bond Conditions | 181 |
| Exhibit 19 | Photographs from June of 2023 | 189 |

*BRIGGS & ASSOCIATES 615-482-0037*

LIST OF EXHIBITS, CONT.

| Number | Description | Page |
|---|---|---|
| Exhibit 20 | 8/16/23 Email | 196 |
| Exhibit 21 | 8/17/23 Phone Log | 199 |
| Exhibit 22 | 8/18/23 Text Message | 200 |
| Exhibit 23 | 8/19/23 Text Message | 201 |
| Exhibit 24 | 8/20/23 Email | 210 |
| Exhibit 25 | Franklin Special School District Phone Calls | 213 |
| Exhibit 26 | 8/24/23 Text Message | 219 |
| Exhibit 27 | Four Letters from Mr. Gordon | 224 |
| Exhibit 28 | 9/11/23 Envelope | 232 |
| Exhibit 29 | Photos of Package | 235 |
| ID Exhibit 30 | June 23rd Letter | 264 |
| Exhibit 30 | June 23rd Letter | 265 |
| Exhibit 31 | Indictments for Cases: 266, 267, & 248 | 277 |
| Exhibit 32 | Williamson County Mail Log | 293 |

(Whereupon, the following proceedings were had in open court:)

THE COURT:  Thank you, good morning.  We're here on pretrial motions in the State of Tennessee versus Robert Cole Gordon.  There are several motions, and some motions apply to all ten cases.  There's a motion for mandatory joinder, a 404b motion regarding evidence of the alleged victim, a motion to compel favorable evidence regarding Ms. Mishkin.  A motion for particulars in one case, and the State's motion for 404b evidence regarding the defendant.  Let's take up what will hopefully be the low-hanging fruit; let's deal with the motion for mandatory joinder in cases N-CR230655 and N-CR240116.  I did not see a response filed.  Does the Defense have an objection to the joinder of these cases?

MR. BURLISON:  Yes, Your Honor.

THE COURT:  Alright, Ms. Dungan?

GEN. DUNGAN:  Your Honor, can we address something preliminarily before?

THE COURT:  Sure.

GEN. DUNGAN:  Your Honor, General Evans will be handling this case; and he'll be handling all the motions today.  However, something happened last night that the Court should be aware of; and based on that, the State will be asking the Court for an order

prohibiting the defendant to contact anyone outside of the jail except for the Public Defender's Office either by phone, text, email, or written mail. If I may pass up some documents for the Court; the Defense has copies. Your Honor, what you're being handed, if you look what's on the bottom, the pictures --

MR. BURLISON: Judge, I object. None of this is properly entered into evidence.

GEN. DUNGAN: Your Honor, we can enter this through the victim. However, if I might just tell the Court what happened. And then, we can --

MR. BURLISON: Your Honor, the State's testifying.

THE COURT: Well, I won't receive it as evidence. But I'd like to get an idea of what -- what we're talking about.

GEN. DUNGAN: Last night, the victim received a package at her house: The package was addressed to her. Inside it is contained -- it looks like, if you go to the next page, it's basically women's diapers, adult women diapers. And then, the third page is a note that says, The 20th will be a hoot. The other set of documents that the Court has are certified from the jail text messages of the defendant. If you go to page two of the messages, on the 8th, the defendant messaged

, subject: Email check. And the message was, Hey, my mailing address is ▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮ in Franklin, TN 37064, which the Court will note is the victim's address and is on the front of the package that was mailed to her.

On the 15th, the same email address responded back to the defendant, subject: 20th, fiesta materials. It's on -- still on page two, Your Honor. Mr. G, you are a sage and an unequaled dynamo and just a damn good man. Tell Chris Looney return after this weekend and Old Man G to stay brave. Depends will be on pointe, b. Depends is capitalized. As the Court's well aware, Depends is a common adult diaper brand. And if the Court will note, Pointe is spelled P-O-I-N-T-E, which is not the spelling of point as it would be used in this type of way but is actually the spelling of her address, ▮▮▮▮▮▮▮▮▮▮.

And then, if the Court would go to the next page, there's another message on page 306 from the same email address to the defendant, and it's subject is ▮. And it says, Four days, you'll be out of that static shit hole and tearing up the world, hallelujah. I'm in D.C., and Greg gets a chance of staying alive because of you. That's some pretty mighty kindness. Doordash did Depends but not Vodka. I'll be thinking about you all

Case 3:24-cv-01121    Document 111-1    Filed 08/12/26    Page 8 of 314 PageID #: 2169

day on the 20th.

The State's happy to call and will ask the victim, who is here to testify today on other matters, who can certainly testify to receiving these packages, this package last night with these pictures. And the State would - can also put in this certified record from the jail. This contact, Your Honor, would certainly violate the defendant's order of protection, which the State has certified copies of, that's out of the Chancery Court. It's also arguably coercion of a witness who's here to testify today and the defendant was well aware was coming to testify today. And this also could be retaliation of past action.

This morning I've already spoken with the captain over at the jail and with the county attorney. The county attorney is well aware that I will be asking for this order and welcomes it.

THE COURT: Thank you, Ms. Dungan.

GEN. DUNGAN: Thank you.

THE COURT: And Mr. Burlison, your response?

MR. BURLISON: Your Honor, again, these are allegations that haven't been proven. I believe that any measures that the Court would take to limit Mr. Gordon's contact outside of contact with his attorney would be rash without further proof of what Mr. Gordon

may, or may not, have done.

GEN. DUNGAN: Your Honor, if I might also, he is currently charged. And today, the Court will see that as part of the allegations in the case that's going to trial, the defendant was writing her at her house using legal mail titling it to his attorney John Ballard, Law Office of John Ballard, and then this victim's address, ███████████████. It's a picture that we will be putting into evidence today in some of the course of letters he sent.

So, the defendant has used legal mail to contact the victim in the past. The State can also call the jail administrator who can testify that the defendant sends legal mail to different people; the latest, during the summer, is he's been sending stuff calling it legal mail but it is titled to Don Chitwood, who is the defendant's father, Esquire, and Joan Cooper, who is the defendant's grandmother, Esquire, and sent to their address.

The defendant is already manipulating the legal mail system; he is contacting people via the text system, and he's using this to harass the victim. There is no less restrictive manner the Court can take to protect the victim. And the jail, the sheriff, Your Honor, pursuant to 88-2-13, it is the sheriff and the

sheriff's deputy that are conservators of the peace:
It's the sheriff's duty to detect and prevent crimes.
And pursuant to 88-201 A3, it is the Sheriff's duty to
take charge and custody of the jail of the sheriff's
county and of the prisoners therein.  The State would
argue that this requires, by statute, the sheriff to
prevent the defendant from committing crimes from within
the jail which he is doing by contacting the victim,
harassing her, and coercing her.

MR. BURLISON:  Your Honor, the proof will
show that the alleged victim has done the very thing
that the State is accusing Mr. Gordon of doing, sending
correspondence posing as legal counsel or religious
institutions to get documents to Mr. Gordon.  That calls
into question everything regarding these allegations as
to whether, or not, Mr. Gordon actually sent a package.
Is this yet another situation in which the alleged
victim is saying something that will ultimately not pan
out to be true?  And again, we know it again.  And not
only is -- do we have proof that the alleged victim has
sent these letters, but she has denied it under oath.

So, this needs to be looked at with a
fine-tooth comb, and no -- of course, not jump -- jump
to any conclusions or do anything that limits Mr.
Gordon's constitutional rights in anyway that isn't

Case 3:24-cv-01121    Document 111-1    Filed 08/12/26    Page 11 of 314 PageID #: 2172

necessary.

THE COURT: Alright. Do you any objection to the documents that are presented through the affidavit at the custodian of records at the sheriff's department?

MR. BURLISON: No, Your Honor.

THE COURT: Alright. So, I'll receive this as Exhibit 1 to this hearing. And I will -- I will hear proof regarding the other information recited by Ms. Dungan.

(Exhibit 1 was marked.)

THE COURT: And Ms. Dungan, do you want to handle this separately, or would you prefer -- I understand we have several different motions that we're going to get into today. Do the parties request to just have the witness one time, or do we want to have it separately?

GEN. EVANS: Your Honor, the State's going to amend its 404 response and include these -- these allegations in the 404 response. The State feels that it's appropriate to handle all of them at the same time.

THE COURT: And what do you say, Mr. Burlison?

MR. BURLISON: Well -- I mean, number one, 404b, you know, addresses prior bad acts. These are not allegations that occurred prior to the -- the alleged

offense and the issuance of the indictment in this matter. Plus, addressing this today does not give the Defense proper notice to prepare -- to refute those issues in light of the fact that this information -- the Court could potentially rule that this comes in as substantive evidence against the defendant. So, we would -- we'd object to any ruling today before we've been able -- afforded an opportunity to further investigate this issue.

THE COURT: Alright. I will reserve ruling on the 404b nature of the alleged mailing, the purported mailing, to ensure that the Defense has the opportunity to fully contest that at a hearing. And if we need to have a separate hearing before trial as it relates to this particular 404b, we can do that. So, let's stick -- as for the 404b motion, let's stick to the motion as it is today; and then, we can certainly revisit that.

GEN. EVANS: Would Your Honor then permit at the conclusion of the 404b proof, the State can then inform the Court that this is where we're stopping, we're now going to move into the proof to General Dungan's motion?

THE COURT: We can. And again, we can -- it doesn't even have to be that delineated. I will consider the State's request regarding communication

Case 3:24-cv-01121    Document 111-1    Filed 08/12/26    Page 13 of 314 PageID #: 2174

from the Defense -- defendant, excuse me, as it relates to Ms. Mishkin. So, let's -- let's hears -- let's hear the evidence.

GEN. EVANS: Your Honor, was Your Honor going to take up the joinder motion first?

THE COURT: I would like to at least discuss that. Let's try to address any matters that we can without -- that do not require evidentiary testimony.

GEN. EVANS: The State's motion rests primarily in the fact that the State's going to be presenting evidence in N-CR230655, the case that is originally set for trial, as to the events that occurred in N-CR240116. The claims in 116 are that the defendant violated the order of prote -- criminally impersonated both the news caster, or news agent, and a federal law enforcement agent. And the counts -- I believe it's Count 1 of N-CR230655 is aggravated stalking.

And the State's position is that by contacting, indirectly, the ███████████████████ ████████, the victim's employer, with the intent to harass, harm, threaten, molest, or injure, that the defendant has committed -- you know, has committed that offense by calling and impersonating. The same charge -- the same facts would go to prove the case in 240116. They're functionally -- well, they're not functionally,

they're identical:  They're exactly the same facts.

So, the State's position is that it's a mandatory joinder pursuant to rule 8(a)(1) in rule 13. And for the purposes of judicial economy, it doesn't make sense to try this case twice.

THE COURT:  Alright.  What's your response, Mr. Burlison?

MR. BURLISON:  Your Honor, the Defense's position is that this is not an alleged offense that's based on the same conduct or arising from the same criminal episodes.  We've got completely distinct allegations regarding the indictment that Mr. Gordon is currently facing trial on, allegations of direct contact with Ms. -- with Ms. Mishkin.  Contact that will be shown was consensual, voluntary.  This is contact that is outside of any direct contact with Ms. Mishkin.

The State had a remedy:  If they thought this was appropriate, the State could of brought this in the same indictment originally.  They c of issued a superseding indictment.  To now ask the Court to do so is unproper under the rules.  The State is essentially trying to bring additional allegations and put those before the Jury.  Allegations that maybe the Court would not admit the proof of which through 404b or other evidentiary avenues.  So, this is a way to ensure that

the State is getting evidence of a -- of an alleged crime that is not of the same conduct or same criminal episode before the Jury.

GEN. EVANS:  I can respond on those grounds, Your Honor.

THE COURT:  You may.

GEN. EVANS:  Judge, the statute under aggravated stalking defines unconsented conduct as appearing at a person's workplace or residence.  So, Mr. Burlison's arguing, at least in part, that this isn't direct contact with Ms. Mishkin.  And the State concedes, it's not direct contact; but that's not what the statute requires.  The statute requires unconsented conduct which includes but is not limited to any of the following, subsection (c), appearing at the person's workplace or residence.  So, it does fall into that category.

Then, if you look at the indictment, the indictment alleges offenses on August the 18th in both 240116 and 230655:  That's the State's case.  That's at least part of the State's case.  I mean, obviously, there are more allegations, more -- other incidences of conduct.  But this is an incidence of conduct that falls within the direct language of the indictment on both cases.  It's the same course of conduct.

Case 3:24-cv-01121    Document 111-1    Filed 08/12/26    Page 16 of 314 PageID #: 2177

THE COURT: So, in N-CR230655 --

GEN. EVANS: Count 2.

THE COURT: -- Count 2 -- well, Count 2 is September 18th.

GEN. EVANS: I'm sorry, Count 5.

THE COURT: Count 3 -- Count 5. So, Count 5 alleges a violation of a no-contact order on August the 18th as well as aggravated stalking that encompasses activities between August the 14th and October the 1st of '23.

GEN. EVANS: So, Judge, I'm sorry. I'm in error on that: It's not Count 5, it's Count 1. Count 1, at the aggravated stalking charge, includes a date range between August and October which includes this date; and it wasn't indicted at the same time because the defendant had already been arrested on those charges. The State felt that it was improper to bring two separate indict -- or two separate cases against the defendant. We waited until that case was bound over.

THE COURT: And in N-CR240116, the defendant is charged with two counts: Criminal impersonation of law enforcement, and criminal impersonation.

GEN. EVANS: And to mirror Mr. Burlison's argument from earlier, Your Honor, and the fact that Mr. Burlison's arguing that the Sta -- the Defense doesn't

have proper notice, the State doesn't have proper notice because the Defense never -- the Defense never filed any objection to this motion as is required by the local rules.

MR. BURLISON:  I just want to clarify:  I didn't say anything about proper notice regarding the joinder motion.

THE COURT:  So, 116 alleges offenses on August the 17th of 2023 which is criminal impersonation of law enforcement.  And in Court 2, criminal impersonation on or about August the 18th, 2023.  So, the State's position is the criminal impersonation of law enforcement on August the 17th, 2023 and the criminal impersonation on August the 18th, 2023 -- that same conduct constituted the allegations contained in Count 1 of  the indictment in N-CR230655, that being aggravated stalking.

GEN. EVANS:  Not entirely, but in part. There are more events for aggravated stalking.

THE COURT:  Correct.  But those -- both of those are included wholly but not limited to those two incidents.  But those two incidents are -- are included in the State's allegations of aggravated stalking in Count 1.

GEN. EVANS:  Yeah.  Yes, Your Honor.

THE COURT:  Based on that, I do find that joinder is appropriate and mandatory, to hold otherwise could subject Mr. Gordon to the possibility of double jeopardy should he be -- if the cases are tried separately and he is acquitted in one case but convicted in the other based on the same conduct:  The State could be given two bites of the apple.  So, based on that, I do find that because it was based on the same activity, the same conduct, that it is subject to mandatory joinder.  And the Court will grant the State's motion on those grounds.

Alright, let's talk about the cell phone. The Defense has filed a motion to prevent the State from searching evidence or any alternative for the appointment of a special master based on the Defense position that there is a cell phone that was subject to a search warrant and seized that has not been searched pursuant to prior court order; but it's being held by the Police Department, and the Defense avers that it ha -- that it contains attorney-client privilege/communication that should not be subject to disclosure to the State.  Mr. Burlison?

MR. BURLISON:  Yes, Your Honor.  I would verify that there would be communications from multiple attorneys and Mr. Gordon, both criminal attorneys and

civil attorneys. And also, there's an issue that Mr. Gordon has acted in his capacity as pro se legal counsel in -- in certain matters as well. The defendant's position first is that the Court should not allow a search of these phones. The -- this -- these two phones were in property for over a year and a half. The State didn't seek to -- to execute search warrants until they received wind that it might be an effort to get favorable evidence from these phones from the Defense perspective; only at that point was a search warrant sought and executed.

So, we would ask the Court for fairness reasons to deny the search of the cell phone. Should the Court rule that the search is appropriate, the biggest issues there are privileged communications that are contained in the phone. How's that handled? It can be handled a number of ways. The State suggests that local law enforcement could do the extraction while redacting or ensuring that the privileged communications are not -- are not viewed. The Defense has concerns with that procedure, local law enforcement or even outside law enforcement serving in this -- in this capacity.

The risk of law enforcement directly involved in the investigation and prosecution of these cases or

Case 3:24-cv-01121    Document 111-1    Filed 08/12/26    Page 20 of 314 PageID #: 2181

even outside law enforcement that may unwittingly by privy to information that should not been seen is a risk that the Court should not be comfortable with. The proper remedy in the Defense mind, again, if the Court allows for the search, is that a -- a special master be appointed that's completely removed from any connection with law enforcement or any investigation, prosecution, or legal defense in these proceedings.

I would recommend potentially a practicing attorney, a senior or retired judge, or even a judge in this juris -- a presiding judge in this jurisdiction or otherwise that could serve as role to proper -- properly filter out any tainted -- any tainted evidence. I will go into the State's response regarding any potential waiver of the privileged communications in the manner in which the cell phones were allegedly brought into the possession of a civilian witness.

Your Honor, simply by allowing someone to use their phone, the Court can not look at that as a carte-blanche waiver of attorney-client privilege. We look at how -- how strictly the law is protecting our rights to cell phones. The US Supreme Court saying that, No, law enforcement can not get in a cell phone without -- without a search warrant. We have to remember all of the private, sensitive, and in this

Case 3:24-cv-01121    Document 111-1    Filed 08/12/26    Page 21 of 314 PageID #: 2182

situation, privileged communications that people have in their cell phone. We can't have a situa -- we can't have a precedent were if I -- if someone allows their friend or a family member to borrow their cell phone that they've somehow waived privilege to legal, medical, other -- other information that may be contained in that phone.

Also, there's no allegations that whatever this person may have looked at would be considered privileged communications. So, it's a jump to say that just because someone may have viewed information on the phone that -- that somehow waived privilege for everything that's on the phone and also for the entire world because it has to be limited to the situation at hand, to specifically what may or may not have been shown and to who it may have been -- been shown to or viewed.

You know, simila -- a similar analogy would be -- you know, if a guest is allowed in a house, we can't have a situation where privileged communications are in a -- in a fil -- in a filing cabinet or a drawer; and somehow, we just say that -- that person, by allowing a guest in their home, has waived any privilege that they might have in that -- that sensitive information. And I draw the distinction -- or I draw

Case 3:24-cv-01121    Document 111-1    Filed 08/12/26    Page 22 of 314 PageID #: 2183

the comparison to a home or a residence because we know a home is someone's castle; that is -- the privacy of that -- of that location is paramount under the law. And we've seen court after court extend similar protections to information that's contained in a search warrant that could -- could even mirror those protections that we recognize in someone's home.

THE COURT: And I do agree: Giving someone your phone would not automatically constitute a waiver of any attorney-client privileged communications that are on the phone. I will start by saying the fact that there could -- the fact that the phone stayed in property for however long it did, that doesn't really enter into the Court's determination as to whether or not the phone should be searched.

There was a search warrant that was issued, Search the phones, which would indicate that there's probable cause to believe that there is evidence on the phone. And the fact that there may be -- there may also be attorney-client privilege on the phone, the Court does not find that would thereby make the phone unsearchable; to hold otherwise would be tantamount.

To use your example of a home, the fact that there could be communication, written communication, between a defendant and their lawyer in their file

Case 3:24-cv-01121    Document 111-1    Filed 08/12/26    Page 23 of 314 PageID #: 2184

cabinet would not prevent the police from executing a duly-issued search warrant for other papers and information in the same residence.  So, I will find that the phone is subject to search.

But then, the question becomes, How do we insure that the attorney-client privileged communications -- that privilege is respected?  And with that framework, I'll allow -- I'll ask Mr. Evans to respond.

GEN. EVANS:  So, Your Honor, to that point, I think the Court -- the State will use the same analogy then.  If the issue is whether or not the person, a third party, entering a home would not be able to access a locked file cabinet, the case is suddenly a very different case if that third party is given the key by the owner of the file cabinet and told to access the file cabinet, take files out, and provide them to another person:  And that's exactly what happened here.

Before we get there, first, the burden is on the defendant to prove that this sub -- this information is in fact subject to -- to the attorney-client privilege of the work-product doctrine or whichever avenue they choose to pursue; and there's been no evidence presented.

So, first, the State's position is that the

*BRIGGS & ASSOCIATES 615-482-0037*

Case 3:24-cv-01121    Document 111-1    Filed 08/12/26    Page 24 of 314 PageID #: 2185

defendant's motion is unsupported and should be dis -- should be denied, outright. But second, to the question of waiver, the facts are not that a third party was given Mr. Gordon's phone with the intent to use it for some other completely unrelated purpose. The facts are that Mr. Gordon instructed a third party to enter his phone using passwords, the same as a key, that he provided, and then he used that phone -- then used that phone to disseminate information.

Beyond that, the State also would draw to the Court's attention that in the last two weeks the defendant has attempted to manipulate that phone. The defendant has attempted to change passwords, to change iCloud logins, and to manipulate the date on that phone. And this Court specifically rules those phon -- ruled on May 5th that those phones shall not be accessed either physically or remotely by either party. That restriction was not just on the State.

The State's position is that if Mr. Gordon is going to continue to violate court order after court order by instructing other people to intentionally access the phones, which this Court has already ordered shall not be accessed by either party --

THE COURT: Well, the phone's going to be searched. I don't think, even then, that giving

Case 3:24-cv-01121    Document 111-1    Filed 08/12/26    Page 25 of 314 PageID #: 2186

someone, Mr. Zebley, the passwords and telling him to look for certain things -- I don't know that would rise to the level of waiver of the privilege because it's not a communication that took him -- took place in front of Mr. Zebley unless -- and this hasn't been the statement, but unless the defendant told Mr. Zebley, Hey, find these communications that I have with my attorney and send them to my sister or something like that; that may change the equation.

But that may be on a more of a case-by-case basis; this is not necessarily an all-or-nothing situation. There could be evidence on the phone that is protected by attorney-client privilege, there could be evidence on the phone that once was protected by privilege but has subsequently been waived; and then, there may be evidence on the phone that has nothing to do with the attorney-client privilege whatsoever. So, the question then becomes, How do we -- What is the -- for a fair way to sort that out?

GEN. EVANS: So, for that, the State's going to rely largely on its brief. We talked at length about the applicability of a taint team, which is a procedure that's been used in other jurisdictions and a way to handle this exact issue, maybe not specifically phones, but to go through large volumes of data and to sift out

Case 3:24-cv-01121    Document 111-1    Filed 08/12/26    Page 26 of 314 PageID #: 2187

the pieces that are, and not, appropriate. It's similar, in a way, to Mr. Burlison's request for a special master. The only difference is that it's handled by a particular body with the skills and technology able to -- to manipulate the data in a way to make it readable.

So, the State would be asking to have the -- the phones searched by -- we can use a different detective or a different law enforcement agent other than Detective Canovan, somebody who doesn't have any detecti -- connection to this case, and we can have that person sift out and sort. And the State, obviously, we are sensitive to the fact that -- that phone messages or phone contacts between Mr. Burlison and Mr. Gordon, Mr. Ballard and Mr. Gordon, and Mr. Gordon's previous attorneys -- you know, Ms. Dusche is another one. If those phones numbers can be provided to the State, the State can do its best to sort of sift those out; but they can't be sifted out prior to the search. They can be sifted out by the taint team and barred from access by either the District Attorney's Office or Detective Canovan.

THE COURT: And I understand the -- the Defense's concern about having it be law enforcement, either with this agency or with another agency. But the

Case 3:24-cv-01121    Document 111-1    Filed 08/12/26    Page 27 of 314 PageID #: 2188

-- the chief relief, if there were some type of privileged information -- the chief relief, which the Court would have no problem ordering, would be that it -- the exclusion of any evidence.

Then, it begs the question, What if there's information in there that tips off the State or gives the State information that they didn't otherwise have that may lead in an investigative direction that they would not otherwise had been led?  How do we protect against that?

GEN. EVANS:  Your Honor, I think that we would have a hearing at a later date of fruit of the poisonous tree analysis about whether or not the State would have been able to ascertain that information.  I mean, we have procedures.  This Court has conducted a fruit of the poisonous tree analysis within the last two months; there's an established procedure for that.  So, that's what the Court would be -- would be asking for. The State really wants to make sure that the Court understands that if the defendant is attempting to access in the last two weeks, to manipulate and change that data, then the defendant's already violating the court order.

So, this -- it may be a different motion, maybe a slightly different issue than the actual search

of the phone itself; but the State feels that some further order of the Court, or something, is necessary at this point to prevent the destruction of the data in the iCloud account which is on the phone, which is a remote access to the phone.

THE COURT: And what's your response to that, Mr. Burlison?

MR. BURLISON: Your Honor, the Defense has no notice or proof of any efforts to try and manipulate contents of the phone. Again, our concern is, as the Court eloquently pointed out, that -- you know, law enforcement, even someone not directly connected to the investigation, will look at this information with a different eye. The safest thing to do is get someone that is completely impartial/objective that would have the skills to -- to provide the proper taint analysis.

And again, it makes sense that it would be -- you know, an attorney or a judge. The State would say, Well, does that person have the -- the technical wear and withal. Well, obviously, we can -- you know, figure out a way to provide independent technical support to -- to do the -- to do the proper extractions.

THE COURT: Alright, here's what I'm going to do: I am going to utilize -- I am going to afford some protection, but I am going to utilize. And the Court

did some research on this prior to today's hearing, and the use of taint teams has been a regular practice to the extent any of this is a regular practice.

So, I will, for the search of this cell phone, order that the Defense provide the State with a list of attorney's names, email addresses, and phone numbers that they believe appear within the communications in the phone. And I will direct the State and the execution of the search warrant to utilize detectives and/or other personnel who are not involved in the prosecution of Mr. Gordon, that they search the phone and that any data that is associated with any of the numbers or email addresses provided by the Defense as counsel or prior counsel of Mr. Gordon, that not be -- that those communications and any attachments not be disclosed to the investigators or to the District Attorney's Office, but that it be separated and disclosed to Mr. Burlison so that he may have the opportunity to review that.

And upon review, he may object to specific communications as attorney-client privilege. And should -- once that occurs, it can be filed with the Court. The Court can review and make a determination as to whether or not it believes that those are subject to the attorney-client privilege.

Case 3:24-cv-01121    Document 111-1    Filed 08/12/26    Page 30 of 314 PageID #: 2191

I will ask the taint team and its members not to disclose any information concerning whatever data it excludes and provides to Mr. Burlison, that it not disclose any information related in any way to those communications to the State or to the investigating officers. And the reason why I'm doing it this way rather than using a special master is the Court is well aware of how technical and complicated it is to search cell phones and the various software programs that are used. And to ask someone who is not trained and preferably certified in those different programs, I just don't see a way around using someone who's not involved in law enforcement to be able to forensically analyze the phone.

But I believe with these protections, it will give the greatest likelihood that we can -- that the State can obtain whatever evidence may be on the phone without violating Mr. Gordon's confidentiality with his various attorneys. I will ask the State to identify the members of the taint team and provide those names to the -- to the Defense.

GEN. EVANS: Your Honor, I can do that now. The State would intend to use either Detective Kyle Brink or Detective Prentice Griffin. Neither one of them have been involved in Mr. Gordon's case; both of

them are certified in the analysis of cell phones.

THE COURT: Alright. And so, Mr. Burlison, if you could get him the names, cell phones numbers and/or office numbers, and email addresses of prior counsel? If you can get that to the State by 5 p.m. on Friday.

GEN. EVANS: Your Honor, the State would like to clarify the Court's previous order: The May order directing neither party to access the phone. Does that include the iCloud account that is associated with the phone which would be search -- pursuant to the search warrant?

THE COURT: So, the order, and I believe I have it here --

GEN. EVANS: The State's position is that the iCloud is a remote version or a remote system.

THE COURT: Yeah. So, it does say those phones shall not be accessed either physically or remotely by either party without further order of this Court. The Court is aware that it is possible to log in remotely and delete information from a phone, and such would certainly -- could certainly be a violation of this Court's order as proven. So, if it is proven that anyone attempted to manipulate the data on the phone, that would be a violation of this court order.

GEN. EVANS: So, -- and the State is not suggesting that the Public Defender's Office would do that or is doing that. The concern that we have is that we have messages from Mr. Gordon saying, My attorney is trying to access iCloud. I don't have the password. Can I reset the password? The cops have my cell phone, my lawyers have my MacBook. I'm trying to access my cloud -- my account on the MacBook. Is there a work-around?

THE COURT: Well, -- and the cloud -- So, the cloud is different than the phone. The phone can access the cloud, the cloud can modify the phone, but is -- I'm assuming that the phone is not turned on.

GEN. EVANS: It is as of yesterday -- has been placed in -- or as of this morning has been placed into a Faraday cage -- bag.

THE COURT: Can the -- this may be a question for the -- for either Detective Brink or Detective Griffin. But can it be turned on and -- or can it be forensically copied without any external attempts to modify it taking effect?

GEN. EVANS: I believe it can, but I would hate to speak over Detective Brink or Detective Griffin.

THE COURT: The Court will find, iCloud aside, any attempt to modify the data that is on the

phone either physically or remotely would be a violation of the court order. The intent of this Court's order, which I signed, was to ensure that until we could have this discussion today and until the phone can be searched -- now that the Court has concluded that it should be searched, that no one could manipulate the data that has -- it has previously been determined that there's probable cause, contains evidence on that phone prior to the police being able to search it. Does that answer your question?

GEN. EVANS: It does, Your Honor.

THE COURT: Alright, I do have the Defense motion to compel favorable evidence relating to witness Mishkin and the State filed and answered basically avering that there is no such information. Is that correct?

MR. BURLISON: Yes, Your Honor.

THE COURT: So, does that satisfy the motion?

MR. BURLISON: At this time, it does.

THE COURT: And certainly, if things develop and there was information -- the State's under -- under -- under Brady, the State has a duty to provide any information that would favorable to the Defense. I would expect them to do so. Let's talk about the bill of particulars, and we'll save the 404 -- the competing

404b motions for last.

We have a motion from the Defense for bill of particulars in which they are asking as to Count 1 in N-CR230655, aggravated stalking, to specify the specific acts of repeated or continuing harassment. As to Count 2, the specific acts of intentionally influencing or attempting to influence Ms. Mishkin. Three, with a violation of order of protection specified the no-contact order in place at the time of the alleged offense. And then, the violation of the no-contact order. And then, as to Counts 4-8, which were violation of the no-contact order, specify the no-contact order in place and the violation of the no-contact order. So, Mr. Burlison, if you -- if you can explain why what you've requested is necessary for the Defense to prepare its defense, and then I will hear from the State.

MR. BURLISON: Yes, Your Honor. And we take into account the State's response. And Your Honor, the defendant's position is that we need to be sufficiently on notice as to what -- you know, elements of aggravated stalking the State intends to prove and how.

You know, I have a situation where their allegations of harassment, which is defined as unconsented contact: Unconsented contact that which is initiated or continuing without that person's consent or

Case 3:24-cv-01121    Document 111-1    Filed 08/12/26    Page 35 of 314 PageID #: 2196

in disregard of that person's expressed desire that the contact be avoided or discontinued.  In this situation, we've received no evidence that the -- that the intention during that time period is to discontinue any consensual contact.

So, the Defense is requesting specifically what inculpatory evidence the State intends to present that would show unconsensual [sic] contact, involuntary -- or not reciprocate -- contact that's not reciprocated that led to the alleged victim feeling --

THE COURT:  Threatened, harmed --

MR. BURLISON:  -- feeling threatened, terrorized, frightened, intimated.  And so, that's -- that's similar to the persuasion-of-a-witness Count. You know, we've received infor -- we've received information regarding statements that the alleged -- that the defendant has made to the alleged victim. They're not -- they're not in -- they're not statements telling an alleged victim to lie.  They're not statements to tell -- you know, they're statements essentially telling the person to -- to tell the truth, stating that you've -- you've lied to the DA.

So, again, in the same -- in the same vain, we're seeking what actual inculpatory evidence the State intends to -- intends to use, a violation of no-contact

order specifically. We just want to clarify if there is any distinction between Count 3 and Counts 4-8. They receive a -- kind of a -- there's a variance in the title of the -- of the indictment count, and we just want to insure that the State is not alleging that Count 3 requires any different additional or fewer -- fewer elements to -- to prove that statute outside of Counts 4-8.

THE COURT: Alright. Thank you, Mr. Burlison. Mr. Evans?

GEN. EVANS: The State's position is that the Defense already knows all of that: The Defense has received discovery. I've got two boxes behind me, everything of which in those boxes has been available for review by the defendant. It's all been prevent -- presented to the defendant, to the defendant's multiple attorneys. The -- the issue here is not whether or not the Defense is entitled to a fair trial or notice. The issue is -- is the Tennessee Courts have held, it's an attempt to -- to lock the State into a particular theory, and that's -- I'll rely on the State's brief to that.

But the State's going to rely of State versus Stephenson, a case where a bill of particulars is requested and denied, and the Court -- the Tennessee

Supreme Court specifically held that, So long as the defendant had received all of the proper information, received open-file discovery, received everything he was entitled to under Brady Rule 16, then the motion for bill of particulars is improper because all it does is seek to force the State into a particular piece -- or a particular theory which the State is not required to disclose.

Beyond that -- as to the issue about Count 3 and Counts 4-8, there is a difference in the heading; it's a typographical error, they should be the same. So, the difference between Counts 3, 4, 5, 6, 7, and 8 is just the date.

THE COURT: Okay, and thank you for clarifying that.

GEN. EVANS: And Your Honor, -- and it may be -- it may be pertinent to reserve ruling on this issue until after the conclusion of the 404b hearing. The State's position is that there -- there's going to be evidence presented in that, that may shed some light on exactly where the State's headed.

THE COURT: Well, -- and thank you. And Mr. Burlison, I understand the -- the request, but I also -- it almost seems like this is asking -- not in so many words, but asking for election -- for the State to elect

Case 3:24-cv-01121    Document 111-1    Filed 08/12/26    Page 38 of 314 PageID #: 2199

which offenses they intend to rely upon to satisfy, at least Count 1, aggravated stalking. I think the -- that is the Count that gives the Court the most pause as it relates to the motion for bill of particulars. So, how -- how is this not asking the State to elect the offenses upon it which it relies -- it intends to rely to support its accusation of aggravated stalking?

MR. BURLISON: Well, the Def -- I mean, the Defense position is that the State would have to elect at -- at some point. And so, to -- to not identify at this time through a bill of particulars what specific elements the State intends to prove, puts the Defense at a severe disadvantage in being able to prepare for trial when the solution is that the State elects at the end of the State's case in chief or -- or after the Defense rests at some point, after the Jury is sworn, proof has been put on, and then the -- and then the -- you know, the election is made at a later date.

So, the Defense's perspective is that to ensure that the Defense is receiving the constitutionally required information to be able to prepare a defense is specifically what is requested in the -- in the -- in the bill of particulars.

GEN. EVANS: Judge, the State didn't address the question of election. The issue here is that it's

not -- the State would not be required to elect, either after its case in chief or before the case went to the Jury. Count 1, aggravated stalking, is a continuous offense. Everything that occurred between August 14th and October 1st is on the table, and the State would not be required to elect. So, if the State's being forced to elect pre-trial, in a situation where it would not even be required to elect mid-trial, the State submits that's -- it's inhibiting the State from presented its case. By definition, aggravated stalking is a course of contact; so, it's everything.

MR. BURLISON: Judge, just to clarify, the -- the Defense is not -- is not stating that the State has to elect one interact -- has to elect one interaction over that time period to establish aggravated stalking. But the State will have to elect as to which theory of -- of carrying out aggravated stalking by means of harassment that the State does intend to prove whether or not the alleged victim felt terrorized, or frightened, or intimated, or threatened, or harassed -- or harassed, or molested. And that the person did so -- feel one of those ways. If the State doesn't elect as to one of -- one of those, then we might -- then we could potentially have a situation of a non-unanimous jury verdict.

Case 3:24-cv-01121    Document 111-1    Filed 08/12/26    Page 40 of 314 PageID #: 2201

THE COURT: Alright. I'm going to -- I'll take this under advisement; I'm going to do a little more research as it relates specifically to aggravated stalking. And Mr. Burlison, are you satisfied based on the State's comment regarding Count 3 and Counts 4-8, that they are -- the only difference was in the heading, that it was a typographical error?

MR. BURLISON: Yes, Your Honor.

THE COURT: Alright. So, I will take the bill of particulars under advisement. And that leaves us -- well, let's see; we've got the State's motion in limine to require the defendant to comply with Rule 609.

GEN. DUNGAN: Your Honor, that's a typo; it should be 608, I apologize. This is just a -- a motion, and I don't even know that the Defense would object, just to follow Rule 608. 608 requires, if the Defense wants to ask a witness about specific conduct to go to that witness's character for truthfulness, that there must be a -- basically, a 404b hearing, but an out-of-the-jury-presence hearing where the -- both parties are given a -- you know, a chance to be heard.

The Court's got to make a finding that -- I believe that it's by clear and convincing evidence and that it is not more prejudicial than probative. And so, the State's just requesting that the Defense be required

to comply with this rule specifically at trial that they not ask a question prior to complying with this rule.

THE COURT: Well, certainly, if -- if we're dealing with the defendant, the accused in a criminal prosecution, then there has to be reasonable written notice of the impeaching conviction, etc. But if it is not the defendant and if it is just a witness, are you asking that the Court hold an out-of-court -- or a hearing outside the presence of the Jury to make that determination?

GEN. DUNGAN: Yes, Your Honor. The rule requires for -- the conditions that have to be satisfied before allowing cross examination on such conduct, that it be, whether it's probative solely on truthfulness or untruthfulness -- the Court must, upon request, which the State is requesting, hold a hearing outside the Jury's presence to determine that the alleged conduct has probative value and that there's a reasonable factual bases that exists for the inquiry.

Then, that the conduct must have occurred not more than ten years prior to the specific offense. And if it's admissible, we need advanced notice of the intent to use such evidence to provide a fair opportunity to contest it. And then, the Court has to determine in the interest of justice that the probative

Case 3:24-cv-01121   Document 111-1   Filed 08/12/26   Page 42 of 314 PageID #: 2203

value of the evidence supported by specific facts and circumstances substantially outweighs a prejudicial effect.

THE COURT:  But that -- that separate hearing, upon request, that only applies if the witness is the accused.  That doesn't apply to third-party witnesse -- under, as cited here, A3, if the witness to be impeached is the accused in a criminal process --

GEN. DUNGAN:  I'm not under 404b; I'm under 608.

THE COURT:  I'm -- I'm looking at your motion.

GEN. DUNGAN:  I -- I apologize, Your Honor. Does the Court have Rule 608?

THE COURT:  I can, give me just a moment.

GEN. DUNGAN:  Apparently, there were major typos in the motion which I know that General Evans signed, but this is definitely my fault.

THE COURT:  Alright.  So, you are requesting now that should they wish to use any specific incidences of conduct to attack credibility, --

GEN. DUNGAN:  For truthfulness.  That -- prior to asking the question, the State is requesting a hearing so that the Jury can't be tainted with the question prior to the Defense meeting its burden under

Case 3:24-cv-01121    Document 111-1    Filed 08/12/26    Page 43 of 314 PageID #: 2204

Rule 608.

THE COURT: Alright. Any objection to that, Mr. Burlison?

MR. BURLISON: Your Honor, the -- the Defense intends to -- to abide by the -- by the rules of evidence. I'll be clear: I didn't see any typos in the -- in the notice, just the 609 rather than 608, but had not received any evidence of prior convictions. So, had -- had assumed that this was referring to 608 and have no issues with abiding by the applicable rule of evidence.

THE COURT: The Court will expect all counsel, and the COurt, to comply with the rules of evidence. So, that motion will be granted as to both parties under the case of goose versus gander.

GEN. DUNGAN: Thank you.

THE COURT: Let's take up the State's motion to exclude Defense expert testimony.

GEN. DUNGAN: Your Honor, it's come to the State's attention through the Defense's notice that they intend to call an expert witness in handwriting. And, Your Honor, the State would just request again under Rule 608 that the Court rule that this testimony would be inadmissible to prove a character for untruthfulness.

As Rule 608 says, Specific incidences of

conduct of a witness for the purpose of attacking or supporting the witness's character for truthfulness other than convictions of a crime provided in 609 may not be proved by extrinsic evidence.  And certainly, putting on a -- an expert to testify about handwriting would indeed meet that definition of extrinsic.  What the State believes the Defense wants to do is ask the victim if she wrote letters that were mailed to the jail.  And the State -- or the Defense has an expert that the State believes is saying that the victim's handwriting is on these letters.

The State anticipates and has repeatedly told the Defense that the victim will say that she did not send those letters into the jail; however, the victim may say -- the State thinks the victim will also say that the handwriting does look like her handwriting, but that she did not do that or send those letters into the jail.  That would be the extent of the questioning the State would submit under this rule that the Defense could get to.  They can't then put on their expert to say, Yes, this is her handwriting, because that is extrinsic evidence.

THE COURT:  Well, that's not -- that's not just going to her credibility; whether or not she's lying about sending a letter to the jail would fall

under 608. Whether or not she actually sent a letter to the jail would not be extrinsic testimony as it relates to 608. That could be substantive evidence as to whether or not she is in fear or had voluntary conduct.

GEN. DUNGAN: And that would have to --

THE COURT: Contact, excuse me.

GEN. DUNGAN: That would have to come in under the -- the Defense's other motion that they've filed. They've filed a 404b, which really is the -- it's like 23-7-4 something: It's a specific statute that applies 404b to a victim. And so, then, they would have to -- it's 24-7-125. So, then, the Defense is going to have to comply. If they want to bring it in for another purpose other than truthfulness, then they have to comply with 404b.

So, they need to prove it obviously by clear and convincing evidence and that it's more preju -- more probative than it is prejudicial prior to bringing it in. The burden would be their's to prove that first. And then, that it goes to something other than a propensity. So, they'd have to figure out what it goes to and how it proves that in relation to the case, and the Court would need to make a finding. So, what the State is asking under this rule is that it be prohibited as extrinsic evidence to prove a character for

Case 3:24-cv-01121    Document 111-1    Filed 08/12/26    Page 46 of 314 PageID #: 2207

untruthfulness under 608.

Now, if they're going to bring it in under 404b through the statute 24-7-125, that's a different matter. And that will be taken up under their 404b motion.

THE COURT: Alright, thank you. Mr. Burlison?

MR. BURLISON: Your Honor, yes. We absolutely intend to introduce this under 404b and not 608, and we absolutely intend to cross examine the alleged victim regarding what the State has -- has referred to, an alleged victim who has a clear bias. And we have a witness, not only objective and impartial, but we will have -- we're confident we'll have qualified as an expert before this Court to testify, to give the -- to give the full context, and -- and bring to light to the -- all of the facts that will be presented -- presented to the Jury. So, yes, we do intend to travel under 404b as -- with regard to our expert testimony.

Now, when -- when the Defense received this motion -- you know, it became that the -- you know, the Court would not have enough information at this time to make a ruling as to whether or not this evidence should be -- should be admissible. So, what -- the way the Defense interprets this is we believe that the State --

you know, is potentially requesting a Daubert hearing regarding the testimony because they do recei -- refer to the relevance.  A Daubert hearing would test the reliability and the relevance of the -- of the witness. The Defense would prefer to have that -- have that hearing sooner than later rather than in the -- in the middle of trial.  It sounds like that's a -- that's a hearing that needs to be conducted prior to the Court being able to -- to make any -- any ruling regarding the -- the introduction of -- of this expert testimony and findings.

So, the -- the Defense is -- is comfortable having that hearing.  What we would ask is that -- the Defense recognizes that testimony that could come from that expert witness will go to the Court's decision as to whether or not there is clear and convincing evidence of the alleged victim's prior bad acts.  I would believe that -- that testimony would be beneficial to the Court's determination.

So, we would -- we would ask that -- that the Daubert hearing be conducted and that the Court reserve ruling if clear and convincing evidence is not established today, that the Court reserve ruling until it hears the -- the expert testimony that we suspect will contradict the -- the testimony of the alleged

victim.

GEN. DUNGAN:  Your Honor, just to be clear, on this particular motion, all the State is asking is the Court rule today that the Defense can not use the expert for extrinsic evidence to prove a character for untruthfulness under Rule 608.  And then, we would -- we'll be happy to address the Defense's 404b motion as well; but first, the State feels it's necessary for this motion to be ruled on.

THE COURT:  Well, -- so, this motion says, --

GEN. DUNGAN:  It also has a typo.

THE COURT:  Well, and -- well, the typo aside -- so, it's asking the Court to exclude Dianne Peterson as any testimony she could offer is either inadmissible, irrelevant evidence pursuant to 402 or 403, or it's inadmissible extrinsic evidence pursuant to TRE608 as amended; wherefore, the State of Tennessee requests this honorable Court to exclude any testimony of the Defense forensic document examiner, handwriting expert, Dianne Peterson, from the trial in this matter.

So, there -- there are several mechanisms through which the Defense may seek to have her testimony.  I certainly can't make a ruling as to it's -- whether or not it's relevant pursuant to 402 and 403. I can make a ruling that extrinsic evidence is not

Case 3:24-cv-01121    Document 111-1    Filed 08/12/26    Page 49 of 314 PageID #: 2210

permissible under 608, but that -- I don't want there to be any confusion in the record. I'm not saying that Ms. Peterson can not testify; I'm saying Ms. Peter -- that in accordance with Tennessee rule of evidence 608b that specific incidences of conduct of a witness for the purpose of attacking or supporting the witness's character for truthfulness may not proven by extrinsic evidence.

GEN. DUNGAN: Your Honor, and to be clear, the State's not asking for a Daubert motion on this witness. The State is just asking that the Defense comply with their 404b motion because the witness isn't relevant to anything until she comes in -- if until -- unless and until she comes in through 404b from what the Defe -- the State has seen the Defense provide. If -- if --

THE COURT: Okay. Well, if the State is alleging that Mr. Gordon had repeated conduct in stalking of this victim and caused her to be placed in fear, feel harassed, etc., whether or not she testifies -- whether or not she makes any statement as to whether or not she sent a letter, the fact that she sen -- may or may not have sent letters to Mr. Gordon would be relevant to -- could that not be relevant to whether or not she was terrorized, threatened, or whether or not

the consent -- the contact was --

GEN. DUNGAN: Certainly, the State understands the Court's point, but a handwriting expert can't testify to whether or not this victim sent the letters into the jail. The handwriting expert can only testify whether or not the victim wrote these letters, right -- or not wrote them -- whether or not the handwriting is that of the victim. Now, if the victim's going to testify that, That's my handwriting, but I didn't send those letters in. How is the expert's testimony relevant? It doesn't prove anything; it's already been admitted. That's my handwriting. It looks like my handwriting. So, what -- what then is relevant about this expert?

THE COURT: Well, I guess that would depend on what she says.

GEN. DUNGAN: Yes, Your Honor. And that's why I think that, you know, we have to have -- I think that the Defense can certainly ask today. She'll be on the stand, but I fully expect that -- that will be her testimony; and then, this expert will be irrelevant.

THE COURT: What do you say?

MR. BURLISON: Your Honor, that -- I mean, that only -- that only strengthens the -- the Defense's argument that this expert testimony is going -- is going

to be necessary. Our position is that this goes to weight: This would be substantive evidence for -- for multiple reasons. We will not be introducing it as extrinsic evidence. How the Defense intends to show not only that the alleged victim wrote these letters but also sent them into the jail to the defendant despite saying under oath that she didn't is ultimately an evidentiary hurdle for the Defense to figure out; but that doesn't go to whether or not this expert should be allowed to -- to testify. We will absolutely show that the testimony is -- is relevant, that the witness is reliable, and we're confident we'll be able to show the steps that we've -- that we've laid out that will contradict the -- the anticipated testimony of the complaining witness.

THE COURT: Alright, so --

GEN. DUNGAN: Your Honor, the State would also just like to caution and make the Court aware that the defendant is currently charged with forging the victim's signature. So, I would think that certainly if we get into an argument back and forth over this during trial that might become very relevant. If the victim is saying, I didn't write -- I didn't send those in. That's my handwriting, but I didn't send them in. And the defendant has forged her handwriting before.

THE COURT:  Allegedly.

GEN. DUNGAN:  Allegedly.  But that would be relevant, Your Honor.

THE COURT:  Alright.  For this motion to exclude the Defense expert testimony, I will reserve ruling on this pending -- maybe pending what Ms. Mishkin testifies to at trial.  Let's see.  Before we get into the 404b motions, let's take a -- the morning recess. We will resume at 10:45.

(Whereupon, a recess was observed.)

THE COURT:  And before we continue, I wanted to bring it to both parties attention, put it on the record, and give the opportunity to be heard.  The parties have discussed John Ballard previously representing the defendant.  Prior to taking the bench, I did practice in the same law firm as John Ballard; and it may have been at the time he represented the defendant, I don't know.  I didn't have any interaction with Mr. Gordon, had no discussions with Mr. Ballard, know nothing about the case other than what's before the Court; but I wanted to bring that to the parties attention to see if they had any objection or to at least give them the opportunity to voice any concern.

GEN. EVANS:  None from the State, Judge.

MR. BURLISON:  Not at this time.

THE COURT: Okay, thank you. And with that, we had the -- we've touched on them, the 404b motions. The State seeks to introduce 404b evidence against the defendant. And the Defense wishes to seek -- to introduce 404b evidence against the alleged victim. The Defense filed their motion first, so we'll hear their motion first.

MR. BURLISON: And Your Honor, -- Your Honor, before we continue, we'd request the rule.

THE COURT: Alright. If there are any parties who will be testifying in this motion hearing, any witnesses who intend to testify or may be called to testify, please step into the lobby area until you have testified.

MR. BURLISON: Your Honor, the Defense calls Erin Mishkin.

GEN. DUNGAN: Your Honor, if it's okay with the Defense, can I tell Ms. Mishkin the Defense is calling her? I don't think she had any warning, they didn't subpoena her; and so, this may cause her anxiety. If I can just tell her they're calling her, I won't say anything besides that -- that it's not us, that's it them. And I'll probably say something reassuring.

MR. BURLISON: Your Honor, we're aware -- we are aware that the State had issued a subpoena for --

for Ms. Mishkin. Obviously, she's a necessary witness for both the State and Defense 404b testimony. If I could have a moment? Your Honor, under the circumstances since both parties have 404b motions pending, the Defense is comfortable allowing the State to call Ms. Mishkin. And -- and we would -- we would pursue our questioning through cross.

GEN. EVANS: Your Honor, the -- the State's happy to let the Defense go first. The Court's ruled that the Defense should go first.

THE COURT: Let's go ahead and let the Defense go first.

GEN. EVANS: Your Honor, at this point, we can go ahead and combine the two motions if you'd like and hear all the proof together.

THE COURT: That -- that would suit the Court fine. Do you have any objection to that, Mr. Burlison?

MR. BURLISON: No, Your Honor.

Whereupon,

ERIN MISHKIN,

having been first duly sworn, was examined and deposed as follows:

THE COURT: Good morning. There's water in the pitcher on your right. Please speak into the microphone and answer all questions audibly, thank you.

Case 3:24-cv-01121    Document 111-1    Filed 08/12/26    Page 55 of 314 PageID #: 2216

DIRECT EXAMINATION BY MR. BURLISON:

Q. Ms. Mishkin, if you could please state your name, spell your last name for the record?

A. Sure, Erin Mishkin: M-I-S-H-K-I-N

Q. And Ms. Mishkin, I'm Greg Burlison. I represent Mr. Cole -- or Mr. Gordon. I have some questions for you; okay? Now, Ms. Mishkin, do you know the person sitting next to me?

A. I do.

Q. Okay. And it's true that you and him were in a -- in a romantic relationship; correct?

A. Correct.

Q. Okay. And for -- and if you could please describe the -- when you first met Mr. Gordon and when your relationship first began.

A. Sure. I met him on July 31st, 2022, fell in love with him very quickly; but soon, it all so quickly demised and the abuse started. I tried to make him better, myself better, and it just became a horrific rollercoaster.

Q. Okay. Now, you're the -- you're the complaining witness in multiple cases against Mr. Gordon; correct?

A. Correct.

Q. Okay. Now, you're aware of multiple arrests

of Mr. Gordon; correct?

A. Correct.

Q. And those involve allegations that you have made against Mr. Gordon; correct?

A. Correct.

Q. Okay. Now, when Mr. Gordon was first arrested, the relationship didn't end; correct?

A. On which date?

Q. When Mr. Gordon was first arrested in November of 2022.

A. Mm-hmm.

Q. Okay. The relationship didn't end; correct?

A. Correct.

Q. Okay. And in fact, you had all intentions of marrying Mr. Gordon; correct?

A. Incorrect.

Q. Incorrect?

A. No, we were not legally married.

Q. No. Well, that's not what I asked. There was a time where you thought you were legally married to Mr. Gordon; correct?

A. We went to the courthouse, correct.

Q. Okay. You had all intentions of marrying Mr. Gordon; correct?

A. Incorrect.

Case 3:24-cv-01121    Document 111-1    Filed 08/12/26    Page 57 of 314 PageID #: 2218

Q.   Okay.  You, for a long time, held yourself out to be --

GEN. EVANS:  Objection, leading.

THE COURT:  Your response?

MR. BURLISON:  Okay.

BY MR. BURLISON:

Q.   Ms. Mishkin, is it true that you have referred to Mr. Gordon as your husband on multiple occasions?

A.   I don't recall.

Q.   You don't recall?  Is it true that you have referred to you and Mr. Gordon as being married on multiple occasions?

A.   Again, I don't recall.  We did an annulment.

Q.   In police reports?

A.   I don't recall.

Q.   In court filings?

A.   I don't recall.

Q.   You don't recall, okay.  Now, you said that you and Mr. Gordon went to the clerk's office to get married; correct?

A.   Correct.

Q.   Okay.  And when was that?

A.   September 17th.

Q.   September 17th of 2022?

Case 3:24-cv-01121    Document 111-1    Filed 08/12/26    Page 58 of 314 PageID #: 2219

A.     Correct, yes.

Q.     Okay, and you began dating in July of 2022. Is that your --

A.     July 31st, it was quick.

Q.     Okay.  Now, did you go to the clerk's office with the intentions of marrying Mr. Gordon at that time.

A.     I went to the clerk's office because I loved him very much.  They were very specific that the only way you're married is if you have a ceremony.  Quickly, that night, I realized that -- that's not what I wanted and that I was under the impression we were not going to be married anymore -- or married.

Q.     Okay.  So, again, going back to original question:  Did you go into the clerk's office with the intention of marrying Mr. Gordon?

A.     I went into the clerk's office because I loved him and we went to get a marriage certificate, yes.

Q.     Went to get a marriage certificate.  And it's your understanding that a marriage certificate donates being married; correct?

A.     False; in Tennessee, you have to have a ceremony, and I knew that.

Q.     Good.  Yes, yes.  Along with the ceremony, a marriage certificate would be -- be proof of lawful

marriage; correct?

A. Correct. We did not have a ceremony.

Q. Okay, okay. When you went into the clerk's office that day, did you have the intentions of having a ceremony?

A. No.

Q. Why not?

A. It was fast, I loved him, it was impulsive; and once they read us our rights or what we had to do, I knew after that night that it wasn't right.

Q. You came to that realization that night?

A. I went into the clerk's office knowing we're going to get a certificate, but I knew we weren't going to have a ceremony to be married. Does that answer your question?

Q. Well, my question is, Did you decide that night that you did not want to be married to Mr. Gordon?

A. I was never given the option to decide because the ceremony was forged, and I have no say in that. So, yes, I went to get the certificate. Yes, they read us our rights. You have to have a ceremony. That night, I knew we weren't going to have a ceremony; and after that, it was not in my hands.

Q. But my question is, Did you decide that night that you did not want to be married to Mr. Gordon?

A.   I'm going to repeat myself again:  I knew that day I was going to get a certificate, but I knew we weren't going to have a ceremony that day; so, going into it, I knew that.

Q.   Going into what?

A.   When we walked into the clerk's office I knew that there's not going to be a ceremony.

Q.   Okay.  Now, you've said that you loved Mr. Gordon very much.

A.   I did, yeah.

Q.   You said that it was your intentions to marry Mr. Gordon when you entered the clerk's --

A.   I did not say that.  I said it was my intention to get a marriage certificate.

Q.   Okay.  At any point, did you have the intention of marrying Mr. Gordon?

A.   I think I answered that already.  I had the intention to get a marriage certificate when we walked in that day.  That was my intention --

Q.   Okay.

A.   -- because I loved him very --

Q.   And you would agree that if someone goes into a clerk's office to get a marriage certificate, it would be reasonable to believe that -- that person intended to get married?

A.    It would be reasonable to know that was step one in knowing there's a step two to get a marriage in Tennessee.

Q.    Ma'am, it's a straight forward question.  Did you intend to marry Mr. Gordon when you entered into the clerk's office that day?

A.    I intended to get a marriage certificate --

Q.    That's not what I asked.

A.    I mean, I'm going to answer the same way. That was my intention.  I'm not going to --

MR. BURLISON:  Your Honor, I'd ask the Court to instruct the witness to answer the question.

THE COURT:  She's answering it.  She's answered the question to some extent.  If she's going to keep saying the same thing, I don't think she's going to answer it directly.

BY MR. BURLISON:

Q.    At any point, did you have the intentions of marrying Mr. Gordon?

A.    I loved him very much.  And when I walked into the court -- or the clerk's office, my intention was to get a marriage certificate.

Q.    Okay.

A.    I'm not denying I didn't love him, I did very, very, very much.  But it was -- it was soon, and I

knew there was two steps.

Q. So, you loved Mr. Gordon very much? You had the intentions of getting a marriage certificate on that day; correct?

A. Mm-hmm, knowing that was step one.

Q. Okay. I'm sorry?

A. Knowing that was step one of the process in Tennessee.

Q. Okay. Did you have the intentions of following through with step two at any point?

A. Not at that point.

Q. Okay. And again, it's your testimony that you've never referred to Mr. Gordon as your husband?

A. Not that I recall; but then again, I loved him very, very much. But...

Q. It's your intest -- it's your testimony that you've never held yourself out to be married to Mr. Gordon?

A. It's my testimony that I don't recall calling him my husband.

Q. Okay. Have you ever referred to yourself with the last name Gordon?

A. Not that I recall.

Q. Have you ever sent messages under the last name Gordon?

A.    Not that I recall.

Q.    Now, if there's proof that shows otherwise, what do you have to say about that?

A.    I didn't recall.

Q.    You didn't recall --

A.    Correct.

Q.    -- sending messages under the name Erin Gordon?

A.    Correct.

MR. BURLISON:  Your Honor, I think we've established that this is a hostile witness.  I'd request to able to cross Ms. Mishkin under Rule 611.

THE COURT:  The Court does find that this witness is hostile -- is hostile and evasive in her answers to your questions; and I will note her as a hostile witness, and you may cross examine.

BY MR. BURLISON:

Q.    Ms. Mishkin, you've stated that you are the complaining witness in multiple allegations against Mr. Gordon; correct?

A.    Can you restate that?

Q.    You're the complaining witness in multiple charges against Mr. Gordon; correct?

A.    Correct.

Q.    Okay.  Now, your relationship did not end

once he b -- once he got arrested; correct?

A. Correct.

Q. Okay. You continued to be in a relationship with Mr. Gordon; correct?

A. Correct, I was stuck in a cycle.

Q. Okay. Now, you also were arrested for a charge involving Mr. Gordon; correct?

GEN. EVANS: Objection, Your Honor. The Defense is going to ask questions at this point about a charge that has been expunged; the expungement statute is pretty clear on that.

MR. BURLISON: Your Honor, may we approach?

THE COURT: I don't know that you need to approach. The expungement statute does away with the legal records, but it doesn't undue the event or the incident.

BY MR. BURLISON:

Q. Ms. Mishkin, you were charged with domestic assault against Mr. Gordon in 2022; correct?

A. Correct.

Q. I'm sorry?

A. Correct.

Q. Correct, okay. And can you tell us the circumstances of that arrest?

A. It's expunged; I was arrested, and that's

about all I know.

Q. I'm sorry?

A. That's all I know.

Q. And did you at some point while this case -- while this charge was pending, did you apply for a job with ██████████████████████████?

A. Correct.

Q. Okay. And you disclosed to them that you had an arrest; correct?

A. Correct, and that it was in retirement.

Q. And then, that was -- and that was -- that arrest was still pending; correct?

A. Upon when I applied, I sent them a retirement paper and then my expungement paper.

Q. Okay, and if I can provide you a document. Ms. Mishkin, have you ever seen this document?

A. Is then when it got retired?

Q. Well, the question is have you ever seen this document?

A. I guess I need knowledge on what this is.

Q. Have you ever seen this document?

A. I'm saying no, but I know that it got expunged; so, I don't know if this is the expunged document.

Q. Ms. Mishkin, you signed this document;

correct?

A. I -- so, I -- if this is my expungement, which I don't think I signed --

Q. This is a -- this is a dismissal, not an expungement.

A. Correct. I signed a -- I signed a retirement -- or an expungement paper; and that's all I signed, I believe.

Q. Okay. This has your signature on it, Ms. Mishkin.

A. No, I hear you; and many things have, but I've -- I know I signed an expungement and then a retirement paper, but I don't know if I s -- I don't know if we sign at the end of a retirement paper.

Q. Do you recall signing this document?

GEN. EVANS: Objection: Asked and answered.

THE COURT: I'll let him ask it.

BY MR. BURLISON:

A. If this is my expungement paper, then yes.

Q. The question is have you seen this document before?

A. I guess I'm not sure what I'm looking at. Like, is it my expungement paper, or is it my retirement paper?

Q. Can you identify this document?

A.    No, because I'm asking you.  Is this my expungement paperwork or my retirement paper?

Q.    Ms. Mishkin, do you see the date on this document?

A.    Correct.

Q.    And what's the date?

A.    This document says, 4-4-23.

Q.    Okay.  And when did you apply with the ████████████████████████████████?

A.    In -- I'll be there three years of July '22.

Q.    July of 2022?

A.    No, July of twenty -- this will be my third year.  So, yes.  I can't answer yes or no, I'm mixed -- I -- I can't identify what this is because -- if this is my retirement paper, then yes.  I think I signed it.  If it's my expungement, I know I signed it.

Q.    Ma'am, did you forge a document showing that your case was dismissed --

A.    No.

Q.    -- to provide to the ████████████████████ ████████?

A.    The only thing I gave my ██████████████ was the retirement form and then the expungement form.

Q.    At what time did you provide them with the retirement form?

A.    When I applied, when I applied.

Q.    And that was in July?

A.    I got hired in July.  I can't be sure of my exact date -- hire date.

Q.    Okay.  And how long after providing your retirement form did you provide the expungement form?

A.    When it -- when it became expunged, when I was notified.

Q.    And at wh -- and when was that?

A.    I don't recall the date.

Q.    Isn't it true that you provided ███████ ████████████████████████ with a forged judgement of dismissal so that they would be under the impression that your case had been resolved?

A.    False.

Q.    And that you were eligible for being --

A.    I gave them my retirement form, and they knew -- and they knew my upcoming dates; and then, I gave them my expungement form:  And that was it.

Q.    Ma'am, can you take a look at the bottom right-hand corner of this document?

A.    Sure.

Q.    Does it appear to be altered to you in any way?

A.    I mean, I'm not sure what I'm looking at.

So, I'm confused -- I'm confused at what I'm looking at. Again, if it's my retirement form, which it doesn't look like it is, the dates are off, or my expungement -- sorry, I for sure signed it. If it's my retirement, I don't think I signed at the end of something like that.

Q. And that -- that -- that has your signature on it; correct?

A. I mean, it looks like my signature; but I don't recognize this document unless it's my expungement paperwork. But I don't...

Q. Okay. At the time of your arrest, did you assault Mr. Gordon?

A. No.

Q. How many times have you assaulted him over the years?

A. Zero.

Q. Zero?

A. Zero.

Q. How many times have you stabbed him over the years?

A. Zero.

Q. Never stabbed Mr. Gordon?

A. No.

Q. Even if there's evidence to the contrary, what would you say?

A.    I'd like to see it.

Q.    Okay.  And have you ever pointed a gun at Mr. Gordon?

A.    No, never.

Q.    Okay.  Have you ever threatened him in any way?

A.    I've sworn at him many times.

Q.    Okay.  Again, this relationship between you and Mr. Gordon, it continued after you were arrested; correct?

A.    Mm-hmm.

Q.    It continued after Mr. Gordon was arrested; correct?

A.    Correct.

Q.    And at some point in September of 2022 [sic], Mr. Gordon was arrested and has been in custody ever since.  You are aware of that; correct?

A.    Correct.

Q.    Okay.  Do you recall him being arrested at that time?

A.    I was not there when he got arrested that time.

Q.    You were not there, but you -- were you informed that he had -- that he had been arrested?

A.    Well, yeah.

Q. Okay, okay. And after his arrest, you continued to have contact with him; correct?

A. Which time?

Q. In September of 2023. Let me just -- let me just try to clarify: My Gordon has been arrested -- or has been in custody since September 1st of 2023. You would agree with that; correct?

A. Mm-hmm.

Q. Okay. You continued to have contact with Mr. Gordon after his arrest; correct?

A. I believe so.

Q. You believe so? You had contact with him through text messages through the kiosk?

A. We had mul -- we talked on the phone, correct.

Q. You talked on the phone and also sent text messages.

A. I believe so.

Q. You -- you belie --

A. He was arrested so many times, it's hard for me to keep track of.

Q. Okay. I'm trying to pinpoint it down so you can remember. Let's think about when Mr. Gordon was arrested, the time that he wasn't released; okay?

A. Yes.

Q.   Okay.  Now, after that arrest, you continued to contact with him?

A.   I believe so.

Q.   You would have video contact.

A.   He would call, yes.

Q.   You would initiate this contact as well.

A.   Correct, I was stuck in a cycle.

Q.   Okay.  Video contact, audio phone contact, through text messages, multiple contacts; correct? Multiple means of communication; correct?

A.   I believe so.

Q.   Okay.  And you would use your name Erin Mishkin; correct?

A.   I don't recall how it worked.

Q.   Okay.  And you also used other names in contacting Mr. -- Mr. Gordon.

A.   I don't recall that.

Q.   You don't recall contacting Mr. Gordon with Katherine Nichols?

A.   I think if I did, I didn't want him to get in trouble; but it ended, quickly.

Q.   What ended quickly?

A.   Our talking, once he got arrested.

Q.   Okay.  How about Erica Lane?

A.   No.  I don't know who that is.

Q.    You -- you've never used that --

A.    I've never used Erica Lane.

Q.    You've never used Erica Lane to contact Mr. Gordon?

A.    Correct.

Q.    What about Jill Chase?

A.    No, no.  She was a mutual friend/sponsor.

Q.    Okay.  You never used her name in contacting --

A.    I did not use her name.

Q.    -- in contacting Mr. Gordon?

A.    Correct.

Q.    Katie Nichols?

A.    I don't recall.

Q.    Okay.  So, it's -- it's certainly possible?

A.    Maybe.  I --

Q.    Okay.  And you -- you did say you've used Katherine Nichols?

A.    I believe that's what we agreed on so that he wouldn't get in trouble.

Q.    Okay.

A.    Again, I loved him:  I wanted him to get better.  I -- it was hard to get away.

Q.    So, you were lying to jail staff in the Williamson County Sheriff's Department?

A. I told Jill -- I told Jill that I had used -- that I had used that name -- or a name because I wanted to protect him.

Q. And in doing so, you lied to --

A. False.

Q. -- jail staff.

A. Who's jail staff?

Q. You submitted these names to the Williamson County Sh --

A. Oh, jail staff. I'm sorry, I didn't understand you.

Q. Oh, okay. That's okay. You submitted these names to the Williamson County Sheriff's Department in order to gain access to communicate with Mr. Gordon; correct?

A. False, I was scared. He said to use a name so he didn't get in trouble. I did that, and then I told Jill about it, the detective; and then, we stopped talking once the threats kept going.

Q. But the question is, You used that name to be able to communicate with Mr. Gordon; correct?

A. Correct.

Q. And in doing so, you were dishonest with the Williamson County Sheriff's Department?

A. False, I said -- I told them that I had done

Case 3:24-cv-01121    Document 111-1    Filed 08/12/26    Page 75 of 314 PageID #: 2236

that.

Q. I'm talking about at the time when you used that name.

A. False, I told her.

Q. You didn't tell her immediately.

A. I -- I did tell her what was going on.

Q. Okay. And then, after telling her, then you used different names; correct?

A. False.

Q. You used Kim Nichols.

A. False.

Q. Cara Nichols, Cara Gordon. How many -- how many different aliases did you use in communicating with Mr. Gordon?

A. Like I told the detective, I used one name to communicate with him. I didn't want him to get in trouble, I'm stuck in a cycle of abuse, and I loved him: I wanted him to get better. And at this time, I'm having a therapist who is helping me get -- like, the self-esteem to get away; but as I'm telling -- like, PD and what not what's going on -- and my therapist, being aware of -- like the cycle of abuse and how love doesn't hurt like that, and he shouldn't of been in jail that many times.

Q. Okay. So, you don't -- you do not deny using

aliases to contact Mr. Gordon?

A.   I said I used one name that I told the police about.

Q.   Your testimony is that you used only one alias?

A.   Correct, that I told the police about.

Q.   Your testimony is that you used only one alias that you told the police about?

A.   Are you asking me the same question twice?

Q.   No.  Are you -- is your testimony that you only used one alias?

A.   I'm telling you, I used one name to communicate with him when he got in there; I was worried, I didn't want him to get into more trouble, and I was honest with the detective about it.

Q.   And that name was Katherine Nichols?

A.   I believe so.

Q.   Okay.  Now, the communication continued for several weeks; correct?

A.   I don't recall the time frame.

Q.   Okay.  There was a period of time where you were unable -- there came a time where you were unable to have a video visit with Mr. Gordon; correct?  Or a text message?

A.   Correct, we were no -- he was no longer

allowed to contact me, so there's no contact.

Q. Ma'am, that was in place when you were contacting him; correct?

A. He was still contacting me, though. There was a place when -- I don't know the timeline, but then they shared with me that we can no longer talk anymore; and then, it stopped.

Q. But the point is that you continued to contact him?

A. False, I couldn't anymore. I mean, I -- there was no contact.

Q. The contact ended when he was put in the hole; correct?

A. I don't know what that means.

Q. That he was unable to have video access to you or text messages.

A. I was told he can no longer contact me; I can no longer contact him: But that's all I knew.

Q. Okay. And you didn't have anymore video contact; correct?

A. I believe so, no.

Q. And you didn't have any more text communications?

A. No.

Q. Okay. And do you recall the last video

contact you had with Mr. Gordon?

A. I actually don't.

Q. Okay. Do you recall him saying, Go forge some more documents?

A. I mean, that's a common threat he would say to me.

Q. Okay.

A. Among many others, which I'm sure you've heard.

Q. Well, have you forged documents?

A. False, no.

Q. You've ne -- you've never forged a document?

A. Sir, I'm answering directly: I've not forged a document.

Q. Okay. Now, your communication with Mr. Gordon continued through the mail; correct?

A. He wrote me multiple, multiple, multiple letters alongside his jailmates; or he had jail people call me, or show up at the house, or have their wives call.

Q. And you had direct contact with him.

A. False.

Q. You were initiating the contact through the mail.

A. False.

Q. Is your testimony that you've never sent -- that you haven't sent letters into the jail to Mr. Gordon?

A. Once he -- his bond was revoked, I did not write him any letters to the jail.

Q. And you didn't send letters into the jail under other peoples' names?

A. Correct, I said that already.

Q. Okay. You didn't understand that he could get legal mail, and so you would pose as legal counsel in sending letters?

A. False. I started getting letters from him that said, Legal only; and when I asked the detective what that meant, she explained that he gets the right to legal counsel.

Q. And so, based upon that information, you then sent documents into him --

A. False.

Q. -- as legal mail.

A. False.

Q. And you sent documents into him as members of a religious institution --

A. False.

Q. -- because you understood that -- that was the mail he could get: Legal and religious.

A.    False.  Despite him continuing to contact me when I didn't want him to, doesn't mean that I did it.

MR. BURLISON:  Your Honor, I'd ask to have a document marked then shown to the witness.

THE COURT:  Okay, marked for identification?

MR. BURLISON:  Yes, Your Honor.

THE COURT:  That would be fine.  Not that one, I believe that -- that will go back to him.  I'll mark this for identification at this time.

BY MR. BURLISON:

(ID Exhibit 2 was marked.)

Q.    Ma'am, if you could just take a moment to review the documents that you've been provided.  Do you recognize these documents?

A.    Just as you guys asked me in the other court case, I did not write these letters.

Q.    Okay.  So, you recog -- you recognize these documents; correct?

A.    Because at our annulment hearing, I was shown these.

Q.    Okay.  And you testified at that hearing; correct?

A.    Correct.

Q.    And you were under oath?

A.    Correct.

Q.   Okay.  And you testified that you did not write these letters?

A.   Correct.

Q.   Okay.  You testified that you did not send these letters into Mr. Gordon?

A.   Correct.

Q.   Okay.  And now, that you've had an opportunity to review these documents, what do you say?

A.   I -- same thing I said before:  I did not write these documents.

Q.   Okay.  And you've been informed that a handwriting expert has reviewed your handwriting; correct?

A.   Correct.

Q.   Okay.  And you've been informed that -- that handwriting expert has determined that you are the author of these documents.

GEN. EVANS:  Objection:  Relevance.

THE COURT:  Overruled.

BY MR. BURLISON:

A.   Can you repeat your question?

Q.   You've been told that a handwriting expert has determined that you wrote these documents.

A.   I was aware that you hired one, but I didn't know.  I'm not aware with what they came up with.

Q.   Okay.  And learning that a handwriting expert has determined that you wrote these documents, does that change your testimony?

A.   I did not write these documents.

Q.   If you could take a look at the -- the first two documents.  These appear to be envelopes; correct?

A.   I would assume.

Q.   And do you date -- do you see dates on there which they were postmarked?

A.   Yeah.

Q.   And what is the date?

A.   October 24th.

Q.   Of what year?

A.   '23

Q.   Okay.  And can you read the return address?

A.   It's blurry.  The first one...

Q.   Okay.  If I said it reads "Holy Trinity Lutheran Church", do you agree with that?

A.   I mean, it's blurry.

Q.   Okay, very well.  Are you familiar with the Holy Trinity Lutheran Church?

A.   I'm still not familiar.

Q.   Okay.  But yet, you sent documents posing as someone --

A.   I did not.

Q.    -- with Holy Trinity Lutheran Church --

A.    False.

Q.    -- to get letters into Mr. Gordon.

A.    False.

Q.    Okay.  If you could look at the third document.  Do you see the document with three hearts?

A.    I do.

Q.    Okay.  And can you tell what's inside of that heart?

A.    This one's blurry; but if it's the same one that you showed me last time, it has a F and an S.

Q.    F and an S.  And what does that mean to you?

A.    It's something that we used to say to each other.

Q.    Okay.  And what does it stand for?

A.    For flaws and sins.

Q.    Okay.  And this is something that you and Mr. Gordon would use in communication often; right?

A.    False.  It was a song of a rapper that he really liked, and we listened to it.

Q.    Okay.  And you would use it as a subject in your messages to Mr. Gordon at the jail.

A.    No, I do not recall that.

Q.    Flaws and sins.

MR. BURLISON:  Your Honor, if I could hand up

a document?

THE COURT:  You may.

MR. BURLISON:  If we can mark it for identification first, Your Honor.

THE COURT:  So, for identification number two are the letters, number three is this document.

BY MR. BURLISON:

(ID Exhibit 3 was marked.)

Q.    And do you recognize what's been handed to you?

A.    I mean, they're emails.

Q.    Okay.  Just take your time to familiarize yourself.  Looking particularly at a page where there are two -- two boxes; okay?  I think there's a back page to that; the second box shows from enichols17@gmail.com.

A.    I see that it says that.  I still don't recall putting that in the subject, but I see that you hear that.

Q.    ██████████████, is that your -- is that -- is that an email you used to communicate with Mr. Gordon?

A.    It's an email address that I had, yes.

Q.    And you used it to communicate with Mr. Gordon.

A.    I don't recall what email I signed up, but

Case 3:24-cv-01121    Document 111-1    Filed 08/12/26    Page 85 of 314 PageID #: 2246

enichols17@gmail is an email of mine, yes.

Q. You don't dispute sending this email to Mr. Gordon; correct? I mean, you know you've sent several emails; this is one with your email address. Do you agree that you sent this message?

A. I don't recall sending these messages, but I see that -- I'm not denying that I didn't [sic] speak with him, but I can't recall the exact messages I sent to him no matter how many times you ask me.

Q. Okay. Now, what I'm asking is do you acknowledge that this has been sent from your email address?

A. I see my email address, correct.

Q. Okay. And the subject line is flaws and sins?

A. Correct.

Q. Okay. So, this is a term that you and Mr. Gordon would use?

A. Correct. Like I said, it was a song that we listened to often.

Q. Okay.

MR. BURLISON: And Your Honor, I'd ask that this document be entered into evidence.

THE COURT: Says the State?

GEN. EVANS: No objection.

THE COURT: Alright. So, Exhibit 3 will be entered as an exhibit; it's no longer for identification purposes only.

(Exhibit 3 was marked.)

BY MR. BURLISON:

Q. Ms. Mishkin, if we could go back to the documents that I've previously provided you.

A. Can you be more specific? You just threw a lot at me here.

Q. Oh, I understand. The -- the envelopes and the letters.

A. Okay.

Q. Now, you've stated that you've seen these before; correct?

A. Yes, when you gave them to me at the annulment hearing.

MR. BURLISON: Your Honor, I'd move to introduce the documents that Ms. Mishkin has identified from a prior civil proceeding.

THE COURT: The State?

GEN. EVANS: Judge, the authenticity isn't there. She's identified them as documents she's saw in a hearing, but she hasn't identified what they are, where they came from, who wrote them, where they originated: It's not 901 authentication. Just because

they were in another hearing, that doesn't mean this witness knows what they are.

THE COURT: I agree with the State so far. Can -- can you lay a foundation for their authenticity through this witness?

MR. BURLISON: I believe we've exhausted it under this witness at the present time.

THE COURT: So, the request to have it admitted is respectfully denied and will remain in the record for identification purposes as Exhibit 2. And it may be revisited through other witnesses.

BY MR. BURLISON:

Q. Ms. Mishkin, I want to revisit something you said earlier; I was asking regarding the aliases that you have used, you denied using the name Jill Chase. Is that correct?

A. Correct.

Q. Okay, and you said that is someone that -- that you know. I'm not asking how you know her, but that is someone you know; correct?

A. She's in AA with us.

Q. Okay. And now, your testimony was that you talked to Jill Chase about this.

A. Correct. I was -- again, like I said, I loved him: I wanted him to get better. I think at this

point, I'm still thinking he can.

Q. And specifically, you talked to her about using her name to contact Mr. Gordon?

A. False.

Q. Okay. If you could clarify what you mean when you say you talked to Jill Chase about her name being used.

A. That's not what I said. I said, I talked to Jill Chase about Cole and his sobriety, and maintaining mine, and what we could do to help.

Q. Okay. And -- and you continue to deny using that name?

A. Correct.

Q. Okay. And you -- you've struggled with addiction issues; correct?

A. Correct.

Q. Okay. And that was over a several year period?

A. Correct.

Q. And it's impacted relationships. Is that --

A. Yep.

Q. It's impacted your -- your custody rights.

A. At one point; but now, I have them back.

Q. Okay. At one point, you did -- you did lose your children for a period of time; correct?

A.    At one point, I had supervised visitation. Correct.

Q.    I'm sorry?

A.    At one point, I had --

Q.    Oh, supervised visitation.  Okay.  And you've -- you've acknowledged lying about how much you've drank?

A.    In what capacity?

Q.    I'm sorry.

A.    In what capacity?

Q.    You -- you've told people you've lied about how much -- how much you used to drink.

A.    I think in my addiction I wasn't honest with what was going on, but that's part of it.

Q.    And so, you've talked -- okay.  And so, you've told people that you weren't honest while you were facing addition -- addiction issues; correct?

A.    In my addiction during my recovery process, I'm sure I said that.

Q.    Okay.  And you've said before that you would suffer falls and injuries while under the -- under the influence.

A.    I don't think I said that, but I'm sure.

Q.    And you would have bruises.

A.    I -- can you tell me where I said that?

Q.    Well, ma'am, I'm asking -- I'm asking you. Do you recall saying that?

A.    I don't recall saying that, but I also was in addiction so...

Q.    Did you suffer falls as a result of your addiction?

A.    I'm sure at one point.

Q.    You suffered bruising?

A.    Not that I recall, but...

Q.    Other injuries?  You don't deny it.

A.    I mean, if you can give me a pinpoint in what you're talking about or what you're leading into; but yes, it was an addiction for a while.  I'm sure I fell, and I'm sure I wasn't honest during my addiction of how much I drank.

Q.    And you -- while you were in a relationship with Mr. Gordon, you were also going -- going through child custody issues; correct?

A.    Correct.  My -- I had supervised visitation due to drinking and due to him continuing to be around my home and feeling that it wasn't safe:  And that's a direct quote from that motion.

Q.    Okay.  And --

A.    And in fact, my custo -- my parenting plan had to be revised that he can no longer ever be around

my children, and we have a ten-year order of protection.

Q. Did you -- were you ever told by anyone that you could lose custody of your children if you recanted your allegations against Mr. Gordon?

A. Say that again?

Q. Were you ever told that you could lose custody of your children if you said Mr. Gordon never harmed you?

A. No.

Q. Did you ever tell anyone that you -- that Mr. Gordon did not harm you?

A. No, that would be a lie.

Q. Did you ever tell anyone that you wanted to recant?

A. No, I was stuck in a cycle of abuse. And like I said, I loved him very much; I went through the cycles. And so, he would be abusive, and good, and abusive, and good. But I knew that him continuing to hurt me or the children wasn't right. And I had to get out, and I did.

Q. It was your understanding that if you got out of the relationship it would assist you in your child custody; correct?

A. That was two separate entities.

Q. Okay. So, again, it's your testimony that no

one with law enforcement ever told you that you could have your kids taken away if you didn't assist in prosecuting Mr. Gordon?

A.   I was told -- No.  I was told that if I was dead I wouldn't have my children if he continued to harm me.  But that was the underlining thought of why I had to get out.

Q.   Did you ever tell anyone that you didn't want to testify against Mr. Gordon?

A.   Yeah.  I still say that to this day, I'm terrified.

Q.   Well, is it because your test -- terrified or because the allegations didn't happen?

A.   I am terrified to testify that if he gets out the repercussions of what would happen to me, and my family, and my children.  And that's why I continued to go back because he getting out; and that's still a fear to this day.

Q.   Have you ever -- have you ever been on government assistance, food stamps or otherwise?

A.   A very long time ago.

Q.   And when was that?

A.   Like, around Covid time.  I had the three kids, and I was taking care of him full time.

Q.   Okay.  How about -- how about more recently?

A.    No.

Q.    Did you provide any false information, financial information, to receive those benefits?

A.    No, because it cut off.

Q.    I'm sorry?

A.    I said, no.  I no longer qualified, so then it was done.

Q.    Why did you no longer qualify?

A.    Because I started -- I was starting to get child support, I think, at that point.  It had nothing to do with Robert Gordon, though.  This is a sepa -- again, a separate entity.

Q.    I'm not asking if it involved Robert Gordon. I'm asking, did you pro -- did you falsify documentations to receive government assistance?

A.    No, no, no.

Q.    And you were also going through a divorce proceeding; correct?  Not with Mr. Gordon, but with Mr. Mishkin?

A.    I had -- I was married at one point, correct.

Q.    Okay.  And that overlaps some with Mr. Gordon's relationship?

A.    False.  I was divorced when I met Cole; he was not, but I was.

Q.    Well, but you -- there were still divorce

Case 3:24-cv-01121    Document 111-1    Filed 08/12/26    Page 94 of 314 PageID #: 2255

proceedings going on after you met Mr. Gordon; correct?

A. False. When I -- there was a -- I got supervised because I relapsed and Cole kept coming around, and around, and around.

Q. While the divorce proceedings were still pending.

A. We were divorced.

Q. But you were still having court hearings.

A. False, I was divorced.

Q. That's not what I'm asking. Some -- even post divorce, you were still having court hearings after you were -- after you became involved with Mr. Gordon.

A. Correct. When I relapsed and Cole kept coming around, yes, we had court proceedings.

Q. Okay, and there was a private investigator involved.

A. Correct. They were trying to find out if Cole kept coming around.

Q. Okay. And there was no -- there was never any proof of that?

A. I don't recall.

Q. But do you know that they -- they -- their intention was to find you and see if they could prove that you and Mr. Gordon were together?

A. I didn't find out about the private

Case 3:24-cv-01121    Document 111-1    Filed 08/12/26    Page 95 of 314 PageID #: 2256

investigator until I was told about a private investigator.

Q.    And you've never -- to your knowledge, they had no evidence that Mr. Gordon was with you?

A.    Cor -- I don't...

Q.    Particularly, on any dates of the allegations that you've brought forth.

A.    Can you repeat that?

Q.    There's never been any proof from the private investigator that Mr. Gordon was around you on the dates that you allege --

A.    The private investigator was a separate thing so he was around my children.  When I alleged what I said, that Cole was around when he attacked me -- or assaulted me, or was around, he was clearly there; there was a police report.

Q.    No, but that's not what I'm asking.  The private investigator never provided any information that corroborated those allegations?

GEN. EVANS:  Objection:  Lack of personal knowledge.

MR. BURLISON:  Well, if she knows, she knows.

THE COURT:  To the extent she has personal knowledge of what the private investigator evidence -- what the private investigator's evidence was, she can

Case 3:24-cv-01121    Document 111-1    Filed 08/12/26    Page 96 of 314 PageID #: 2257

testify. But...

BY MR. BURLISON

A. The private investigator, it had no -- had no -- like, pictures or anything of him around my children, correct.

Q. Okay. Or pictures --

A. That wasn't true, but...

Q. -- or pictures -- to your knowledge, or pictures, or any other corroborating evidence that lines up with any allegations you've brought?

A. You're talking about two separate things. The private investigator was to see if Cole was around my children, and she did not catch a picture of him doing it. When I called the police or I was assaulted, he was clearly there.

Q. Well, --

A. And it has nothing to do with the private investigator.

Q. And I'm not saying the private investigator was to follow Mr. Gordon around to see if he was abusing you. My point is --

A. It was to see if he was around my children.

Q. Isn't it odd that the private investigator is so closely investigating this situation. But yet, they never gained any evidence that corroborates --

A. Not once when he assaulted me did it come on a day where I had cust -- where my -- it was children's day, not once; so, that's -- does that make sense?

MR. BURLISON: Your Honor, if I may have a moment?

THE COURT: You may.

BY MR. BURLISON:

Q. Ms. Mishkin, it's true that you've -- you've told multiple people that Mr. Gordon would never hurt/harm your children; correct?

A. He's never harmed my children.

Q. He's never harmed your children.

A. Not physically, no.

Q. And you've told members of law enforcement that he -- that he didn't harm your children and that he would never harm your children. Is that correct?

A. I don't recall that. My children are still in therapy due to him; however, he did not ever physically harm my children, no. And I try my best to keep them very separate.

Q. Ms. Mishkin, I'd like to hand you another document.

MR. BURLISON: If I could have that marked?

THE COURT: And Mr. Burlison, we'll handle this; and then, we'll take our lunch break.

Case 3:24-cv-01121    Document 111-1    Filed 08/12/26    Page 98 of 314 PageID #: 2259

MR. BURLISON: Yes, Your Honor.

(ID Exhibit 4 was marked.)

BY MR. BURLISON:

Q. Ms. Mishkin, if you could take a look at this document. If I could direct you to the second message, a message from Robert Gordon.

A. Can you read the subject line? Which one are you talking about?

Q. It's the subject line message from Robert Gordon, the second message.

A. Oh, okay.

Q. And it is to K Gordon; correct?

A. Yeah.

Q. Okay. And K Gordon is you; correct?

A. I mean, that's my phone number. And he's sending it to me, so...

Q. Okay. Could you read the message under the subject line?

A. Where it says, Love you?

Q. No, on the other side.

A. When I say, Stop messaging me?

Q. No. Below that, the second message, subject: Message from Robert Gordon.

A. Mm-hmm.

Q. If you could read the number under that, or

if you could read the message under that?

A. Yeah. He writes, What is this number of things for the something pictures. I forgive you for your affair -- that didn't happen -- and lying to the cops -- which didn't happen. We will get you help.

Q. And what else does it say?

A. I love you.

Q. Okay. And what is your response?

A. It looks like I say, Thank you.

Q. Okay. So, Mr. Gordon says, I do forgive you for your affair and lying to the cops.

A. I did not have an affair, and I didn't lie to cops.

Q. But yet, your response -- and we will get you help. And your response is, Thank you.

A. I also say, Stop messaging me, multiple times.

Q. That's -- that's before this message; correct? You don't say, I didn't have an affair. You don't say, I didn't lie to the cops. You don't say, I don't need help.

A. So, I don't recall -- I don't recall these messages because it was a long time ago. But to me, this seems -- like, kind of the same way where -- like he would get abusive; and then, you just kind of do

Case 3:24-cv-01121    Document 111-1    Filed 08/12/26    Page 100 of 314 PageID #: 2261

whatever he says to appease the situation. It looks like this is -- like 6:01 in the morning, and he's nonstop all the time; so, sometimes, you'd have to say to make him stop.

Q. So, your respond to than -- your response is, Thank you: Thank you for forgiving me for lying to the cops.

A. That's not what it says: It says, Thank you. I'm telling you right now: I did not lie to the cops, and I never had an affair on him. I loved him very --

Q. You would agree that this makes it look like you did?

A. I see how you're spinning it where you're picking one --

Q. Ma'am, these are -- these are your words; so, this is proof that you've lied to the cops.

A. False, there's no proof. I did not say I lied to the cops because I didn't.

Q. So, your testimony is that there's no proof that you ever lied to the cops?

A. Correct.

Q. There's no proof that you lied under cour -- lied under oath in a civil proceeding regarding sending messages to Mr. Gordon?

A. Correct.

Q. That you didn't create a forged document --

A. I did not create a forged document.

Q. A judgment of dismissal so that you could get a job at ███████████████████████?

A. Correct.

Q. That is your testimony today?

A. Just like it was an hour ago.

MR. BURLISON: Thank you.

THE COURT: Thank you, Mr. Burlison. We will return for cross examination at 1:15. The Court will be in recess until that time, thank you.

(Whereupon, the Court observed a recess.)

THE COURT: Thank you. Alright, if Ms. Mishkin can take the stand.

MR. BURLISON: Your Honor, I've passed the witness. But the -- failed to address the last document that had been marked as -- for in --

THE COURT: For identification.

MR. BURLISON: -- identification only. I'd move to have that document moved into evidence as Ms. Mishkin did identify and acknowledge being the one that sent the message.

THE COURT: And what says the State?

GEN. EVANS: Is that the sins and flaws text message?

THE COURT: Any objection?

GEN. EVANS: No, Your Honor.

THE COURT: Alright. So, Exhibit 4 will be the 9/25/23 -- is that the right date? Alright. So, 9/25/23 messages will be received as evidence. Thank you, Mr. Burlison.

(Exhibit No. 4 was marked.)

MR. BURLISON: Thank you, Your Honor.

THE COURT: Okay, and Mr. Evans?

GEN. EVANS: Before we start with the State's cross, Your Honor, the State would ask that the document that we discussed as the general sessions document regarding the dismissal. Was that eve -- I don't believe that was ever admitted as an exhibit. The State does feel it's -- given the nature of the hearing, it's important to mark it as an I -- an exhibit for ID only.

THE COURT: We can. It has not been. So, any -- well, we'll have Exhibit 5 for identification purposes be the general sessions dismissal order, correct.

(ID Exhibit 5 was marked.)

GEN. EVANS: And Your Honor, at this time, the State's going to ask to pass up a document to the bench; we've provided a copy to the Defense. This is sort of a follow-along guide that the State's prepared

to talk about the different events that we're going through today.  The State's not asking to introduce it as an exhibit at this time; it's just a way for the Court to help keep track of where we are and what we're talking about.

THE COURT:  Thank you.

GEN. EVANS:  We can mark a copy of that for ID only at this time if Your Honor would like?

THE COURT:  If it's just to help me follow along --

MR. BURLISON:  Judge, we would object to it being used even for that purpose because it -- it treats allegations as -- as if they've been proven.  It's evidence that -- it's the State's burden to present in a cogent matter through the testimony.  I don't believe it's appropriate for the Court to rely on it, nor should it be -- well, I can't stop it from being marked for identification; but we don't think it's appropriate to be used in that manner.

GEN. EVANS:  Judge, the State's position is that everything in there is included in the State's motion already.  The Court's already seen all this.

THE COURT:  Yeah.  I'll allow -- it makes no difference to me whether or not we admit it as an exhibit.  I'm happy to use it to follow along, but it

certainly will not be substantive evidence.  I will not consider the statements here as evidence.  It's just their -- what they intend to prove, much like an opening or a closing.  So, do you -- would you like for it to be in the record, or...

GEN. EVANS:  Yes.  Just to make it cleaner, I think it's best for everybody.

THE COURT:  Alright.  So, we'll mark this as, for identification purposes, Exhibit 6 I believe.

(ID Exhibit 6 was marked.)

GEN. EVANS:  And Your Honor, I can pass up a clean copy.  And we can leave a copy unmarked if Your Honor would like to --

THE COURT:  I would appreciate that, thank you.  I'll note that as the State's 404b outline.

CROSS EXAMINATION BY GEN. EVANS:

Q.    Ms. Mishkin, I want to start going all the way back to when you first met Mr. Gordon.  Now, you said on direct examination that you met in the summer of 2021.

A.    Mm-hmm.

Q.    And at that time, you had about a six-week period where you were engaged in a relationship with him.

A.    Correct.

*BRIGGS & ASSOCIATES 615-482-0037*

Q.   And after that, you believed that some sort of document had -- had been filed that -- that made you married.

A.   Correct.

Q.   Okay.  Can you tell me what happened -- did anything happen leading up to that?  Tell me about your relationship before you got married or before you went through that procedure?

A.   Sure.  So, when we first met, like I said, fell in love with him.  He was very kind, very sweet, very patient; it was kind of this overwhelming love.  And then, you know, you want to be with this person.  And then, we go for step one which is the -- getting a marriage certificate.  And then, quickly that night --

Q.   So, before we get there, I want to kind of ask some questions about that.

A.   Yeah.

Q.   Would it be fair to characterize that as sort of a whirlwind romance?

A.   Yeah.

Q.   Okay, very fast, very intense.

A.   Yeah.

Q.   Okay.

THE COURT:  And just sa -- Ms. Evans, I believe you just said, Summer of '21; but I believe her

testimony was summer of '22.

GEN. EVANS: I'd like to clear that up, Your Honor.

BY GEN. EVANS:

Q. Did you meet him in the summer of '21 or the summer of '22?

A. It was '21.

Q. The summer of '21.

A. July.

Q. So, the question that you were asking -- answering from Mr. Burlison earlier, I want to make sure we're -- we're all on the same page; and there are a lot of dates in this case.

A. There is a lot of dates.

Q. So, you met him in July -- July of 2021?

A. Yes.

Q. Okay.

A. September...

Q. Okay. Tell me about what happened immediately after you were married.

A. It was his birthday that night. The next --

Q. So, that -- I say married. I'm going to keep saying married even though I understand that there's some discussion about what that means. Was the -- that procedure on his birthday?

A.    Yeah.

Q.    Okay.

A.    Yeah.

Q.    So, tell me what happened that night.

A.    I made him dinner that night; and then, it quickly changed.  I believe the direct words were, I own you now.  And then, it just went downhill from there.

Q.    Okay.  And did that sort of pattern continue, words of that nature, between July of '21 and July of '22?

A.    Correct.

Q.    Can you sort of characterize the relationship a little bit more in that time period?

A.    Sure.  So, like I said, I was very much in love with him.  He's very, very sweet; and then, it would quickly change.  And then, he -- some kind of violent behaviour would happen, he would say sorry and get better, I'd blame myself; and then, it just starts again, and again, and again, and again.

Q.    So, I want to make sure we're clear:  You didn't stop loving him in August of 2021?  Is that fair?

A.    Correct.

Q.    Okay.  That -- did you say that you stayed in love with him for a while?

A.    Correct.

Q.   Okay.  Was he ever violent to you?

A.   Yes.

Q.   Was he ever -- can you -- can you tell me about some of things that he would do during that time?

A.   During which time?

Q.   I'm sorry?

A.   Which time period?

Q.   I want to talk about, specifically, that first year between July of '21 and July of '22; we're going to get to the specific events in a second.

A.   Okay.  So, it's just -- like, sub -- subtle things.  Like, he would -- you know, give me a gift or something and then immediately take it back, or he moved into my house and I didn't realize it.  Same as like, I own you now.  Just little, like, pushing or whatnot.  And then, it would be, I love you, I'm so sorry, I'm going to get better.  And at this point, I'm blaming myself.  I'm wanting him to get better because I loved him, but -- I did for a very long time.

Q.   So, let me ask you this:  Did you ever -- you said that he said, I own you, and things like that.  Did you ever say anything like that to him?

A.   No.

Q.   You never told him you owned him?

A.   False.

Q. You never told him that you were going to take his things.

A. No.

Q. Did he ever threaten to take anything from you?

A. My house, my children, --

Q. Your house and your children?

A. -- my life, my mom's life, my ex-husband's life.

Q. Okay. I want to start in now on -- I want to talk about your addiction. We talked a little bit about that on direct examination.

A. My -- I'm sorry?

Q. Your addiction.

A. Yep.

Q. When did -- when did your addiction start?

A. So, I've been battling with, you know, alcoholism since I was fifteen.

Q. Okay.

A. The last treatment I did was March 23rd, 2023. It was a six-month stint. I be -- been able to remain sober since; but prior to that, it was -- you know, some on-and-off rehab.

Q. Okay. So, you -- have you -- would it be fair to say you've relapsed?

A.    Not --

Q.    Not today.

A.    Yeah.

Q.    But you have relapsed in the past?

A.    Of course, yeah.

Q.    Okay.  Can you tell me when the last time that was?

A.    It was that stint right before March.

Q.    Okay, of '23?

A.    Twenty-three, yeah.

Q.    And tell me, when was the last day -- or the first day of sobriety for you?

A.    March 23rd, 2023.

Q.    March 23rd, 2025 -- or '23.

A.    Twenty-three.

Q.    Okay.  I want to start in on some of these specific events.  Do you remember an event on July the 15th of 2022?

A.    Yes.

Q.    Okay.  You remember being with him in a car?

A.    Correct.

Q.    At that point, he was intoxicated at a bar.

A.    Correct.

Q.    And he had called to ask you to pick him up.

A.    Correct.

*BRIGGS & ASSOCIATES 615-482-0037*

Q.    You went and you picked him up from the bar.

A.    Correct.

Q.    And you took him to the Walgreens.

A.    Correct.

Q.    You took him to the Walgreens so that he could get some prescription medication; and at that time, --

MR. BURLISON:  Your Honor, I'm going to object.

GEN. EVANS:  It's cross examination, Judge.

MR. BURLISON:  But this is the State's -- this is going into testimony regarding the State's motion.

GEN. EVANS:  Judge, Mr. Burlison argued that she was not in fear.  These events go specifically to show that she was in fear.

MR. BURLISON:  But my point is that we shouldn't be leading because this could -- this -- this is switched back to the State's motion to introduce 404b evidence.

THE COURT:  What's your response to that?

GEN. EVANS:  Judge, it's both.  It's intrinsically intertwined.  The State's rebuttal to the Defense case is the State's case, so it's both a rebuttal in which case the State would be entitled to

*BRIGGS & ASSOCIATES 615-482-0037*

cross and a separate assertion; so, separating the two is impossible.

THE COURT: It is a sticky wicket. I will overrule the objection, but I would ask that you allow her to testify.

GEN. EVANS: Yes, Your Honor.

BY GEN. EVANS:

Q. So, Ms. Mishkin, you said that you went to the Walgreens with Mr. Gordon.

A. Correct.

Q. And did you -- did you have your phone on you that day?

A. I did.

Q. Did you make a recording that day?

A. I did.

Q. Tell me what happened there at the Walgreens or about that time.

A. We're in line to get him medication that he needed, he was intoxicated, and he had punched me in the arm and my right shoulder, and just multiple threats, like --

Q. So, this is going to be -- I'm going to kind of walk through these really, really slowly.

A. Okay.

Q. You said that he hit you. When -- where were

you when he hit you?

A.   In the car.

Q.   Was that at the Walgreens?

A.   Yep, in the car.  In the --

Q.   In the drive-thru line?

A.   Yep.

Q.   Okay.  Did you -- did he hit you before or after you -- you started recording with your phone?

A.   This previous incident -- or this particular incident with Wal -- we're in the car, but he had hit multiple times prior to that.

Q.   Okay.  So, prior to the time that he had hit you, he had hit you before?

A.   Correct.

Q.   And at this point, why did you start recording?

A.   At this point, I'm like fearing my safety.  I had contacted a lawyer, and they had said whenever he gets violent to always make sure you have your phone on and record it.

Q.   Okay.  So, fair to say that at this point he got violent and you started to record?

A.   Correct.

Q.   Okay, but you didn't catch the initial violence.

A. Correct.

Q. Did you catch anything afterwards?

A. In that recording, it's just us in a Walgreens line.

Q. Okay. Would you recognize that recording if I showed it to you?

A. Yeah.

GEN. EVANS: If I can pull something up right here on the screen, Judge.

BY GEN. EVANS:

Q. Ms. Mishkin, do you recognize -- based on the two-second clip that you saw, do you recognize this video?

A. Yes.

Q. Have you seen it before?

A. Yes.

Q. Is it a fair and accurate depiction of the events on July the 15th of 2022?

A. Correct.

GEN. EVANS: Your Honor, the State would ask to admit this video as the State's first -- or the next numbered exhibit.

THE COURT: Any objection?

MR. BURLISON: No, Your Honor.

THE COURT: So, Exhibit 7 will be the video

from 7/15/22.  I'll put it out as -- do you have it on a thumb drive today?

(Exhibit 7 was marked.)

GEN. EVANS:  I don't.  What I -- if it's okay with the Sta -- with the Court, the State would like to compile these exhibits onto a flash drive and submit it at the conclusion of the hearing -- or after the hearing.

THE COURT:  You may do that, just make sure on the thumb drive that there is a separate folder.  So, this will be Exhibit 7, 7/15/22 video.  Inside that folder, is this video?

GEN. EVANS:  I will -- I can list -- I can rename each file as Exhibit 7, Exhibit subsequent.

THE COURT:  Thank you.

GEN. EVANS:  Okay.

THE COURT:  And please give an identical copy to Mr. Burlison.

GEN. EVANS:  That, I will do.

BY GEN. EVANS:

Q.   So, Ms. Mishkin, let's go ahead and play this video; and then, we'll talk about it here in just a second.

(Whereupon, the video was played.)

BY GEN. EVANS:

Case 3:24-cv-01121    Document 111-1    Filed 08/12/26    Page 116 of 314 PageID #: 2277

Q.   Was that the conversation that you had with Mr. Gordon in the car at the Walgreens line?

A.   Yes, sir.

Q.   At one point in that video, -- or in that clip, we can hear you saying, Don't hit, there's people here.  Did he hit you again?

A.   I'm not sure --

Q.   Okay.

A.   -- when he hit in that video, but --

Q.   But he did hit you that night?

A.   Yeah, correct.

Q.   Did you start crying at about the two-minute mark in that video?

A.   Yeah, it's sad to live; it's sad to hear.

Q.   Okay.  Why were you crying?  Why were you upset?

A.   Because at that point, I -- I love him; I want him to get better, and I hate that we're living this life.

Q.   You were afraid of him too, though; right?

A.   Yeah.

Q.   Tell me about that.

A.   Because if I -- at this point, I'm told that if I say something, if I do anything -- like, I'm going to get hurt or something's going to get taken away:

Just fear at all times.

Q. So that fear, it came out in this video; but is that something that you were living with all the time?

A. Correct, and still.

Q. You still are?

A. Yes.

Q. Okay. And when would you say you started being in fear?

A. Like, right around the time that I first met him.

Q. Okay. Did it get progressively worse?

A. I mean, it was so great at the beginning. Like I said, I loved him very much; and then, it just escalates, escalates, escalates.

Q. Was there ever a time when you -- you felt like you loved him but you were also afraid at the same time?

A. All the time.

Q. All the time. Okay. Did -- did you have an encounter with the police on the day that this occurred?

A. Yes.

Q. And how did that happen?

A. I believe that day I called the police -- I don't believe there was any arrests or anything that

were made that day -- you have to remind me of the timeline, there's so much.

Q.   I understand.  So -- so, you called the police that day.  And did the police come to your house?

A.   Yes.

Q.   And did you tell them what happened?

A.   Yes.

Q.   And what did the police do?

A.   That said that -- they told me how to get a --

MR. BURLISON:  Objection:  Hearsay.

GEN. EVANS:  Judge, I'll stick with the exact actions of the police if we can.

BY GEN. EVANS:

Q.   So, Ms. Mishkin, I'm not asking you to tell me what they told you.  But did they do anything that day?

A.   -- they told me to get an order of protection that day.

Q.   Okay.

MR. BURLISON:  Objection.

THE COURT:  Sustained.

GEN. EVANS:  Your Honor, they told me to get an order of protection is a command:  It has no truth value.

THE COURT: That is correct. Whether or not she did get an order of protection is irrelevant to the importance of the statement. But for what purpose are you seeking to introduce that statement?

GEN. EVANS: It goes to show the relationship that occurred between Mr. Gordon and Ms. Mishkin. It also sort of helps to underline the fear that we're talking about. It's what we've been talking about all day.

THE COURT: But how does the statement by the police for her to get an order of protection -- how does that indicate her fear?

GEN. EVANS: That statement, specifically, Your Honor, not much. The statement in conjunction with the actions of the police goes to explain Ms. Mishkin's further actions in the future. The action, specifically, if I may proffer, is that Mr. Gordon was not arrested that night.

THE COURT: I'll -- let's -- I'll sustain that objection; but then, let's get to what the police did or did not do.

BY GEN. EVANS:

Q.    So, Ms. Mishkin, did the police arrest Mr. Gordon that night?

A.    Not that night.

Q. Did you -- were you still in fear when the police left?

A. Yes.

Q. Did you stay in fear after they left for a couple of months?

A. Yes, the worst feeling was knowing they leave and you just are stuck in that moment.

Q. You said, Knowing they leave and you're stuck.

A. You know the police are going to leave, and you're just stuck in that moment.

Q. Okay. So, at this point, you have called for help and nobody came.

A. They came, but not --

Q. They came, but they didn't do anything. Fair to say?

A. Correct, he was not arrested.

Q. They just told you to get an order of protection.

A. Correct.

Q. A couple of days later, did Mr. Gordon assault you again?

A. Yes.

Q. Was that on July the 17th?

A. Yes.

Q.   Tell me about that day.

A.   He had relapsed at that point, he grabs me by the arm, I have a broken lip, and then he leaves.

Q.   So, where was this?

A.   In my -- like, downstairs area.

Q.   So, this is at -- at your address.

A.   At my home, yes.

Q.   And where is that?

A.   Where is my home?

Q.   Is that ███████████████ ?

A.   Yes.

Q.   ████████████████████

A.   Yes.

Q.   Okay.  And at this point, tell me about the relationship between you and him in terms of the living situation.  Did he live with you?

A.   Again, I'm like still -- like, trying to -- still love him; I'm trying to make it work.  He's in an out.  I'm not sure if he went and got help at that point or not, but that's kind of when the rehab stays start.

Q.   Okay, so he was in and out of the house; he wasn't sort of permanently living there, but came on a pretty regular basis.

A.   Right.

Q.   Okay.  Now, at this point, you told us about

why you made that video clip we just saw.

A.    Mm-hmm.

Q.    Were you still sort of documenting things based on -- on your fear?

A.    Correct.

Q.    Did you document anything that day?

A.    After he left, I took a picture of my arm and my lip.

Q.    Would you recognize those pictures if we showed them?

A.    I'm sorry, what?

Q.    Would you recognize those pictures if we throw them up on the screen?

A.    Yes.

Q.    I want to show this one here:  Do you recognize that photograph?

A.    Yes.

Q.    And if we look at this picture, what are we looking at?

A.    My busted lip.

Q.    If I can get -- so, we see injuries there around your mouth.

A.    Mm-hmm.

Q.    Okay.  How did that happen?

A.    He hit me in the mouth.

Q. He hit you in the mouth. Can you describe that a little more?

A. That's it.

Q. So, I want to make sure -- and I want to be clear here. Everything we say is being recorded and being written down. So, when you -- when you do that --

A. Sorry, it's hard to say.

Q. That's okay.

A. He hit me with his hand in the mouth.

Q. So, you -- you -- just a second ago, you picked up your -- your right arm, and you moved it across in sort of a slapping motion.

A. It was kind of the backhand; he was extremely intoxicated at this point.

Q. Okay. So, he slapped you across the face.

A. Yes.

Q. Did he -- you said he hurt your arm as well.

A. Yeah.

Q. Did you take a picture of that?

A. I've -- yes.

Q. Well, let me show you a picture of that here if you can see that. Is that the picture that you took that night?

A. Yes.

Q. And if we look at the projection screen, it

may be a little tougher to see.  But I want you to take a look here on the screen, the TV screen.  Can you see an injury on your arm there?

A.    Yes.

Q.    Okay.  Can you see your face in this picture, too?

A.    Yes.

Q.    Is it sort of red and puffy?

A.    Yeah.

Q.    Tell me about what you were thinking that night.

A.    I'm scared, I don't know if he's going to come back, I'm embarrassed.  I just get -- like, this guilt and shame over me like I did something wrong; I want to fix it.

Q.    You said he was going to come back.  Was he gone at this point?

A.    He's gone at this point, yeah.

Q.    Okay.

A.    I'm afraid he's going to come back.

Q.    What were you afraid he was going to do if he came back?

A.    This, again.

Q.    Hit you again?

A.    Yes, or worse.

Case 3:24-cv-01121    Document 111-1    Filed 08/12/26    Page 125 of 314 PageID #: 2286

Q.   Okay.  And was that consistent with your relationship up until that point?

A.   In this moment, yes.

Q.   Okay.

GEN. EVANS:  Your Honor, the State would ask to introduce those two photographs as the next numbered exhibit as a collective exhibit.

THE COURT:  Any objection?

MR. BURLISON:  No, Your Honor.

GEN. EVANS:  Those are photographs from 7/17/22.

THE COURT:  Alright.  Exhibit 8 will be the collective two photographs from 7/17 of '22.

(Exhibit 8 was marked.)

BY GEN. EVANS:

Q.   Tell me about the time between July of '22 and October of '22.  Did anything happen there?

A.   Uh...

Q.   Was it just more of the same?

A.   Correct.  But I'm not -- the police aren't involved at this point.

Q.   Okay.  So, were there ever any times when he assaulted you that you did not record?

A.   Yes.

Q.   Did he -- what about times that you didn't

take pictures?

A.   Multiple times.

Q.   What about times when you didn't call the police?

A.   Multiple times.

Q.   Why not?

A.   Because I was scared when he came back, I was scared he'd get mad, I was scared if I could fix it.

Q.   When you called the police the first time, what happened?

A.   Well, they don't do anything.

Q.   They didn't help you.

A.   Correct.

Q.   Okay, okay.  I want to move on to October 7th of 2022.  Do you remember that day?

A.   Yes.

Q.   Okay.  Tell me, how did that day -- what do you remember about that day?

A.   This is the day my daughter entered a soc -- a horseback-riding competition.  And he's sending me texts that he's hanging out with the police, no one's going to believe me if I ever go to them.

Q.   Okay.  So, he was messaging you at that point.

A.   Correct.

Q. Had anything happened to the best of your knowledge that day? Did he often text you out of the blue for no reason just with these sort of abusive texts?

A. Yes.

Q. He did, okay. If I show you photographs of these text messages, would you recognize them?

A. Yes.

Q. Okay. I want you to take a look at this one here on the screen; I want to walk through the picture. Before we actually get to the text and the picture itself, tell me, is this a screenshot that you took?

A. This is a screenshot of a text he sent me, correct.

Q. Of a text that he sent you. So, this is your phone?

A. Yeah. Yeah.

Q. So, when we look at the top, it says, Robert work phone.

A. Correct.

Q. And does it -- is that your -- the contact information for the number that he usually messaged you from?

A. Yes.

Q. Okay, and then the -- the screenshot. You

*BRIGGS & ASSOCIATES 615-482-0037*

remember taking the screenshot?

A.    Yeah.

Q.    This is an accurate depiction of the texts?

A.    Yes.

GEN. EVANS:  Your Honor, the State would ask that -- the State would ask that the next three text messages go in as a collective exhibit, so I'm going to do that at the end when we finish on these ones.

BY GEN. EVANS:

Q.    Tell me, what -- can I get you to, if it's okay with you, can I get you to read the text message that's there on the screen?

A.    Sure.  It says, You crazy little bitch, I am not listening to -- or, to Megan, or David, or anybody. I have real people, real friends.  If you really want to go down this route, let's fucking go and see who wins it.

Q.    And what's below that?

A.    A picture of a cop.

Q.    Is it one cop?

A.    Three.  I see three, yes.

Q.    I'm going to have General Dungan sort of zoom in here.  We've got -- is that one police officer on the right?  And then, a police officer dead center and a police officer to the left?

A.    Mm-hmm, yeah.

Q.    So, three police officers?

A.    Yep.

Q.    How did you perceive this?

A.    It's -- it was -- it's terrifying.

Q.    Why?

A.    Because it -- it feels like no one would ever listen to me or -- like, I would end up in trouble, or -- or if I did ever report it that no one's going to listen to me; he's going to come back and hurt me.

Q.    Why would nobody listen?

A.    This seems like -- like what he's -- I'm listening to him at this point; and it just seemed like they're on his side, not mine.

Q.    And when you say they're on his side, who are they?

A.    Like, the police, yes.

Q.    Okay.  So, you took this as him sending you this message as a threat or as an intimidation.

A.    Yeah.  Like, don't fucking say what ha -- don't say what happens, like --

Q.    Because --

A.    Because no one's going to listen to you.

Q.    Okay.  Let me take a look at the next text message we have here.  And this one is -- is this one

just text? Is there a photograph here? I know it seems like I'm asking you dumb questions, but I'm trying.

A. Oh, no. It's just text.

Q. Just text, okay. Now, what is this -- is this the -- again, from the same -- same contact?

A. About, yeah. I'm saying -- yeah. I'm saying that, You're hurting me, it's not okay. And again, saying, Cops are involved, this game just got fucking escalated. Good luck, kid. Let's fucking escalate this.

Q. And then, what did you say after that?

A. I'm blocking you, leave me alone.

Q. Did you say, Leave me alone?

A. Yes.

Q. Okay. You sent a screenshot back to him. Is that what that is?

A. Yeah. It was a text message between my mother and sister that -- they're concerned at this point because he's also harassing them.

Q. To the best of your knowledge, what had they done?

A. So, at this point, they called the Spring Hill Police because they're terrified, and they get a no-contact.

Q. So, they -- okay. What is the last piece

there at the bottom of the screen say?

A.    Tell your sisters not to fuck with me.  Let's play ball.

Q.    When you say, Let's play ball, what did you think that meant?

A.    It's kind of how he kind of talks.  So, to me, that's like, Don't threaten me:  Don't play with me, or else.

Q.    Is it -- like, fair to say something's about to go down.

A.    Yeah.

Q.    Okay.

A.    It's a good th -- it's a threat.

Q.    Okay.  And was that consistent with his -- his pattern of behaviour up until that point?

A.    Correct.  Correct.

Q.    Okay.  So, at this point previously, we've -- we've now been talking for about a two-and-a-half month -- sorry, three-and-a -- three-month period.  Was this sort of what you got after -- after July of 2022?

A.    Yes.

Q.    The same kind of -- the same kind of stuff.

A.    Mm-hmm.

Q.    Was it always in text messages?

A.    Usually, that was the way the threats came

about, if not verbally.

Q. You said, If not verbally?

A. Yeah.

Q. So, a lot -- was some of it verbal?

A. Yes.

Q. Okay. So, this day, were you afraid?

A. Yes, and my family was too.

Q. What happened next?

A. My sisters --

Q. You said you -- they got a no-contact or trespass order.

A. Yep, and then he keeps going.

Q. He kept going?

A. Yeah.

Q. Did he send you more texts?

A. Yep.

Q. Let me take a look at the next text.

GEN. EVANS: And Your Honor, I apologize. The -- the reference guide that I have there for you has only two photographs listed, there is a third; this is the third. So, Ms. Mishkin, let me get you to read this one; and you can censor yourself if you would like to, I know there's a lot here.

A. Okay. No, you're being a -- like a pain in the ass. Well, if you want to see who doesn't give a

fuck more, I'm probably not the person to be fucking -- to fucking challenge. I said, Okay. He said, Have fun you little cunt when there's no TV in the house because I'm going to break every motherfucking one of them, and I'm dead serious. Erin, I spent three hours with the police department. These guys are friends. They're not -- there's not been one complaint, nor can somebody call and make a complaint on some bullshit. So, I'm not even worried about it. And the cops are on my side, not yours. Just get that fucking clear. I smoke cigars with these guys everyday, every fucking day year round. And they know me, and I know them. Fuck off.

Q. The cops are on my side, not yours. Just get that fucking clear.

A. Correct.

Q. How did you take that?

A. It's terrifying.

Q. What did it mean to you?

A. To me, that would mean that no one's going to listen to me, and I'm not safe even if I were to go say something.

Q. Did the police -- had the police helped you up until this point?

A. They had been to the house a few times. This weekend, I believe, I called them a few times; again,

they recommend an order of protection.

Q.   We heard a discussion earlier about an arrest.

A.   Correct.

Q.   And I don't want to get into the expungement, the dismissal, all of that stuff.  But I do want to ask, when did that event happen?

A.   This all happened right around this weekend.

Q.   Right around this time.

A.   If not that night.

Q.   Okay.  Did you hit Mr. Gordon that day?

A.   No.

Q.   Did you abuse Mr. Gordon that day?

A.   No.

Q.   Did you assault him that day?

A.   No.

Q.   Did you make him -- did you make him fearful that day?

A.   No.

Q.   Did you intend to make him fearful that day?

A.   No, never.

Q.   Did he -- did he hurt you the day that you -- that event that we're talking about?

A.   Not physically that particular day.

Q.   Did he make you --

A.    Fearful, yes.

Q.    He did make you fearful?

A.    Correct.  So, I -- this day, I called the police a few times.

Q.    Did he -- so, when you say he made you fearful, what did he make you fearful of?

A.    That no one would listen to me, or I'd continue to get hurt, or he would hurt me if I said something, or --

Q.    Had he threatened anybody else at that point?

A.    Besides my sister, mother, and ex-husband?

Q.    So, at this point, he has threatened -- and this is in October of 2022, he has threatened you, your sister who's -- and what's your sister's name?

A.    Emily.

Q.    Emily.  He has threatened your mother.  And what's her name?

A.    Her name is Eileen.

Q.    And he has threatened your ex-husband who's name is David Mishkin?

A.    Yes, sir.

Q.    Okay, okay.  I want to move on into November if we can.  So, in November, do you remember -- do you remember calling the police in November of 2022 -- November 29th of 2022?

Case 3:24-cv-01121    Document 111-1    Filed 08/12/26    Page 136 of 314 PageID #: 2297

A. Yes.

Q. And do you remember how that first came about?

A. Yes. The night before -- again, I believe he goes to treatment the summer in between here.

Q. So, I want to make sure we're -- we're clear on our dates. So, you're saying on November the 28th?

A. Yep.

Q. Okay. So, on November the 28th, what happened?

A. So, on the 28th, he's wasted; he's angry about a remote is usually the fight. He drags me by my hair up and down the stairs multiple times, breaks my toe, slams my head into a cabinet, breaks my cell phone, my computer, corners me in my room, tries to smother me, says someone's after me.

Q. Did he punch you?

A. Multiple times.

Q. Did he punch you in the head?

A. Yes.

Q. Did he punch you in your back?

A. Yes.

Q. Was that while you were on the ground?

A. Yes.

Q. Okay. At that -- did you have your phone on

138

you that day?

A. The next day.

Q. I'm sorry, the next day?

A. The next day, the same thing happens again. He comes back, multiple -- I had contacted a lawyer at that point.

Q. Who's the la -- a lawyer, you said?

A. Yeah.

Q. Okay.

A. So, it keeps happening. He comes back, the same thing's about to start; and I have my son's phone, and he's starting again.

Q. So, when you say starting, what is he starting?

A. Screaming, I'm going to die. Like, someone's going to come get me, they were going to hurt me. I better watch out, bitch.

Q. Did he hit you that day?

A. Yes.

Q. Did he drag you by your hair that day?

A. Yes.

Q. Did he punch you that day?

A. Yes, on the living room floor.

Q. On the living room floor?

A. Yeah.

*BRIGGS & ASSOCIATES 615-482-0037*

Q.     Okay.  And you said that you had some videos from that day?

A.     Yep.

Q.     Would you recognize those if I showed them to you?

A.     Yes.

Q.     Okay.  Let me pull up the first one.

GEN. EVANS:  Your Honor, at this time, the State's going to ask to admit the text messages that are on the screen along with the previous two as the State's next collective exhibit.  And those text messages are from October 7th of 2022.

THE COURT:  Any objection?

MR. BURLISON:  No.

GEN. EVANS:  We just heard a little bit of audio.  Can you identify what's on the screen there?

THE COURT:  Hold on one second.  So, Exhibit 9 will be the three text messages, screenshots, from October 7th of '22.

GEN. EVANS:  That's correct.

(Exhibit 9 was marked.)

BY GEN. EVANS:

Q.     So, Erin, what are we looking at here?  Is that your floor?

A.     Yep.  This is -- like, the walkway to my

kitchen floor.

Q. And you just heard a little bit of the audio. Is that -- have you seen this video before?

A. Yes.

Q. Did you make this video?

A. Yep.

Q. And is it a fair depiction of what happened that day?

A. Yes.

Q. We're going to go ahead and play this one.

(Whereupon, the video was played.)

BY GEN. EVANS:

Q. Why were you recording?

A. I'm terrified. I want to get out.

Q. You said you want to get out when -- do you mean you want to get out of the house?

A. Yeah. I want -- I feel like I'm going to get hurt again; and at this point, I'm -- like, fearful he's going to be too intoxicated and kill me or something.

Q. At that point when you made that video, had he already dragged you by you by your hair and hit you?

A. The night before and that day.

Q. Okay. Did you make any other videos that night?

A. Yes.

Q.    Let me ask you to take a look at the next one.

(Whereupon, the video was played.)

BY GEN. EVANS:

Q.    So, I think we went -- reverted back to the first one there.  That video is about fourteen seconds and it's you screaming.  Is that right?

A.    Yes.

Q.    What's going on?

A.    He's trying to come after me again.

Q.    How did you know that?

A.    Because he's running after me.

Q.    Has he done that before?

A.    Yes, and then I run.  It was raining really bad that day, and I run to the Mapco -- like, right across the street.

Q.    So, you ran out of the house?  And then, what did you do?

A.    Somehow, the -- someone called 9-1-1.

Q.    Okay.  And I think we may have taken it out of order here, but was there another video?

A.    Yes.

Q.    Did he threaten to kill you that night?

A.    Yeah.

Q.    We'll take a look at another video.

A.    Yeah.

Q.    Erin, do you recognize this one?

A.    Yep.

Q.    And is this another video from that night?

A.    Yep.  This is at the very beginning, yeah.

Q.    Is it a fair -- I'm sorry?

A.    This is at the beginning of all this.

Q.    This is the first part?  Okay.  So, is this a fair and accurate depiction of the events that night?

A.    Yep.

Q.    Well, let's go ahead and play this one and see what it says -- see what it shows.

(Whereupon, the video was played.)

BY GEN. EVANS:

Q.    So, this is how the night started?

A.    Yeah.

GEN. EVANS:  If I can get -- General, if you would play from minute 1:00 to 1:15?  Again, you may have to reopen the video.

(Whereupon, the video was played.)

BY GEN. EVANS:

Q.    Erin, what did he tell you that day?

A.    So, here, he's threatening to put me back in jail.  He had gone to my ex-husband's house to threaten him.

Q. Did he say, I will go to jail for your murder?

A. For -- murder me.

Q. Did he say, That should scare you?

A. Correct, and it does.

Q. Did it scare you?

A. Yes.

Q. Why?

A. Because I firmly believed that.

Q. You believed he would kill you?

A. Mm-hmm.

Q. Had he ever hurt you in a way that made you feel that way before?

A. Yes.

GEN. EVANS: Your Honor, the State would ask to introduce those three video clips as the next collective exhibit; and those are videos from November the 29th, 2022.

THE COURT: Any objection?

MR. BURLISON: No, Your Honor.

THE COURT: So, Exhibit 10 will be late filed: Three videos from November the 29th, 2022 late filed on the same USB drive.

(Exhibit 10 was marked.)

BY GEN. EVANS:

Q. Tell me what happened after the police were called.

A. They come to me at the gas station that night.

Q. So, did you run?

A. Yep.

Q. You left the house and went to a gas station?

A. Correct. I had no shoes on, it's raining, I went to the gas station.

Q. You said with no shoes on?

A. Yeah. It's like right across from my house, the gas station.

Q. About how far? How long did it take you to run there?

A. Like, three minutes.

Q. Three minutes?

A. It's like right across the street.

Q. Okay.

A. An ambulance comes, I'm worried about -- again, like what's going to happen. Is he coming back to the house? If I go back to the house, is he going to be there? I believe he gets arrested that day -- or next day.

Q. He was arrested, but based on that incident?

A. Yep.

Q.   Okay.  When you were talking to the police, did they get any photographs of you?  Do you know?

A.   I believe it was my face.

Q.   They might have taken some pictures?

A.   Yeah.

Q.   If I showed you one of those pictures, would you recognize it?

A.   Yeah.

Q.   This may not be the photograph that the police took; this may be a photograph that you took of your injuries later.  Is that right?

A.   Yeah, that's two days later.

Q.   Okay.  And let me -- walk me through here.  I want to start at the top and work my way down.  We're looking just to the right of your eye.  Is this you?

A.   Yes.

Q.   Well, -- just the right of your eye, what do we see there?

A.   A cut.

Q.   A cut.  What about above that?

A.   Bruising.

Q.   Bruising.  What about over by your ear?

A.   Another cut.

Q.   Another cut and more bruising?

A.   Yeah.

Q.   What about down on your cheek?

A.   Bruising.

Q.   And were those the injuries -- who caused those injuries?

A.   Mr. Gordon.

Q.   Mr. Gordon?

THE COURT:  And you do have to answer out loud.

BY GEN. EVANS:

A.   Mr. -- sorry, Mr. Cole Gordon.

Q.   Okay.  And you're calling him Cole.  He's listed in our case as Robert.  Is he -- is that the same person?

A.   Yes.

Q.   Okay.

GEN. EVANS:  Your Honor, the State would ask to introduce the photograph as the next numbered exhibit.

THE COURT:  Objection?

MR. BURLISON:  No, Your Honor.

BY GEN. EVANS:

Q.   What happened -- you said that the police came and that he was arrested.  Did you do anything that night or immediately after because of this event?

A.   Oh, I get an order of prot -- I go and get an

order of protection.

Q. Okay. Why did you get an order of protection?

A. I was scared.

Q. Why were you afraid?

A. And I thought he was going to come back.

Q. You thought he would come back to your house?

A. Correct. And I finally had called the police. And I was afraid what he was going to do.

Q. Did you think he might follow through on those threats?

A. Yep.

Q. That he might go to jail for your murder?

A. Yep.

Q. Okay. Are you aware of whether or not Mr. Gordon was released from jail?

A. He was released.

Q. Do you know if there were bond conditions that were put in place at that time?

A. I believe it was that we couldn't talk, but he was released very quickly.

Q. You say very quickly. Do you know how long?

A. It might have been that night.

Q. Might of been that night?

A. Or day after.

Q. And for the record, Exhibit 11 will be the photograph of Ms. Mishkin with the facial injuries late filed on the USB.

(Exhibit 11 was marked.)

BY GEN. EVANS:

Q. So, if I threw up the copy of the order of protection up on the screen, would you recognize that?

A. Yes.

Q. Okay. What happened to the order of protection? Did you dismiss the order of protection?

A. I ended up dismissing it.

Q. Can you tell me why?

A. Again, I'm stuck in a cycle of abuse, I love him, I'm --

Q. So, let's back up for a second because you've said that --

MR. BURLISON: Your Honor, could he let her answer the question?

THE COURT: You can finish your answer. You said you were --

BY GEN. EVANS:

A. I end up dismissing it because I'm stuck in the cycle of abuse, I love him, I think he's going to get better.

Q. So, let me ask you that, because you've said

a bunch of times today -- you've talked about this cycle of abuse.

A.    Mm-hmm.

Q.    What -- without going into what you've sort of learned from a therapist or learned about this cycle, tell me, what happens to you on a regular basis?  What is your cycle?

A.    With Cole, it was just you love him, you want him to get better, you blame yourself.  It's almost like wishful thinking:  It's going to get better.  And then, he says he's going to get better; and then, it just quickly just circles, and circles, and circles, and circles.

Q.    So, is it sort of he -- he hurts you, you're upset, you go back to him, he hurts you, you're upset, you go back to him?

A.    Correct.

Q.    And I know it's more complicated than that, but is that a --

A.    Yeah, about the gist.

Q.    Did Mr. Gordon ask you to dismiss the order of protection?

A.    I'm sure, but I -- ultimately, I did it.

Q.    Sure.  But did he ask you to do it?

A.    I believe so, yes.

Q.    Okay.

GEN. EVANS:  And let me pass up -- actually, I'm not going to pass these up to the witness.  Your Honor, I'm going to ask that these be introduced -- I'm going to pass them up to the Court -- I'm sorry -- pass these up to the Court and ask that these be admitted as the next numbered exhibit.  These are the bond conditions initiated for Mr. Robert Cole Gordon as a result of an arrest in Franklin Police Department case 2022-004279 that eventually became docket number B-CR230248.  These are a certified copy of the bond conditions stemming from the general sessions court that have been retrieved from the circuit court.

THE COURT:  Thank you.  And I do note that they -- there is a certificate from the court clerk. Any objection to this?

MR. BURLISON:  One moment, Your Honor.  No, Your Honor.

THE COURT:  Alright.  So, Exhibit 12 will be the bond conditions dated November 30th, 2022.

(Exhibit 12 was marked.)

BY GEN. EVANS:

Q.    You said he was released from custody.

A.    Yes, sir.

Q.    What did -- did you know what the bond

conditions were at that point?

A. I believe so; I just knew we weren't supposed to talk.

Q. You knew you were not supposed to talk?

A. Correct.

Q. Did he talk to you?

A. Yes.

Q. Did he try to reach out to you a couple of different times?

A. Yes.

Q. Okay. Why did you keep talking to him?

A. Again, I -- I loved him, it was just a lot of guilt and shame.

Q. Had you ever not talked to him before?

A. Unless he was at treatment, no.

Q. Okay. Had you ever sort of tried to distance yourself or tried to ignore him before?

A. No.

Q. Okay. Why not?

A. Again, I was afraid, I loved him. You know, you keep thinking it's going to get better and it just doesn't.

Q. Did it get better?

A. No.

Q. Did it ever get better?

A.    No.

Q.    I want to go on now through -- into 2023, and I want to talk about what happened in February of 2023. Do you remember an event in February?

A.    Yes.

Q.    At this point, was Mr. Gordon still on bond for the event that we just talked about?

A.    I don't recall specifically.

Q.    You don't remember exactly?

A.    Yes.

Q.    Okay.

A.    There was a lot of them.

Q.    But if those bond conditions that were entered are valid, then -- then he would of been; fair?

A.    Yes.

Q.    Okay.  Did police show up at your house that day in -- on February 23rd of 2023?

A.    Yes.

Q.    Do you remember that?

A.    Yes.

Q.    How did -- how did that night happen?

A.    We had gotten into an argument, it was late at night, I went to sleep --

Q.    So, let me -- let's back up.  Where was -- where were you?

A.    In my hou -- home.

Q.    And where was Mr. Gordon?

A.    I have no idea.

Q.    So, when you say you had an argument, how did you have an argument?

A.    On the phone.

Q.    On a call, on a text?

A.    Yeah.

Q.    On a call.

A.    Call, yeah.

Q.    Okay.  And you said that you got into an argument.

A.    Mm-hmm.

Q.    And then, what happened?

A.    I'm -- I wake up, and he is -- it's pitch dark, and he's on top of me hitting me.  I role onto my bathroom floor which is -- like, right by my --

Q.    So, I'm going to back you up here because I want -- I want to make sure we're clear on what was going on.

A.    Yeah.

Q.    You woke up in the middle of the night --

A.    Pitch dark.

Q.    -- in your house?

A.    Yes.

Q.   And there was somebody on top of you?

A.   Correct.

Q.   And that person, you are able to identify, was Mr. Gordon?

A.   Correct.

Q.   You said that you were asleep.  Do you lock your door?

A.   I do now.

Q.   You do now?

A.   It was not.  The --

Q.   It was not locked that day?

A.   Yeah.

Q.   Okay.  So, you said you woke up and he was on top on you?

A.   Correct.

Q.   So, what --

A.   Like, middle of the night, pitch dark.

Q.   What is the first thing you remember?

A.   He's on top of me.  And then, I just immediately role to the ground.  And then, I'm -- like, at --

Q.   You said out of your bed, onto the floor?

A.   Yeah.

Q.   Okay.

A.   Punched in the stomach.

Q. Your said he punched you in the stomach?

A. Yeah. And then, I'm on the floor -- like, kind of making it stop; and then, he leaves.

Q. You're on the floor trying to make it stop. How are you trying to make it stop?

A. Like, I'm -- like, on the floor.

Q. Like, curled in the fetal position?

A. Yeah, yeah. Yes, sir.

Q. Okay. And where was that?

A. In my bathroom.

Q. So, you had crawled from the side of your bed into the bathroom?

A. Mm-hmm.

Q. How far is that?

A. Not too far.

Q. Ten feet?

A. Yeah.

Q. Okay. And at that point, did he follow you into the bathroom?

A. Yeah. He's on top of me in the bathroom, but then he leaves; he just leaves.

Q. So, did he hurt you in the bathroom?

A. Yes.

Q. What did he do in the bathroom?

A. That's when the -- I got punched in the

stomach, and my face is on the floor; and like I said, he leaves. And then, luckily, I had my car keys there, and I just pushed the alarm over and over again.

Q. When you were in the bathroom, what's on the floor in your bathroom?

A. Tile.

Q. Tile. Did he do anything with your face?

A. Yeah. I said pushing my face on the floor.

Q. You say pushing your face. Was he sort of pushing?

A. Like, hitting -- like, hitting my head on the floor.

Q. Like, slamming it into the floor?

A. Yeah, yeah.

Q. Okay. After that, you said he disappeared?

A. Mm-hmm, he leaves.

Q. Did you have your phone that night?

A. And he took -- and he takes my phone.

Q. So, did you ha -- do you know you had your phone that night?

A. Yeah, I had --

Q. And then, did you look for your phone afterwards?

A. Yes, after he leaves; and it's gone.

Q. Okay. So, what happened to your phone?

*BRIGGS & ASSOCIATES 615-482-0037*

A.    He took it.

MR. BURLISON:  Objection, Your Honor.

THE COURT:  What's the objection? Speculation?

MR. BURLISON:  Yeah, cause for speculation unless she has basis of knowledge.

THE COURT:  What's your response to that, Mr Evans?

GEN. EVANS:  Your Honor, Ms. Mishkin can testify where her phone wound up.  She knows where her phone ended up, and the State would proffer --

MR. BURLISON:  But -- but where her phone ended up is based on hear -- her learning it through hearsay.

GEN. EVANS:  Not it's not, Your Honor.

THE COURT:  I'll -- we'll go down that path.

BY GEN. EVANS:

Q.    Did you eventually get your phone back?

A.    Yes.

Q.    Where did you get your phone from?

A.    The police bring it back to me.

Q.    The police brought your phone back?

A.    Brings it back to me, yes.

Q.    Did you ever give your phone to the police?

A.    No.

Q. Did you ever give your phone to anybody else?

A. No.

Q. Did you have your phone with you when you went to sleep?

A. Yes.

Q. And the next time you saw it after you woke up was when?

A. The -- the police officer when they made the report.

Q. When -- when the police officer handed it back to you.

A. Yeah, he comes back. Yeah.

Q. Okay.

A. And he said, Is this your phone? I had to identify him.

MR. BURLISON: Objection, Your Honor.

THE COURT: Sustained.

BY GEN. EVANS:

Q. Do you know if officers took photographs of your injuries that night?

A. Yes.

Q. Would you recognize those photographs?

A. Yeah.

Q. I'm going to throw those up on the screen for you to get you to take a look at them. This first one,

Case 3:24-cv-01121    Document 111-1    Filed 08/12/26    Page 158 of 314 PageID #: 2319

walk me through what we're looking at here.

A.    There's a cut on my head.

Q.    So, I want -- let's -- let's kind of do what we did before top to bottom.  So, we're -- you see there's a cut on your head; and then, I want to look down near your eye.  What do you see in there?

A.    I got a bruise on my eye, swollen.

Q.    Swollen?  Is it -- like, dark or black?

A.    Yes, my eye is dark and swollen.

Q.    Okay.

A.    There was a cut on my head.

Q.    Is that a shadow or makeup?

A.    No.

Q.    Pull down on the picture just a little bit and take a look.  Is there -- or I'm sorry, the other way.  Is there any other injury on this photograph that you can see?

A.    My cheek looks very red.

Q.    Your cheek, okay.  And where did that come from?

A.    My face on the tile.

Q.    Your face being slammed into the tile?

A.    Correct.

Q.    Okay.  Was there another photograph that law enforcement took that night?

A.   Yes.

Q.   Maybe, it shows kind of the same thing?  Do you recognize this one?  Do you recognize that one?

A.   Yeah.

Q.   And is that the -- sort of show substantially the same injuries?

A.   Yes.

Q.   Are those fair and accurate depictur -- depictions of your injuries from that night?

A.   Yes.

GEN. EVANS:  Your Honor, the State would ask that these two photographs be admitted as the next numbered exhibit.

THE COURT:  Any objection, Mr. Burlison?

MR. BURLISON:  No, Your Honor.

GEN. EVANS:  These are from February the 23rd, 2023 for the record.

THE COURT:  So, Exhibit 13 will be the two photographs collective from 2/23 of '23.

(Exhibit 13  was marked.)

BY GEN. EVANS:

Q.   So, Erin, you said you got your phone back. Was that from Officer Corner with the Franklin Police Department?

A.   I believe that was his name.

Q.    And when he brought you your phone back, did you get to look at it?

A.    Yeah, I had to identify that it was my phone.

Q.    How do you know it was your phone?

A.    Because I was able to turn it on.

Q.    You were able to -- how do you turn your phone on?

A.    With a passcode.

Q.    You were able to log in with a passcode?

A.    Yeah.

Q.    Was it the same kind of phone?

A.    Yeah.

Q.    Was it a black iPhone?

A.    Yeah.

Q.    Okay.  Did it have your -- your wallpaper, your lock screen on it?

A.    Yes.

Q.    And did it have all your text messages in it?

A.    Yep.

Q.    Did it have any unread text messages?

A.    Yeah.  A text pops up, and it says, You better pray or --

Q.    Would you recognize that text if you saw it?

A.    Yeah.

Q.    What is this?

A.    That is the text.

Q.    That's the text.  And down there, at the bottom --

A.    Yeah, You should start praying.

Q.    So, did you take this screenshot?

A.    Yeah.

Q.    And who was this text message from based on your -- how your understanding?

A.    Cole.

Q.    And is that -- you can tell that based on what's up at the top?

A.    Yes.

Q.    Does it have a time above it?

A.    10:56.

Q.    It says, Yesterday.  So, would this -- when you took this screenshot, was this on February the 23rd or February the 24th?

A.    I had to send it to the police.

Q.    Okay.

A.    So, that's what --

Q.    Tell me about -- and this is going to be, kind of, a little out of order.  But tell me, you said you got your phone back from -- from Officer Corner.

A.    Mm-hmm.

Q.    What happened before that?  Did you go to

sleep again?

A. No, I was --

Q. Did -- well, did Officer Corner wake you up to bring your phone back?

A. Yeah, he -- it was in the middle of the night. I was upstairs, but I'm afra -- I didn't know where Cole is at this time. I don't know if he's going to come back and get me again or -- like, where he is or...

Q. So, at that point, you were hiding?

A. Yeah.

Q. Why?

A. Because I don't know where he is, I don't know what he's going to do.

Q. What did you think he might do?

A. He just attacked me. The same thing, but worse.

Q. The same thing, but worse? Did you ever think on these days, and sort of all of these days, did you keep thinking about those things that he had told you?

A. That he's going to murder me if I got help?

Q. Yeah.

A. Yes.

Q. Anything else?

A.    That was pretty much the big one.

Q.    That's the big one?

A.    Yeah.

Q.    Okay.  Had he -- we heard the -- the call where he said that -- or the video recording where he said that earlier.  Was that the first time he had ever told you he was going to kill you?

A.    No.

Q.    How often did that happen?

A.    It was -- like, usually it was -- like, an anger threat.  Like, I'm going to kill you:  I want you dead.

Q.    Okay.  Did he ever go into more detail than that?  Did he ever say he was going to slit your throat?

A.    Yes, I think.

Q.    Okay.

A.    I think you heard him say that.

Q.    Yeah.

A.    Yeah.

Q.    Do you know if Mr. Gordon was arrested as a result of what happened that night?

A.    Yes.

Q.    He was?

A.    He was.

Q.    Okay.  And do you know if he posted bond?

A. Yes.

GEN. EVANS: Your Honor, the State's going to pass up another copy. These are the bond conditions stemming from the Franklin arrest in case number 23 -- or 2023-000954 which would later become circuit court case number B-CR230267.

THE COURT: Thank you. I do have a certified -- a copy with a court clerk certification that purports to be an order granting bail for abuse cases that was entered on March the 20th of 2023.

GEN. EVANS: I'm sorry, Your Honor, I think that may be the wrong -- the wrong document. I think we need -- there was another one, and Your Honor can -- can hold onto that one; we're going to come back to that one in a second. This one is for Franklin Police Department case number 2023-000649 which would later become circuit court case number B-CR230266.

THE COURT: Alright. And I am in receipt of a document with the certification from the circuit court clerk that purports to be an order granting bail for abuse cases State of Tennessee versus Robert Cole Gordon that was dated February the 23rd of '23.

GEN. EVANS: The State would ask to admit that as the next numbered exhibit.

THE COURT: Any objection?

MR. BURLISON: No, Your Honor.

THE COURT: So, Exhibit 14 will be the 2/23/23 bond condition order.

(Exhibit 14 was marked.)

GEN. EVANS: Your Honor, the State would also ask to introduce that text message that's on the screen as the next numbered exhibit. And that text message is the text message that was sent on 2/23/23, received on 2/24/23.

THE COURT: Any objection?

MR. BURLISON: No, Your Honor.

THE COURT: So, Exhibit 15 will be the late-filed text message sent -- or received 2/24/23 late filed on the USB as Exhibit 15.

(Exhibit 15 was marked.)

GEN. EVANS: Your Honor, can I just ask, do -- as far as Your Honor's tracking, is Exhibit 23 the injuries from 2/23/23?

THE COURT: Exhibit 23?

GEN. EVANS: Exhibit 13, sorry. '

THE COURT: Exhibit 13 are the two photographs --

GEN. EVANS: Okay.

THE COURT: -- of 2/23/23.

GEN. EVANS: Just making sure I got all my

Case 3:24-cv-01121    Document 111-1    Filed 08/12/26    Page 166 of 314 PageID #: 2327

pieces here.

BY GEN. EVANS:

Q.    So, after February 23rd/24th of 2023, you were aware that Mr. Gordon was arrested.

A.    Correct.

Q.    Was he released from custody?

A.    Yes.

Q.    And did -- were you aware that he was not allowed to contact you?

A.    Yes.

Q.    Did he contact you?

A.    Yes.

Q.    Did you continue to talk to him?

A.    Yes.

Q.    Why?

A.    Same thing:  I'm scared of him, he got out that night, I didn't feel like there was any consequences of what he kept doing, I still love him, I'm hoping that it'll get better.

Q.    What did you think he was going to do to you?

A.    Kill.

Q.    Okay.  Did you continue to have contact with him between February of '23 and March of '23?

A.    Yes.

Q.    Did you have -- were you assaulted again in

March of 2023?

A.   Yes.

Q.   Can you tell me about that?  And that one's a little complicated; let's start at the very beginning of this one.  How did you first get, sort of -- how did you come around Mr. Gordon that day?

A.   That day was my birthday.  We go out to dinner, he -- a friend is there and is -- like, noticing that he's kicking me under the table, we go back to the hotel room, --

Q.   So, you say he was kicking you under the table.  Where was that?

A.   At a restaurant.

Q.   At a restaurant.  Was that at Cajun Steamer?

A.   That was at Tony's.

Q.   That was at Tony's?  Okay.  And after you left Tony's, did anything else happen at either Cajun Steamer or Tony's?

A.   Yeah.  He was very drunk, and he bit my ear very hard at Cajun Steamer.

Q.   What happened?

A.   He was angry, and --

Q.   Were you bleeding?

A.   I don't remember.

Q.   You don't remember?

A.    I just felt it was --

Q.    But he bit your ear?  And that was at the restaurant?

A.    At Cajun Steamers, then we go to Tony's.

Q.    And where he kicks your leg.

A.    Yes.

Q.    So, after you left Tony's, where did you go next?

A.    To his hotel room.

Q.    Can we go back to the -- to your leg for just a second?

A.    Mm-hmm.

Q.    Sorry, I'm taking this out of order.  Why did the -- why did you think he was kicking your leg?

A.    We were with another couple, and I think I was saying too much; he didn't like it.

Q.    You said you were saying too much?

A.    Yeah.

Q.    What were you saying?

A.    Just that we had gotten into a fight.  I don't recall the whole conversation.

Q.    Was that behaviour normal for Robert?

A.    Yes.

Q.    It was?

A.    Yeah.

Q. For him to sort of take physical action against you because you said something?

A. Correct.

Q. Okay. Had he ever hurt you like that before?

A. Yes.

Q. Okay. So, you went back to the hotel. Why did you go back to the hotel?

A. Again, I loved him, thought it was going to get better.

Q. Okay. And did he have a hotel room?

A. Yes.

Q. Did he get a hotel room when you got there?

A. I don't recall.

Q. Okay. But at some point, you ended up in a hotel room?

A. Right.

Q. And that was at which hotel? Do you remember?

A. I don't recall.

Q. Was it the Courtyard Marriott Hotel?

A. It was in Cool Springs.

Q. In Cool Springs?

A. Yeah.

Q. A hotel in Cool Springs?

A. Yes.

Q. And the -- so, once you got up to the hotel room, walk me through what happened.

A. This is right before I go to treatment. We're both intoxicated, get into a fight, and he ends up hurting me again; this time, I end up getting choked. He's pushing me on the couch. The only way I can get away is to initiate sex, then I run away. A friend had called 9-1-1 at that point. Again, my phone's smashed: I don't have my phone.

Q. Okay. So, I'm going to back you up to the hotel room. So, you're in the hotel room.

A. Mm-hmm.

Q. And you said that he -- he hit you and did some other stuff. I want you to -- and I know this is painfully slow here, but what happens step by step? Did he hit you first?

A. Yeah, so there's -- like, a bed and a couch. And he hits me against the wall, hits the side of my face.

Q. So, at this point, he's got your face against the wall?

A. Yeah.

Q. And where's his hand?

A. On my face.

Q. His hand is on your face?

A. Yep.

Q. Does he do anything with his other hand?

A. Then, I'm -- like, trying to get away. He ends up choking me, then --

Q. You say choking. Can you describe what you mean by choking?

A. Like, hands on your neck.

Q. So, he put his hand on your throat?

A. Yep.

Q. And was he pinning you still up against the wall?

A. Yeah.

Q. Okay. And what happened after that?

A. I get away; I initiate sex to make it stop.

Q. Okay. So, before you did that, what were you thinking when he put his hand on your throat?

A. I'm going to die.

Q. Why did you think that?

A. Because it had happened before.

Q. He had -- had he ever strangled you before?

A. He had tried to, but --

Q. Okay. Do you remember anything that you were thinking in that moment?

A. I just -- like, thought of my daughter. I don't know. I just thought -- like, if this is the end,

this is the end.

Q.    Could you breathe?

A.    I mean, I got away.

Q.    But, did you have any difficulty breathing while his hand was on your throat?

A.    Well, yeah.  You start to panic.

Q.    Okay.  So, not only were you hyperventilating, you also were struggling?

A.    Yeah.

Q.    Okay.  At that point, you said that you tried to initiate sex.  Was that something you had done in the past with him?

A.    Yes.

Q.    Why?

A.    Because it gets you out of the situation.

Q.    So, it was a way -- are you saying that it was a way for you to diffuse the situation and -- and put some distance between you and him?

A.    Yes, yes.

Q.    Did it also stop him from hitting you?

A.    Yes.

Q.    So, describe what happened if you can.

A.    I mean, --

Q.    So, you started to initiate sex; and then, did he -- did he sort of back off?

A. Well, yeah.

Q. Okay, and then what happened?

A. Then, as soon as it all stops, I just run out of the room.

Q. So, did you have sex with him, or did you sort of start the --

A. Like, I start to initiate -- like, -- like, oral sex.

Q. Okay. And then, that gives you an opening, and you take off. Where'd you go?

A. To the lobby.

Q. You ran.

A. Mm-hmm.

Q. You ran downstairs.

A. It was a -- we were like on the main level.

Q. Oh, you were already on the main level?

A. Yeah.

Q. Okay. So, you ran out into the lobby. At that point, can you describe your sort of physical appearance? Did you have shoes on?

A. I had no shoes on, I had a -- I was dressed. And the friend who I had called prior to the phone being smashed and whatever, she was worried about me; And so, she was there.

Q. When -- and back up for me. When was the

phone smashed?

A. At some point, that night.

Q. At some point in the night before you got to the hotel?

A. At the hotel.

Q. At the hotel?

A. Yeah.

Q. Okay. You said that this -- this friend showed up. Did you call the police, or did somebody call the police?

A. She had called the police.

Q. And who showed up?

A. The police.

Q. Do you remember Officer Lipinski showing up?

A. Yes.

Q. Do you remember talking to Officer Lipinski?

A. Yes. They took us into the office. And I'm really reluctant to say anything again because I'm afraid of what's going to happen; but I end of saying what happened.

Q. You told them what happened. Did you tell him why -- why this was all happening?

A. Why I was reluctant to say anything?

Q. Mm-hmm.

A. Because I was scared.

Q.    Do you remember specifically why you were scared that night?

A.    Well, I had just been assaulted.

Q.    Okay.  Do you remember what he told you he was going to do?

A.    I don't recall.

Q.    Okay.  Did law enforcement officers take photographs that day?

A.    Yes.

Q.    Would you recognize some of those pictures if we showed them to you?

A.    Yes.

Q.    Let's pull those up here.  So, I want to -- and again, I think it's -- I want you to take a look over on the screen because I think the colors are a little bit better there than they are on the projection. But if I can get General Dungan to zoom in for me, what are we looking at here?

A.    My swollen ankle.

Q.    What did that come from?

A.    I got kicked.

Q.    And was that the --

A.    I was kicked by Cole, yeah.

Q.    Was that the kicking you were talking about at the -- at the restaurant?

A.    Yes, yep.

Q.    And at the point where they took this picture, about -- can you give me a ball park about how long had passed?  Maybe an hour?

A.    It was -- like, a few hours.

Q.    Three hours?

A.    No, like a few hours.

Q.    A few hours?

A.    Yes.

Q.    Okay.  Were there -- I think they took a couple more pictures of your injuries; let me show you another one.  Do you recognize this one?

A.    Yes.

Q.    Okay.  What are we looking at here?

A.    My cheek is red.  My eye looks --

Q.    Is there any sort of bruising around your eye there a little bit?

A.    Yes, yes.

Q.    Okay.  And is there -- I think that law enforcement took one more photograph:  This one's of your neck.  Is that -- are those three pictures a fair and accurate depiction of your injuries from that night?

A.    Yes.

Q.    Get you to zoom in on that one a little bit. Is there any -- it's tough to see, but is there any

injury there?

A.    I mean, it looks red.

Q.    It looks red, okay.  And was that what you remember from that night?

A.    Yes.

Q.    Okay.

GEN. EVANS:  Your Honor, the State's going to ask that those three photographs be introduced as the next numbered exhibit.

THE COURT:  Any objection, Mr. Burlison?

MR. BURLISON:  No, Your Honor.

THE COURT:  So, Exhibit 16 will be the photographs from March -- on or about March 18th of '23 late filed on the USB.

Exhibit 16 was marked.)

BY GEN. EVANS:

Q.    And at this point while you were in the room getting these photographs taken, did you get a chance to talk to another law enforcement officer?

A.    Yes.

Q.    And if we show a photog -- or a video clip, would you recognize you in the hotel room talking to the officer?

A.    Yes.

Q.    Let's go ahead and do that.

(Whereupon, the video was played.)

BY GEN. EVANS:

Q.   Is that a fair and accurate depiction of your conversation with the Franklin Police Department that night, at least one of them?

A.   Correct.  Correct.

GEN. EVANS:  Your Honor, the State would ask that -- actually, we're going to introduce another video clip.

BY GEN. EVANS:

Q.   Can I pull up the other one and have you tell me:  Is this also a fair depiction of your conversation with Franklin Police Department that night?

(Whereupon, the video was played.)

BY GEN. EVANS:

Q.   Fair to say that's what happened that night?

A.   Correct.

GEN. EVANS:  Your Honor, the State's going to ask that those two videos be introduced as the next collective exhibit.

THE COURT:  Mr. Burlison?

MR. BURLISON:  No objection.

THE COURT:  So, Exhibit 17 will be the two body-warn camera videos from 3/18 of '23 collective late filed on the USB.

(Exhibit 17 was marked.)

BY GEN. EVANS:

Q.   Erin, did you stay because you thought it was going to get better?

A.   Yes.

Q.   Did you stay because he told y -- he told you he was sorry?

A.   Yes.

Q.   Did he threaten suicide at any point?

A.   Yes.

Q.   Tell me about that.

A.   I mean, a cou -- a few times, he said that; that was always a worry of mine.

Q.   You were worried:  You didn't want him to kill himself.

A.   Correct.

Q.   Okay.  Did he ask to be forgiven?  Did he ever say sorry?

A.   Of course.

Q.   Was that repeated?

A.   Yes.

Q.   Was that part of that cycle that you were talking about earlier?

A.   Yes.

Q.   Okay.  When -- after that day, are you aware

if Mr. Gordon was arrested that night or shortly thereafter?

A.    I think shortly after.

Q.    Okay.  Do you know if he stayed in jail?

A.    He bonded out, like --

Q.    He bonded out.

A.    -- that night again.

GEN. EVANS:  Your Honor, at this time, the State's going to ask to introduce the document that I passed in error earlier, bond conditions from Franklin Police Department arrest 2023-000954 which became circuit court case number B-CR230267.

THE COURT:  Alright.  The Court is in receipt of the document with an attachment from the court clerk certifying its authenticity.  The State of Tennessee versus Robert Cole Gordon order granting bail for abuse cases; it was issued March the 20th of '23.  Any objection, Mr. Burlison?

MR. BURLISON:  No, Your Honor.

THE COURT:  So, this will be Exhibit No. 18.

(Exhibit 18 was marked.)

BY GEN. EVANS:

Q.    After that event at the hotel in March, were you afraid?

A.    Yes.

Q.    Were you s -- so, tell me what's going through your head at this point.

A.    I mean, it's the same thing.  Like, he's going to get out that day; and no matter what I say or whatever happens, he's going to get out.  I end up getting treatment right after that.

Q.    So, we've talked at least about two arrest where he was taken into custody and got out.  This was a third time that he was arrested --

A.    Correct.

Q.    -- and got out.  Was his bond ever revoked in the general sessions court?

A.    Yes.

Q.    And did you testify at a hearing?

A.    Yes.

Q.    So, based on your understanding, what happened there?

A.    A week later, he got out again.

Q.    So, -- so, the State sought to have his bond revoked; and then, less than ten days later, he's back out on the street.

A.    I believe it.

Q.    What did that do for you?  Did that -- that mess with you at all?

A.    I was terrified.  You don't -- well, right,

you don't know.

Q. Sometimes, you question -- like, what -- why would I even say anything? He's just going to get out anyways; there's no -- I'm going to get hurt anyways: Your safety's concerned.

A. So, at this point, he's been arrested and gotten out, arrested and gotten out, arrested and gotten out, bond revoked and gotten back out.

Q. Mm-hmm.

A. So, -- now, tell me what happened. Did you seek an order of protection in March of 2023 after this event?

Q. Yes.

THE COURT: I'll tell you what, Mr. Evans, before we get into that, let's take our -- our afternoon post-lunch break. We'll be in recess until 3:05.

(Whereupon, the Court observed a recess.)

THE COURT: You may proceed, Mr. Evans.

BY GEN. EVANS:

Q. So, Ms. Mishkin, we were talking about the events at the hotel on March the 18th. After the events there, did you go and seek an order of protection?

A. Yes.

Q. And based on the events that day, we've already entered the bond conditions, were you still

afraid of Mr. Gordon?

A. Yes.

Q. Is that why you got the order of protection?

A. Yes.

Q. That order of protection, was it dismissed?

A. Yes.

Q. Why was it dismissed?

A. I went to treatment.

Q. So, tell me -- so, let me kind of understand what's going on here. So, you -- you seek the order of protection on the 20th of March?

A. Mm-hmm.

Q. Which is a day and a half after the incident.

A. Correct.

Q. And then, the hearing is set ten days later.

A. Correct.

Q. So, follo -- immediately following the incident but before that hearing date, is that when you went to treatment?

A. I went on the 23rd.

Q. You went to treatment on the 23rd.

A. Mm-hmm.

Q. You were not available for the hearing on the 30th.

A. Correct.

Q.   Okay.  So, did you at any point get to testify about that hearing?

A.   No.

Q.   Did you ask that the order of protection be lifted?

A.   Did I ask that what?

Q.   Did it -- did it go away?  Did you -- did it go away because you said it should go away, or did it go away because you never showed up?

A.   It went away because I di -- I didn't go; I was in treatment.

Q.   And so, you had to make a choice in that moment:  I can either go to treatment and try to better myself, or I can show up in court and testify.

A.   To be honest, my sobriety at that moment was -- like, most important.  And I didn't know that if I didn't go it would be lifted, so...

Q.   So, you chose yourself over Mr. Gordon for the first time in the last two years.

A.   Correct.

Q.   Okay.  So, I want to talk now about -- was that the last time you had -- had contact with Mr. Gordon?

A.   No.

Q.   Did you have contact with him in June of

2023?

A. Yes.

Q. Was that at another hotel in Spring Hill?

A. Yes.

Q. So, tell me about that one. How did you first get to the hotel in Spring Hill?

A. I continued to have contact with him; again, I'm stuck in that cycle. He was really sick that summer. There's an incident where I'm trying to go to IOP, he's intoxicated blocking the door, and I get scratched.

Q. Okay. So, let's -- let's kind of walk through that slower. So, you got to the hotel?

A. Mm-hmm.

Q. Why did you go? You said he was sick?

A. He was really ill that summer, yes.

Q. Okay. So, you were trying to go to -- for why? To comfort him?

A. Yes. I loved him, I -- he said he was sorry, he's was going to get treatment.

Q. Okay. So, more of the same cycle.

A. Correct.

Q. And then, after you got there, did you guys talk? Did you do anything?

A. Yes, I saw him a few times then; but this

particular time, I -- I'm trying to leave to one of my treatment centers.

Q. So, you get to the hotel, and you start talking; and then, you try to leave?

A. Mm-hmm.

Q. And what happens?

A. And he's blocking the door so I can't go to my treatment, and I get scratched.

Q. So, he's standing in the doorway of the hotel room and preventing you from getting out.

A. Correct.

Q. And then, you try to get out. And can you describe how he scratched you?

A. I'm trying to get out, he's saying, Don't go, let's talk, it's been a while. And eventually, I get out --

Q. Okay.

A. -- of the hotel room.

Q. And did you -- did you go down to the elevator?

A. Yes.

Q. Did you take a photograph in the elevator?

A. Yes.

Q. Would you recognize that photograph if we showed it to you?

A.    Yes.

Q.    Is this that photograph?

A.    Yeah.

Q.    And describe what we're looking at here if we can.

A.    I see giant scratch marks.

Q.    And who made those scratch marks?

A.    Cole.

Q.    You said that he scratched you across the chest, and that's how that happened.  I don't -- can you be a little more specific about it.  You said he was blocking the door, and then he scratched you.  Can you describe it?

A.    So, I'm trying to get out.  And he's saying, No, you're not going to go out, and we're -- like, arguing.

Q.    Okay.

A.    When I sit down, I take a breather.  And I try to leave again and he's like, You're not going; and that's the result of that.

Q.    Did he like grab you by the -- by the arms, or what?

A.    It was more of a -- like, You're not going.  It wasn't a grab this time.  It's just -- like, he's trying to prevent me from stopping to leave.

Q.    Okay.  But he obviously grabbed you hard enough to make red scratch marks on your --

A.    Correct.  Correct.

Q.    Okay.  Did you bleed at all?  It looks like there's blood there.

A.    Yeah, and I still have a giant scar.

Q.    You still have a scar, okay.

GEN. EVANS:  Your Honor, the State's going to ask to introduce that photograph as the next numbered exhibit.

THE COURT:  Any objection?

MR. BURLISON:  No, Your Honor.

THE COURT:  Exhibit 19 will be the photographs from June of '23.

(Exhibit 19  was marked.)

BY GEN. EVANS:

Q.    I was remiss, and there's one more thing I want to talk about.  I want to go all the way back to where we started:  I want to go back to July of 2022. In that event we talked about that was at the Walgreens, people showed up -- then, the officers showed up at your house.  Do you remember that one?

A.    Like, way in the beginning.  Yeah.

Q.    All the -- all the way in the beginning, yeah.

A.    Yeah, okay.

Q.    Did anybody show up at your house other than the police?  Did you call anybody else for help?

A.    My neighbor started to get concerned.

Q.    Who's your neighbor?

A.    Christian Cole.

Q.    And tell me about her.

A.    She lived next door to me, and she became friends with the family; and she pointed out quickly as well that something wasn't right.  She heard a lot of fighting, she's noticing I'm having bruises.

Q.    So, at that point on the fifteenth, did you run out of the house and she sort of saw you?  Or...

A.    I believe that day she came to the door because she heard -- she heard -- like, yelling and crying.  And she's my next door neighbor.

Q.    Okay.  And that was before the police arrived?

A.    Correct.

Q.    Okay.  Did she do anything that night?  Do you remember?

A.    I mean, she told me to leave.

MR. BURLISON:  Objection:  Hearsay, Your Honor.

GEN. EVANS:  She to -- I'm sorry, I believe

she said, She told me to leave: That's a command, it holds no truth value.

THE COURT: I'll sustain the objection.

BY GEN. EVANS:

Q. When she showed up outside, what was going on?

A. Cole's intoxicated. He's, I believe -- he's yelling at me, I'm -- that's all I can recall at this -- that particular time.

Q. Okay. But she was outside, and she would have seen whatever happened that day?

A. Correct.

Q. Okay, okay.

GEN. EVANS: Your Honor, I believe that constitutes the State's proof as it relates to the 404. Now, we have -- the State's going ask -- just to sort of orient everybody as to where we are, the State's now going to move into proof of the events of this case. So, those are the events that the State's seeking to introduce. Now, we're going to move into the events of the case that is set for trial to show why the events that we've just talked about are relevant.

BY GEN. EVANS:

Q. So, the next thing I want to talk about, Erin -- between that event in June and August, did you still

have contact with Mr. Gordon?

A.    Yes.

Q.    Okay.  Sort of on and off, same kind of stuff?

A.    Yep.

Q.    Okay.  Did you -- okay.  I want to talk about August the 16th.  Do you remember receiving an email on August the 16th?

A.    Which year?

Q.    This is 2023.

A.    Okay.

Q.    Do you remember receiving an email from -- from Robert in August of 2023?

A.    Yes.

Q.    Do -- do you remember it being a part of a calendar invite?

A.    Yeah,  we had a -- like, an everyday pasta dinner, or every -- like, week pasta dinner or something.

Q.    Okay.  And is that something that was set up as a continuing event?

A.    Yes.

Q.    Okay.  When you -- when we say that, does that mean that the computer was automatically generating --

A.   Correct, and I had stopped; and then, it came back.

Q.   When did it stop?  Do you remember?

A.   I don't recall.

Q.   But did it stop a week before August, a month before August, a while?

A.   A month prior.

Q.   At least a month?

A.   Yeah.

Q.   Okay.  And so, this was a weekly event so you would've gotten three of four of these calendar invites, you should have, and you didn't.

A.   Correct.

Q.   And then, you got -- did you get another one?

A.   Yes, I got one.

Q.   So, tell me about that one.

A.   It was just an invitation to -- like, a Wednesday pasta dinner.

Q.   Okay.  Did you respond to it?

A.   No.

Q.   Did you decline the invitation?

A.   I don't recall.

Q.   You don't remember if you did, okay.

A.   I don't know if I --

GEN. EVANS:  If I can pass up a document to

194

the witness.

BY GEN. EVANS:

Q. Erin, is it fair for you to say that you don't remember whether you declined it or not? You said you don't recall.

A. I don't recall if I declined it or not.

Q. Okay. If you look at the document that I've just passed up, does it say "declined" on that second page?

A. Yes.

Q. Okay. So, did you decline the invitation?

A. Yep.

Q. Did you get an email back after you declined the invitation?

A. Yes.

Q. Is this that email?

A. Yes.

Q. Can you take a look there at the first page? What -- how do we know that this is that email?

A. Because the date and time.

Q. Because the date and the time.

A. Yeah.

Q. It says it came from an email, between two different emails, cole.gordo@gmail.com.

A. Correct.

Q. Whose email address is that?

A. That is Cole's.

Q. And how do you know that? Is that email address you and him have used in the past?

A. Yes, yes.

Q. Do you have access to it?

A. I've received an email from it.

Q. You've received emails from it.

A. Yeah.

Q. And when you've received those emails, who have they been from?

A. Cole.

Q. And then, the email below that where it says "To:", it says, "enichols17@gmail.com". And I think we talked about that email address with Mr. Burlison earlier. Is that an email address that you have?

A. Correct.

Q. So, when -- can you read me the email that's there at the bottom of the first page? What was the email you received?

A. It said, You lied to the DA - Cole.

Q. You lied to DA - Cole. Is this a fair and accurate copy of the email that you received?

A. Yes.

GEN. EVANS: Your Honor, the State would ask

that this document be introduced as the next numbered exhibit.

THE COURT: Any objection?

MR. BURLISON: No, Your Honor.

THE COURT: Exhibit 20 will the be the email. What's the date?

BY GEN. EVANS:

Q. On August the 17th, --

THE COURT: Hold on, was that August the 16th?

GEN. EVANS: That was August the 16th, Your Honor.

THE COURT: The August 16th email will be Exhibit 20.

(Exhibit 20 was marked.)

BY GEN. EVANS:

Q. So, tell me about that. Before we get into the 17th, did that email address -- or email that he sent to you, how did you feel when you got that email?

A. Scared. Once again, if I were to advocate for myself, I'm going to get a rebuttal and somehow not be safe or get hurt.

Q. Did you feel threatened?

A. Yes.

Q. What about harassed?

A.    Yes.

Q.    What about intimidated?

A.    Yeah.

Q.    Is there anything else other than that general fear that came out of that email?

A.    Those were the top three emotions.

Q.    Okay.  And at this point, were you -- were y -- you said that weren't getting his calendar invites. Were you regularly going to dinner with Cole?

A.    Not at this point.

Q.    Not at this point, okay.  Let's talk about the 17th, the next day.  On August the 17th, did you get a call from Robert?

A.    I'm sure.  In what context?

Q.    Okay, I'm just saying.  Did you receive a phone call from him?

A.    Yes, yes.

Q.    Would you -- did you take a screenshot of the call log on your cell phone?

A.    Yes.

Q.    And would you recognize that if I passed that up to you?

A.    Yeah.

Q.    So, that screenshot you've got -- or what is that there that you have?

A.   This is a call list.

Q.   And when -- did you take this screenshot?

A.   Yes.

Q.   When is this call list from?  What's the day?  Is it August the 17th?

A.   Yes.

Q.   And does it have a phone call from Cole Gordon?

A.   Cole, yes.

Q.   And who's Cole Gordon?  Is that Robert Cole Gordon?

A.   Yes, yes.

Q.   Is that the defendant?

A.   Yes, yes.

Q.   Okay.

GEN. EVANS:  Your Honor, the State would ask to admit that document into evidence as the next numbered exhibit.

THE COURT:  Any objection?

MR. BURLISON:  I'm not sure we're identifying it as August 17th.

GEN. EVANS:  The witness has identified it as August 17th.

THE COURT:  Let me take a look at it.  Does the document --

GEN. EVANS: The document itself does not show August 17th; but based on this witness's knowledge and -- and the fact that she created the screenshot, she's telling us that it came from August 17th.

THE COURT: Alright. I'll find that the lack of the data on here would go to -- possibly go to weight and not admissibility, so I will allow the phone log to be entered as Exhibit 21.

(Exhibit 21 was marked.)

BY GEN. EVANS:

Q. The next day, did you get a text message from the same number from Cole Gordon?

A. Yes.

Q. Did you take a screenshot of those text messages?

A. Yes.

GEN. EVANS: Can I pass up a document? I'm going to ask you to take this one, this one, and that one, and this one just so you don't have to walk back and forth. They're going to be separate. So, we've got this one, and this one, then this one.

BY GEN. EVANS:

Q. So, Erin, we're now on to August the 18th. And I've passed up a document there. Do you see a screenshot?

A.    Yes.

Q.    And is that screenshot got a photograph of a wristband on it?

A.    Yes.

Q.    Can you tell me about that text message?

A.    Cole is telling me that he has cancer, and his mom and dad are coming: He's at the hospital.

Q.    Okay. So, can I -- it says, My mom and dad are coming. I have cancer. And then, there's a photograph of the hospital wristband.

A.    Correct.

Q.    And when did you receive that one. Was that on August the 18th?

A.    Yeah.

GEN. EVANS: Your Honor, the State would ask that we -- that document be admitted as the next numbered exhibit.

THE COURT: Any objection?

MR. BURLISON: No, Your Honor.

THE COURT: Exhibit 22 will be the 8/18/23 texts.

(Exhibit 22 was marked.)

BY GEN. EVANS:

Q.    There's another photograph that I -- oh, maybe not yet. This one includes the text that starts,

Case 3:24-cv-01121    Document 111-1    Filed 08/12/26    Page 200 of 314 PageID #: 2361

Do not touch.  Do you recognize that screenshot?

A.    Yes.

Q.    And what is that?  Can you -- is that another text message from Cole Gordon?

A.    Yes.

Q.    And is that from August the 19th?

A.    Yes.

Q.    Can you tell me -- can you read that one aloud?

A.    Do not touch the fucking checki -- checking account for the next goddamn hour.  I'm having to pay a bond agent, do not touch it.  There's money in there, don't fucking touch it.

Q.    And that was a text message from Robert Gordon on August the 19th.  Is that right?

A.    Correct.

GEN. EVANS:  The State would ask to introduce that one as the next numbered exhibit.

THE COURT:  Objection?

MR. BURLISON:  No, Your Honor.

THE COURT:  Twenty-th -- Twenty-three will be the 8/19/23 texts.

(Exhibit 23  marked.)

BY GEN. EVANS:

Q.    Now, -- now, I want to talk about those three

all together:  8/17, 8/18, and 8/19.  What is going on at that point?

A.    I believe Cole was arrested around that time.

Q.    Okay.

A.    And -- I need the picture to...

Q.    Do you kn -- and you said that he was arrested?

A.    I believe so.

Q.    Do you know what for?  Do you know what the charge was?

A.    I don't recall.

Q.    Okay.  Do you know if he got out?

A.    He got out.

Q.    And is that what -- the sort of the discussion is there in that last text message?

A.    Correct.

Q.    Don't touch the checking account.

A.    Correct.

Q.    Okay.  At that point, were you still afraid?

A.    Yes.

Q.    Why?

A.    Because he keeps getting out.

Q.    So, is there anything -- what changed there, sort of betw -- in your relationship in the August time?  Did he do something else?  Did he call the school?

A.    Yes.

MR. BURLISON:  Objection, Your Honor: Speculation.

THE COURT:  How -- what first-hand knowledge would she have of him calling the school?

GEN. EVANS:  Two things, Your Honor:  One, the State would proffer that Ms. Mishkin -- and I may need to lay the foundation here, but Ms. Mishkin has heard phone calls that were recorded from employees at the school.  As she has heard those phone calls, she can identify Mr. Gordon's voice on those phone calls.  So, she knows that he made those calls.

Second, the State's not using this to prove, at least at this point, that he did in fact make those phone calls.  The State's using this to show a change in Ms. Mishkin's behaviour.  And she's going to talk about, if the State may proffer, going forward something has changed in her behaviour and her view towards Mr. Gordon as a result of particular actions taken by Mr. Gordon. Whether they existed or not, she believed them to have happened and that's enough for the effect on the listener exception.

THE COURT:  So, whether or not he did call the school --

GEN. EVANS:  Well, --

THE COURT: Whether or not that's true or false would not impact the potential relevance which would be the impact on the -- on Ms. Mishkin.

GEN. EVANS: True. But again, the State's going to sort of first and foremost rely on the fact that she has heard these calls and she did know it happened. She does have first-hand knowledge, and I can lay that foundation if the Court would like.

THE COURT: What's your response to that, Mr. Burlison?

MR. BURLISON: Your Honor, I'll -- I'll withdraw the objection based upon the State's position that they can lay the proper foundation.

THE COURT: Alright. We'll -- we will go forward from here, but feel free to renew the objection if appropriate.

BY GEN. EVANS:

Q. So, Erin, tell me -- we've been talking about calling the school. How do you know he called the school?

A. This is my second day of school, I've just gone back.

Q. So, when we say school, where is the school?

A. Franklin Special District.

Q. In the Franklin Special School District.

A. Mm-hmm.

Q. And who did he call?

A. The -- our central office.

Q. So, how did you find out?

A. I believe the -- oh, the principal -- or the -- the lawyer of our school called me in and said there's a situation --

MR. BURLISON: Your Honor, I renew my hearsay objection.

THE COURT: Yeah, let's -- don't testify as to what someone else told you.

BY GEN. EVANS:

Q. So, --

A. So, I was told that there's a phone call.

Q. So, you found out that there was a phone call.

A. Correct.

Q. Did you hear the phone call?

A. Correct, and then the police --

Q. Did somebody show you the phone call?

A. Yeah.

Q. And they played it for you?

A. Over the phone, yes. And they said, Is this Cole Gordon? Yes, or no? And then, I recognized his voice, yes.

Q.    You recognized the voice?

A.    Yeah.

Q.    And was it one call?

A.    Twice.

Q.    Two calls?

A.    Yes.

Q.    And in that call, do you remember what it was?

A.    I don't know which one came first.  One, was him saying that he was a news caster and he was going to come and do a report on a drunk being a teacher; and the second one was saying he's an FBI agent and that they're going to make some kind of report on me being a teacher.

Q.    And what was the -- well, how did that affect you?

A.    Well, it was my second day as a teacher at my new job, and the school had to do a special shutdown that day because of the calls; so, it effected the entire school.

Q.    When you say, Special shutdown, do you mean they -- like, lock the doors and put all the kids in place?

A.    Like, we had to an indoor dismissal.

Q.    So, what does that mean?

A.    So, instead of the kids being -- like, car

riders and -- like, walker/bikers, we had to all go in the gym and dismiss one by one.

Q. Okay. Is that a safety mea -- based on your understanding of the school's safety policy, is that because of a safety risk?

A. Correct. Correct.

Q. Okay. Was that embarrassing to you?

A. Extremely.

Q. To the best of your knowledge, did the other teachers know that it was because of you?

A. I'm not aware of the other teachers, but my principal, vice-principal, --

Q. So, at least the administration.

A. Yeah.

Q. Okay. Was that intimidating to you?

A. Yes.

Q. Threatening to you?

A. Extremely.

Q. Did you feel harassed?

A. Extremely.

Q. Did you feel like you couldn't just live your life?

A. Extremely, and it also felt unsafe.

Q. You felt unsafe.

A. Yeah.

Case 3:24-cv-01121    Document 111-1    Filed 08/12/26    Page 207 of 314 PageID #: 2368

Q.   Did you feel unsafe now in a different place that you had never felt unsafe before?

A.   Correct.

Q.   So, this is a new job.

A.   Correct.  I'm trying to start a new life, and the harassment's still continuing; and in this -- at this point though, it's at school.

Q.   Okay.  Did you get another -- did you get an email from him on August the 20th?

A.   I'll have to...

Q.   Do you have a document in front of you.

A.   Yeah.

Q.   That's titled -- that says, Jill Canovan at the top?

A.   Yeah.

Q.   And what is that -- that document?

A.   This is a document where he's going to rehab.

Q.   So, where's it from?  Is there an email address where it came from?

A.   Oh, his email.

Q.   How do you know that's his email?

A.   I recognize it.

Q.   What is his email?

A.   Colegordon1@ibm.com

Q.   Cole.gordon1@ibm.com

209

A.     Mm-hmm.

Q.     Okay.  And then, this below, it looks to be some kind of link to something.  Did you click on that link?

A.     I don't recall if I clicked on it or not. This is him wanting to go to rehab.

Q.     Did you take a loo -- if I could get you to flip to the second page, do you recognize that?

A.     Yes, it was emailed to me.

Q.     Is that what -- what that link is to?

A.     I -- I believe so.

Q.     Okay.  And what is that?

A.     This says that he's going to rehab, and he's self-paying.

Q.     So, it's something that came from Robert Cole Gordon?

A.     Correct.

Q.     From robert.gor -- or cole.gordon1@ibm.com?

A.     Correct.

Q.     And does it have his signature on it?

A.     It appears so.

Q.     Okay.

GEN. EVANS:  Your Honor, the State would ask that document be admitted as the next numbered exhibit.

THE COURT:  Objection?

MR. BURLISON:  No, Your Honor.

THE COURT:  Exhibit 24 will be the email from 8/20 of '23.

(Exhibit 24  marked.)

BY GEN. EVANS:

Q.    I want to go back now, now that I've got it pulled up, I want to go back to the -- the phone calls with the school.  Do you remember hearing those phone calls?

A.    Yes.

Q.    You said that you remember because they had been recorded for you and played back for you?

A.    I remember because, very vividly, a police officer called; and I had to hear it over speaker phone.

Q.    Okay.  Was that embarrassing?

A.    Yes.

Q.    Would you recognize that if we played the audio of that for you?

A.    Probably, yes.

Q.    I'm going to play the first, sort of, couple seconds of that; and then, we'll jump into it here.

(Whereupon, the phone call was played.)

BY GEN. EVANS:

Q.    Is that the phone call?  Do you remember hearing that part?

A.    Yeah.

Q.    And this is one of the two phone calls?

A.    Yes.

Q.    Are you aware of this recording itself?  Is this the same recording you heard?

A.    It sounds like one of the two.

Q.    Okay.

GEN. EVANS:  Your Honor, the State's going to ask that this recording be introduced as the next numbered exhibit.  This is the -- one of the two phone calls that Ms. Mishkin heard that Mr. Gordon had made to Franklin Special School District.

THE COURT:  Any objection?

MR. BURLISON:  No, Your Honor.

THE COURT:  Alright, exhibit --

(Whereupon, the phone call was played.)

BY GEN. EVANS:

Q.    So, you heard the voice on that recording. Can you identify the voice -- who that voice belongs to?

A.    Yes.

Q.    Who is it?

A.    Robert Cole Gordon.

Q.    And have you heard his voice before?

A.    Yes.

Q.    And it's kind of silly.

A.   Yes.

Q.   Have you heard it a lot?

A.   Yes.

Q.   If I play the second call for you, would you recognize the second audio recording?

A.   Yes.

Q.   I'm going to go ahead and play that now.

(Whereupon, the phone call was played.)

BY GEN. EVANS:

Q.   So, Erin, that recording, is that part of a longer recording?

A.   Yep.

Q.   Have you listened to the entire recording?

A.   Yes.

Q.   And is that a fair and accurate recording?

A.   Yes.

Q.   Or is that the same recording you listened to?

A.   Yes.

GEN. EVANS:  Your Honor, the State would ask to admit both of those calls as the next numbered exhibit.

THE COURT:  Objection?

MR. BURLISON:  No, Your Honor.

THE COURT:  Exhibit 25 will be collective two

phone calls late filed on the USB.

(Exhibit 25 was marked.)

GEN. EVANS: And for the record, Your Honor, the first call played all the way through; that's the call referencing federal law enforcement. The second call was played from the beginning to minute 1-1-3, 1:13.

THE COURT: Thank you.

BY GEN. EVANS:

Q. Ms. Mishkin, did you receive a text message again, this time about Mr. Gordon? Did you receive a text message on the 24th of August, 2023?

A. Yes.

Q. And is what we just passed up, is that a copy of that text message?

A. Yeah.

Q. Can you read that text message to us?

A. Please ask Kaylee what court is about tomorrow for Cole. This is very urgent. I'm good friends with Cole, and he does not currently have his phone.

Q. That text message, does that come from Robert?

A. I'm not sure who that's from.

Q. You don't -- but it's not Robert, fair?

Case 3:24-cv-01121    Document 111-1    Filed 08/12/26    Page 213 of 314 PageID #: 2374

A.    That's not his phone number.

Q.    Do you know anybody else named Cole?

A.    No.

Q.    Do you know anybody else who's -- who has court that would be involved with -- well, that might not be a fair question.  Do you know who Kaylee is?

A.    Kaylee, at that time, was the advocate.

Q.    The -- one of the assistant victim witness coordinators?

A.    Yeah.

Q.    Did she work for the District Attorney's Office?

A.    She did, yeah.

Q.    And that was in August of 2023.

A.    Yeah.

Q.    Did Mr. Gordon have pending criminal cases in August of 2023?

A.    Yeah.

Q.    So, that text message, did you -- is that -- did you take that screenshot?

A.    Yes.

Q.    And did you submit to the police department?

A.    Yes.

Q.    Is that a fair and accurate copy of the text message?

A.    Yes.

GEN. EVANS:  Your Honor, the State would ask that document be admitted as the next numbered exhibit.

THE COURT:  Objection?

MR. BURLISON:  Your Honor, I'd had to object to the admission of this particular text message. There's -- there's no information to determine the identity of the person that sent the message, nor is there any direct proof that Ms. Mishkin can speak to or that has spoken to that she has any knowledge that this was directed by Mr. -- that this text message was directed by Mr. Gordon to be sent to Ms. Mishkin.

GEN. EVANS:  Your Honor, the State's position is it's not hearsay, which I understand that's not where the Defense is arguing.  But it's not hearsay, it's been authenticated.  The question is, Is it relevant?  The bar for relevance is extremely low.  And there is circumstantial evidence to suggest that it came because of Mr. Gordon.  Ms. Mishkin has already testified that Kaylee is a representative of the District Attorney's Office.  She's talking about court in a time when Mr. Gordon had pending criminal court cases.  It references Cole, it references a reason why Cole was unable to send a message himself, or didn't send the message himself. Everything else goes to -- goes to weight, not

admissibility.

THE COURT: Well, but let -- let's talk first about the hearsay. So, it is an out-of-court statement.

GEN. EVANS: But it's not being used for the truth. The State's not asserting that -- that Cole has court tomorrow, that it is urgent, that he -- that this person is friends with Cole, or that he doesn't have his phone. We're using this for the effect that it would have had on Ms. Mishkin.

THE COURT: Alright. So, I agree that -- so, that it is not precluded by the hearsay exclusion. And so, Mr. Burlison, your objection is to authenticity?

MR. BURLISON: Well, I mean, Ms. Mishkin has -- has noted that she -- that she did receive the text message, but -- so, she's been able to authenticate receiving the text message. The -- the problem is we have no proof of the identity of who sent the text message. The State wants to present this text message to show that Mr. Gordon, directly or indirectly by having others contact Ms. Mishkin, is having improper contact; but there is nothing that -- that Ms. Mishkin knows directly that proves Mr. Gordon directed anyone to send -- to send those text messages.

THE COURT: Yeah, I'll -- so, for the purpose of this hearing, I will let it in. I do find that it is

relevant, certainly in terms of its impact on Ms. Mishkin. I do agree that the sender is unknown and that --

GEN. EVANS: And for the -- for the --

THE COURT: There's no inform --

GEN. EVANS: For the Court's --

THE COURT: -- ation that inferred that the defendant may have had something to do with it; there certainly is no evidence.

GEN. EVANS: For the Court's edification, a voluminous number of cell phone records have been turned over to the Defense as part of discovery. The State understands that in order to introduce this at the trial itself there are obviously several more hurdles to go through. The State's position here is this is a motion in limine: The Court isn't even legally required to hear the proof at all. The Court can make the decision based upon the arguments of counsel alone; that's State versus Newsome. So, even if this -- the State's position is the question is not whether it's admissible today, the question is, Is it conditionally admissible if the State proves what it believes it can prove at trial?

MR. BURLISON: Well, the burden is clear and convincing evidence.

GEN. EVANS:  At trial.

THE COURT:  Well, the burden fo -- well, the burden to allow 404b evidence is clear and convincing that the other bad act occurred.  I'll --

GEN. EVANS:  And the State's position is this isn't -- this isn't 404b.  We're out of that section of the hearing.

THE COURT:  So, this is just showing --

GEN. EVANS:  This is trial proof.

THE COURT:  And how the 404b evi -- thank you for the correction.  This is how the 404b evidence would -- this is the evidence that you intend to present at trail from which the Court can determine if there is a material issue other than conforming the propensity of evidence.

GEN. EVANS:  Yes, Your Honor.

THE COURT:  For the Court to make a determination as to whether or not the --

GEN. EVANS:  The previous evidence which we've already gone through.

THE COURT:  I'll allow it to come in, but the weight that it will be given will be -- it will be given very little weight.

GEN. EVANS:  So, that will be admitted as the next numbered exhibit, Your Honor?

THE COURT: Twenty-six will be the 8/24...

(Exhibit 26 was marked.)

BY GEN. EVANS:

Q. So, Erin, after we got these text messages or you received these text messages, you received these emails, the last one being August the 24th. Was there a hearing in Williamson County General Sessions Court -- Circuit Court? I'm sorry.

A. Yes.

Q. And was that hearing to revoke Mr. Gordon's bond?

A. Yes.

Q. Was he -- was his bond revoked?

A. I don't --

Q. Well, is he out now?

A. No.

Q. Is that because of that hearing?

A. Yes.

Q. And did he go into custody? Has he been in continuous custody since that time?

A. Yeah.

Q. So, let me ask you this: After he went into custody on September 1st of 2023, did you continue to have contact with Mr. Gordon?

A. Yes.

*BRIGGS & ASSOCIATES 615-482-0037*

Q. Why?

A. It was that cycle. I felt bad, I felt guilty, I felt ashamed, and I was afraid he was going to get out at one point.

Q. So, had he been arrested prior to and then released?

A. Yes.

Q. Had his bond been revoked --

A. Yes.

Q. -- previously --

A. Yes.

Q. -- and still been released?

A. Yes.

Q. So, at this point, did you believe anything was different?

A. No.

Q. So, did you believe he was getting out?

A. Yes.

Q. You continued to talk to him, and Mr. Burlison mentioned it on direct. Did you continue to talk to him by -- by video calls, by phone, by text messages? Why did you do that?

A. Again, that guilt and shame. I -- I loved him at one point.

Q. Were you still afraid of him?

A. Yes, you just get stuck in that cycle.

Q. So, even though he was inside the Williamson County Jail behind bars, you were still afraid of him?

A. Correct.

Q. Why?

A. Because inmates start calling me, other inmates.

Q. Did Mr. Gordon ever stay in jail for long in your exper -- in your previous experience?

A. I'm sorry, what?

Q. Did he ever stay in jail for long?

A. No.

Q. So, is this the longest time that he's ever been in jail to the best of your knowledge?

A. Yes.

Q. Did Mr. Gordon send you -- did you at any point talk to members of the Williamson County Law Enforcement Community?

A. At any point in time?

Q. Well, after he went into custody?

A. Yes.

Q. And what di -- who did you talk to?

A. Jill Canovan.

Q. And who is Jill Canovan?

A. A detective.

Q.    She's a detective with the Franklin Police Department.

A.    Mm-hmm.

Q.    And did you tell her that you wanted to stop having contact with him?

A.    Yes, but it's difficult.  And any contact I had, I told her; any letters I got, I showed her.

Q.    You said letters.  Did you get letters from Mr. Gordon?

A.    Many.

Q.    Did you get at least four letters from Mr. Gordon?

A.    Correct.

Q.    If I pass those letters up, would you recognize them?

A.    Yeah.

Q.    Are these documents that you have, are these the letters that Mr. Gordon sent you?

A.    In the mail, correct.

Q.    And how do you know they are?

A.    I -- I recognize them.

Q.    You recognize these are the ones that showed up at your house.

A.    Mm-hmm.

Q.    Have you ever seen Mr. Gordon's handwriting

before?

A. Yes.

Q. And is this his handwriting?

A. Yes.

Q. Have you seen his signatures before?

A. Yes.

Q. If you look at the bottom of these four documents, or at least three of them, are these signed by Mr. Gordon?

A. Yes.

Q. Okay. And these -- when you received these, did they -- did you receive them from the Williamson County Jail?

A. Yes.

Q. And there, up at the top, they all have dates in the top left corner. Is that right?

A. Correct.

Q. And are those dates when Mr. Gordon was in custody at the Williamson County Jail?

A. Yes.

Q. If you look on two of them, do they say, Day, and then a particular day?

A. Um...

Q. The one dated September 27th, and the one dated September 18th.

A.    Yes.

Q.    They say, Day; and then, the other one says, Day 27 in jail.

A.    Correct.

Q.    Okay.

GEN. EVANS:  Your Honor, the State would ask to admit these four documents into evidence as the next numbered exhibit.

THE COURT:  Any objection?

MR. BURLISON:  No, Your Honor.

THE COURT:  Twenty-seven will be --

GEN. EVANS:  And we can -- yeah, the four, we can do it as one collective exhibit.

THE COURT:  -- collective letters.

(Exhibit 27 was marked.)

BY GEN. EVANS:

Q.    Alright.  Ms. Mishkin, I want to start -- I want to start with the one that's labeled, Monday, September 18th:  Day 18.  Do you have that one in front --

A.    No, sir.

Q.    Monday, September 18th:  Day 18.  You got that one?

A.    Yes, sir.

Q.    I want you to go down about eight lines.  Do

you see where it says, You need to go meet with the real DA, not Jennifer?

A. Yes.

Q. Okay. What did that mean to you?

A. I'm not quite sure, to be honest with you.

Q. Okay. Well, If you go down a few more lines where it says, What you say and how you say it will affect my life forever. You were willing to fucking testify to put me in jail, now I need you to get me out -- out with your testim -- with your on the stand testimony. What did that mean to you?

A. Again, fear. What would happen if I don't do this?

Q. What is do this? Do you think he meant come to court and tell the truth?

A. Correct.

Q. You don -- you think he meant for you to come to court and tell exactly what happened?

A. No. I mean, if I were to go tell the truth, what would happen.

Q. What did he want you to do based on that -- that line there?

A. I gather he had wanted me to say that he didn't do anything and he wan -- and that it would be okay if he got out.

Q. Okay. Let me get you to take a look at the next one. This one, I want you to look at September 22nd. It says, I need your con -- or, I need contacts, at the top. You got that one?

A. Yep.

Q. About halfway down the page, do you see where it says, We are going to have to show and tell everything to win in trial. Do you not -- you do not want this, I do not want that. Pick a side, pick a team. I can not have you get on the stand again to ruin my life. This is no time to play. The meek mild quite Erin, grow some fucking balls and help the right team. How and why did you not tell me you have been in talks with the DA again? What did that mean to you?

A. Fearful that I was asking for help from the DA, scared that we had been talking. Again, terrified if he gets out what would happen.

Q. Did he tell you that he knew you were cooperating with the prosecution?

A. Right here he does, yeah.

Q. Let's take a look at the next one. I want you to look now at September 25th. You see that one?

A. Yes.

Q. About halfway down the page again, Why will you not just tell the DA nothing happened? You were

227

drunk and emotional because you lost your kids.  I can't continue like this.

A.   That makes me feel scared, it makes me feel sad for him.

Q.   Is that true?  Is that true what happened, that you were just drunk and emotional?

A.   No, not at all.

Q.   Okay, and then I want you to take a look at the last one here.  The last piece here halfway down the page, it says, I still can't believe you blocked me. That was a slap in the face.  Why did you block him?

A.   I was done.  I -- I mean, I was -- like, getting my voice; it was enough is enough.

Q.   So, has something changed?  And I know we've been talking for a long time, but has something changed in Erin from July of 2021 when this all started to September the 27th of 2023?  Has something kind of clicked?

A.   Yes.

Q.   What clicked?

A.   I'm just aware of the cycle, and that there's nothing I can do to fix it.

Q.   So, the only thing you can do is to block him?

A.   Correct, and be safe.

228

Q.   I just want you take a look at the bottom of the page there on the September 27th letter.  It says, You have sex toys to play with.  At some point, did you find sex toys in your house?

A.   I did.

Q.   Were they yours?

A.   No, this was like a year prior.

Q.   What happened in that -- in that instance?

A.   It was the first time he got arrested.  I believe he was able to come back to the house once to get his belongings with a police escort.  However, when I got home that day, there was sex toys, cigarettes, his belongings gone, and the house and the window open.

Q.   Does Robert smoke?

A.   Cigars.

Q.   Okay.  So, we were talking about what changed.  You said that in this letter there's a mention about blocking him; tell me about that.  What does that mean?

A.   So, at this point, I've like com -- I've completed a six-month in-treatment program, I have a job, I'm getting my confidence through a therapist, I'm having to go three to four times a week, and they're teaching me about the cycle of abuse.  He's called my treatment center and harassed them, they're concerned;

Case 3:24-cv-01121    Document 111-1    Filed 08/12/26    Page 228 of 314 PageID #: 2389

and so, I had a lot of advocates to show me what was safe and not.

Q.    It's fair to say at this point you're just done?

A.    Yes.

Q.    Are you -- at this point, you were trying to close the door on Robert Cole Gordon, and he's still sending you letters.  Yeah, is that fair?

A.    Correct.  Correct.

Q.    At this point on September the 27th of '23, if we look, its says, 27th day in jail.  Is that the longest period of time that Robert had been in jail on any of these events up until that point?

A.    To my knowledge, yes.

Q.    What did -- did that give you any sort of confidence at all?

A.    Not really.  I mean, I felt like he was going to get out at some point.  So, there's always this lingering feeling; but -- but him being in there and not having the contact at all times and the stress --

Q.    Okay.  Did you feel safer?

A.    Obviously, it made me safer.

Q.    After you got those letters, did the letters kind of stop for a little while?

A.    Well, they were --

Q. Or maybe not. No, I'm sorry; let me back up. I want to show you a photograph of an envelope. So, Erin, what is this a photograph of?

A. An envelope to his lawyer at my home.

Q. To your lawyer -- or to his lawyer at your home.

A. Correct.

Q. So, top left corner, let's walk through this. What does it say?

A. Gordon number 65920.

Q. Is that an inmate number?

A. I believe so.

Q. Okay. And then, below that, what does it say?

A. 805 Founder's Pointe Boulevard, Franklin, TN.

Q. And then, if you look on the center of the letter, the sending address. What does that say?

A. Law Office of John Ballard.

Q. Care of?

A. Katherine Gordon.

Q. Is that your name?

A. No.

Q. What is the address there?

A. 805 Founder's Pointe Boulevard, Franklin, TN.

Q. Has John Ballard ever had a law office at 805

*BRIGGS & ASSOCIATES 615-482-0037*

Founder's Pointe to the best of your knowledge?

A. No.

Q. How long have you lived at that address?

A. Five years.

Q. Five years. And in the five years that you've lived there, has John Ballard ever visited that address?

A. No.

Q. Has he ever ca -- used that address as an office?

A. No.

Q. Did you open the letter?

A. I believe so.

Q. What was the letter?

A. I --

Q. Well, if you don't remember what the letter was, can you confirm to me? Was it a letter to the Law Office of John Ballard?

A. I do not believe so.

Q. Was it a letter to you?

A. I believe so; there was multiple letters.

Q. If I get you to take a look at the top and the bottom of that envelope, what does it say?

A. Legal.

Q. Do you know what that means?

A. I was told that --

Q. But do you know what that means without talking to law enforcement?

A. No, I don't know what that means.

Q. Okay.

GEN. EVANS: Your Honor, the State would ask to introduce that photograph of the envelope as the next numbered exhibit.

THE COURT: Any objection?

MR. BURLISON: No, Your Honor.

THE COURT: Exhibit 28 will be the envelope post-marked 9/11/23.

(Exhibit 28 was marked.)

BY GEN. EVANS:

Q. Ms. Mishkin?

A. Yes.

Q. Did you go home around seven o'clock last night?

A. About 6 p.m., correct.

Q. What did you find when you got home?

A. I went to my mailbox, and inside was a -- a package that said, To: Erin Mishkin, and my address; the return address was somewhere in Seattle, and inside was a -- like, sticker that said, The twentieth will be a hoot, alongside some like women's undergarments.

Q.   I'm going to pass up three photographs and get you to take a look at these.  So, Ms. Miskin, what is the first photograph that I've passed up?

A.   It's the envelope that was in my mailbox.

Q.   Is that the outside of the envelope?

A.   Of the package, yes.

Q.   Okay. And then, the second photograph?

A.   It's what was inside with -- like, women's underwear.

Q.   Okay.  When you say women's underwear, tell me -- can you describe them a little more than that?

A.   Sure.  It's -- like, a --

Q.   Are they in-confidence underwear?

A.   Like, diapers for women.  Yeah.

Q.   Adult diapers.

A.   Adults diapers for women.

Q.   Okay.  Is there a third picture there?

A.   Yes.  It's a sticker that says, The twentieth will be a hoot.

Q.   Was is the twentieth?  What's happening today?

A.   I'm testifying today.

Q.   How did that -- how did you feel when you got home and you found that?

A.   Immediate fear.

Q.   Fear of what?

A.   It seems -- it felt like a threat to me?

Q.   A threat for what?

A.   If I testify, what will happen.

Q.   What was going to happen?

A.   I -- anything.  In my mind, I'm not going to be safe, I'll get hurt.

Q.   Let me ask you, did Mr. Gordon ever use the phrase, Put on your big girl panties?

A.   Often.

Q.   What was that phrase?

A.   So, if he would -- like, hit or I would go and like challenge him saying, That's not right, he'd say, Buckle up and put on your big girl panties; so, to me, that's what I read this as.

Q.   Fair to say -- kind of, Deal with it.

A.   That's what I --

Q.   Like a little --

A.   Yeah.

Q.   Okay.  You said that receiving that package the day before you were scheduled to testify in a hearing contested against Mr. Gordon, that put you in fear.

A.   Correct.  Correct.

Q.   Are you afraid today?

A.    Yeah.

Q.    So, you've been on the stand now for over four hours.  Are you still afraid?

A.    Yes.

GEN. EVANS:  Your Honor, the State has no further questions for Ms. Mishkin.

THE COURT:  Thank you, Mr. Evans.  Redirect/cross.

MR. BURLISON:  Yes, Your Honor.

THE COURT:  And I don't believe this was admitted as evidence.

GEN. EVANS:  I'm sorry, Your Honor.  The State's going to ask to admit those three as the next numbered exhibit as one collective exhibit.

THE COURT:  Any objection, Mr. Burlison?

MR. BURLISON:  No, Your Honor.

THE COURT:  So, Exhibit 29 will be the collective photos of package.

(Exhibit 29  was marked.)

REDIRECT EXAMINATION BY MR. BURLISON:

Q.    Ms. Mishkin, I want to go back to what I believe is the first alleged incident and time that the -- the State spoke with you about, July 15th of 2022.

A.    Mm-hmm.

Q.    A time where you and Mr. Gordon were in the

same vehicle.

A.   Yep.

Q.   Do you recall that?

A.   Yes.

Q.   Okay.  Do you recall video being played?

A.   I'm sorry, say that one more time.

Q.   You do remember that?

A.   Mm-hmm.

Q.   Now, you would agree there's -- in that video, there's no assault; correct?  You claim that the assault occurs before the video is playing.

A.   And you can hear it happen in the car.

Q.   You -- your testimony is that you were assaulted during that -- during that video?

A.   And prior.

Q.   And also during the video?

A.   Yeah, you can hear him say -- I meant, you can hear me say, Don't hit.

Q.   And what exactly was being done?

A.   Hitting me in the arm.

Q.   I'm sorry?

A.   I'm sorry, he's hitting me in the arm.  I'm -- I'm in the driveway.

Q.   While the video is playing?

A.   It's on the side of my car, yes, my phone is.

Q.   Now, you were told to seek an order of protection.  Is that correct?

A.   Correct.

Q.   Did you do so?

A.   Which time?

Q.   The -- after this incident.

A.   No.

Q.   I'm sorry?

A.   No, sir.

Q.   And Mr. Gordon was not arrested, correct?

A.   Correct.

Q.   Okay.  And you said there -- there are multiple instances that we didn't talk about today, abuse that you suffered.  Is that -- is that a fair characterization of your testimony?

A.   Yes, sir.

Q.   That you didn't capture on video, take any photographs of any injuries?

A.   Yes, sir.

Q.   That you didn't contact law enforcement?

A.   Yes, sir.

Q.   Why would you not contact law enforcement?

A.   Out of fear, I loved him, I didn't want him to get in trouble, I didn't want to get hurt.

Q.   But there are -- but you testified instances

where you did reach out to law enforcement.

A. Correct.

Q. Okay. So, why are you now claiming that there are other instances that you didn't reach out?

A. Because I was in fear, I loved him, and I felt like I didn't want him to get in trouble, and I was scared.

Q. Now, there were some -- there's discussion about some text messages on October 7th of 2022; now, it's correct that Mr. Gordon was in New York around this time period. Is that correct?

A. I don't recall that.

Q. You don't recall him being -- being out of the state for a lengthy period of time?

A. He -- he often would say he was out of town; he wasn't always out of town, so I don't know.

Q. Okay. So, he might say he's out of town; but you're not seeing him, right?

A. All I saw was the texts that he's sending me of him -- of a police officer. Is that the one that you're talking about?

Q. Yes.

A. Okay. And that, to my knowledge, is at the Franklin Cigar Shoppe.

Q. Okay. But I'm not as -- I'm not asking about

that specific date.  I'm asking, to your knowledge, was he out of town around that period?

A.   I don't recall.

Q.   Okay.  And now, you have used -- you have sent text messages from his work MacBook, correct?

A.   No.

Q.   You've never sent text messages --

A.   From his work MacBook?  No.

Q.   Through his computer?

A.   No.

Q.   You've never had text conversations with your family through his -- through Mr. Gordon's computer?

A.   Not that I recall.

Q.   Not that you recall.  Have you ever sent text messages through Mr. Gordon's computer?

A.   Not that I recall.

Q.   Okay.  It's something you're going to remember or not.  Have you posed as Robert Cole Gordon on his accounts and sent text messages before?

A.   No.

Q.   You have never done that?

A.   I have never done that.

Q.   There's an incident that was discussed of November 29 -- no, I'm sorry; let me back up a little bit.  The day after the text messages that you were

shown, that -- the day after is your date of arrest, correct?

A.    Which date are we talking about?

Q.    Okay.  October 7th is the date that text messages were shown in court.

A.    Correct.

Q.    Okay.  Now, October 8th, the very next day, that's the day that you were -- you were arrested.

A.    I don't remember the exact date.  But yeah, around all those times.

Q.    Okay.  But you remember it's all around the same time, correct?

A.    Correct.

Q.    Okay.  Now, on that date, you were driving a vehicle intoxicated, correct?

A.    Incorrect.

Q.    You were driving a vehicle with one of your children in the car.

A.    Correct.

Q.    Correct?

A.    Yes.

Q.    And you were intoxicated.

A.    False.

Q.    And you hit Mr. Gordon with the vehicle.

A.    Again, false.

Q. You were not intoxicated?

A. I was not intoxicated.

Q. You did not strike Mr. Gordon with the vehicle?

A. I did not strike him with the vehicle.

Q. That is your testimony today?

A. That is my testimony.

Q. You've discussed a date where you believe Mr. Gordon entered your home late at night in February of 2023.

A. Yes, sir.

Q. Okay. Now, you had been with Mr. Gordon earlier that night; correct?

A. I had seen him that day.

Q. You had dinner with him.

A. False, I went to dinner with a friend that night.

Q. You did not have dinner with Mr. Gordon that night?

A. The night he attacked me, we did not have dinner together.

Q. Okay. Who did you have dinner with?

A. One of my -- I guess, ex-sister-in-law.

Q. Ex-sister-in-law. And what is her name?

A. Elise.

Q.   Elise?

A.   Mishkin.

Q.   Elise Mishkin?

A.   Yes.

Q.   And where did you have dinner?

A.   We went to Kimbro's.  I believe we went to Kimbro's; I'm not su -- I don't recall.

Q.   Okay.  We're discussing February 23rd of 2023.

A.   I hear you.

Q.   The night that you testified Mr. Gordon entered your home.

A.   Correct.

Q.   Okay.  You had dinner with Elise Mishkin.

A.   Correct.

Q.   Where did you have dinner?

A.   I believe we went to Kimbro's, but I don't recall.

Q.   Okay.  Did you go anywhere else?

A.   I don't recall where we went.

Q.   Okay.  Did you pick her up?  Did she pick you up?

A.   She picked me up, and we had to get a ride home.

Q.   She picked you up at your home?

A.   Correct.

Q.   In her vehicle.

A.   Correct.

Q.   Okay.  And where did you go from your home?

A.   We went to dinner, but I believe we ended at Kimbro's

Q.   And where did you have dinner?

A.   I don't recall.

Q.   Okay.  And was it in Downtown Franklin?

A.   Yeah.

Q.   Okay.  And how long were you at dinner?

A.   I mean -- like, two hours, three hours.

Q.   And how many drinks did you have at dinner?

A.   A few.

Q.   Okay.  And how many drinks did you have at Kimbro's?

A.   I don't recall.

Q.   Okay.  How intoxicated were you?

A.   I wasn -- I mean, I had a few drinks.

Q.   Did you black out?

A.   No.

Q.   Okay.  And you said you got a ride home?

A.   Mm-hmm.

Q.   Is this an Uber?

A.   It was a friend; I don't remember -- recall.

Q. You don't remember who gave you a ride home that night?

A. I do; I don't recall. I don't recall his name, no.

Q. You don't recall the friend's name who gave you a ride home?

A. Correct.

Q. You and Elise Mishkin both got a ride from this person. Is that correct?

A. No, she stayed. I left to go home.

Q. She stayed at Kimbro's?

A. I'm not sure where she went after I left her, but I went home.

Q. Where was she when you left her?

A. In Downtown Franklin, in front of Kimbro's maybe.

Q. Okay. And you do not recall who took you home that night?

A. He is a mutual acquaintance; I don't remember his name, though.

Q. Okay. How did it come about that he gave you a ride home?

A. He was there, I wanted to leave.

Q. He was there and wanted to leave. He was at --

Case 3:24-cv-01121   Document 111-1   Filed 08/12/26   Page 244 of 314 PageID #: 2405

A.    I wanted to leave; I wanted to go home, yes.

Q.    Okay, and so he took you home.

A.    Correct.

Q.    But you don't recall his name?

A.    Again, it's -- like, a mutual acquaintance; I don't remember his name.

Q.    And again, it's your testimony that you did not have dinner with Mr. Gordon that evening?

A.    I saw him, I believe, during the day; but I don't recall where we --

Q.    And where did you -- where did you see him during the day?

A.    I do not recall.

Q.    But you do recall seeing him?

A.    I believe so.

Q.    Okay.  Now, do you recall having your cell phone at Kimbro's?

A.    I know when I went to bed that night my cell phone was right next to my bed.

Q.    And how do you know that?

A.    Because I remember it.

Q.    But you don't remember the name of the person that gave you a ride home?

A.    Correct, I do not remember his name.

Q.    Okay.

A.    It's been -- like, two years.

Q.    Okay.  And what time did you go to sleep that night?

A.    Midnight-ish.

Q.    Okay.  And at what time were you woken up?

A.    I don't recall the exact time.

Q.    Okay.  Now, you said that it was -- it was pitch black?

A.    Yep.

Q.    Okay.  There were no lights on in the room, correct?

A.    When I woke up, it was dark, yes.

Q.    Okay.  And in your words, Pitch black, correct?

A.    When I woke up, it was dark.

Q.    Okay, it was dark; you could not -- you couldn't see in front of your face.  Is that safe to say?

A.    It was dark, I saw a body come to me, it smelled like Cole, it sounded like Cole.  Yeah.

Q.    Okay, but you did not see Cole.

A.    It was dark.

Q.    It was dark?

A.    Yeah.

Q.    Okay, so you can't be certain who it was.

A.    I could tell by the way he smelled, sounded, and the way he came in that it was Cole:  And that's exactly what I told the police.

Q.    And sounded?  Did he speak?

A.    Almost like a drunk grunting.

Q.    And so, he di -- so, whoever was in your home said no words?

A.    I don't reca -- I don't know exactly what they said to me.

Q.    Okay.  So, you could not make out who the person was with your eyes, correct?

A.    I mean, I could recogni -- I knew it was him.

Q.    You did not know -- you do not recall if the person said anything to you.

A.    Correct.

Q.    Do you remember telling the officer that the person in the room did not say anything to you?

A.    I don't recall.

Q.    Alright.  Now, the friend that dropped you off at home that night, did they --

A.    Mm-hmm.

Q.    Did that person come inside?

A.    No.

Q.    No.

A.    Mm-hmm.

Q. Now, you've stated that there was a knife in the room. Is that correct?

A. Correct.

Q. Where was that knife?

A. I believe it was on the bed; the police officers brought it to my attention.

Q. Okay. So, the person in your room never had it in their hand to your knowledge.

A. They ha --

Q. You did not see it in anybody's hand, right?

A. It was dark, you're right.

Q. Okay. And ha -- did you ever see this knife? Did they show it to you?

A. Mm-hmm.

Q. Okay. Had you seen the knife before?

A. It was some from -- like, my kitchen; and there was one missing.

Q. Okay. So, you could tell that it was a knife from your -- from your home?

A. Correct.

Q. To your knowledge, was there any fingerprints taken of this knife?

A. I didn't -- was never told.

Q. Okay.

A. They did take it though.

Q.   They did take it.  Now, you were taken --
well, you were interviewed that night; correct?

A.   Mm-hmm.

Q.   Okay.  Okay, I want to fast-forward a little
bit to the March 18th, 2023 date at a hotel.  Okay.
Now, how many nights did you stay at that hotel?

A.   I don't recall.  Well, that was our -- that
was my birthday was on the 17th; so, that was the first
night I believe we stayed.

Q.   Your birthday was on March 17th?

A.   Mm-hmm.

Q.   That was also the same day your children were
taken away, correct?

A.   Correct.

Q.   Okay.  And tell us again why that was?

A.   Because I -- because I drank, and it's
against my parenting plan; and they felt like -- he had
felt like it was a safety concern that Cole kept
continuing to come around the home.

Q.   You had your children taken away from you
because you drank and because why?

A.   And because the ho -- they didn't feel the
home was safe anymore because he kept coming around and
he was -- it was a violent offense.

Q.   And you stayed at the hotel on March 17th;

correct?

A.    Correct.

Q.    Okay.  And you became extremely intoxicated that night; correct?

A.    Correct.

Q.    Okay, and you filmed some of this.

A.    I'm sorry, what?

Q.    You filmed some of this, some of your behaviour that night:  The running up and down the hotel room, --

A.    Mm-hmm.

Q.    -- the hotel hallway, --

A.    Correct.

Q.    -- you're accusing Mr. Gordon of cheating on you.  Did you assault Mr. Gordon that night?

A.    No.

Q.    You did not?  Okay.  Now, you stayed the next night as well; correct?

A.    That was the night of the assault, yeah.

Q.    Okay.  But Mr. Co -- Mr. Gordon left the hotel earlier; correct?

A.    He left once the police came.

Q.    He left once the police came?  He left -- he left earlier in the day.

A.    I don't re --

Q. Is that not right?

A. I don't know what time he left did during the day.

Q. Okay. And Have you seen any video footage of Mr. Gordon -- surveillance footage -- or anything from the hotel of Mr. Gordon being in the hotel at the time you allege he was in there at the time you allege he assaulted you?

A. Besides me seeing him with my own eyes?

Q. Have you seen any proof of that?

A. Besides me seeing him with my own eyes?

Q. Besides you seeing him, yes.

A. No.

Q. Is there any other proof of him being in the hotel at the time you allege he assaulted you except for your own testimony?

A. I have no idea.

Q. Now, how do you know -- how do you know Julie Foster?

A. Is that the acquaintance that was with us?

Q. Mm-hmm.

A. I met -- she was just an acquaintance, actually, that I met. She was also a victim.

Q. Okay. And so, how long -- how long had you known her to that point?

Case 3:24-cv-01121   Document 111-1   Filed 08/12/26   Page 251 of 314 PageID #: 2412

A. Not long.

Q. Okay. And so, did you just happen to run into her?

A. Yeah, at Cajun Steamer.

Q. Okay. So, did you recognize her?

A. Yes.

Q. Did she recognize you?

A. Yes.

Q. And how long before that had you actually met?

A. Like, a week or two prior: We had spent -- we had spent -- like, four hours together in a victim's --

Q. A year or two prior?

A. A week.

Q. Oh, a week or two prior?

A. A week prior, yeah.

Q. Okay. And had you two planned on meeting up there?

A. No.

Q. No?

A. No.

Q. Okay. Now, you first see her where, Cajun Steamer?

A. Yep.

Q. Okay, and then you see her -- where do you see her later?

A. They sat right next to us.

Q. At Cajun Steamer?

A. Yes.

Q. Okay. And then, where did you see her after that?

A. And then, we all went to Tony's together.

Q. You all went to Tony's together?

A. Yes.

Q. Okay. So, that --

A. And they --

Q. So, that was planned?

A. I'm not -- I guess, we just walked together.

Q. Okay, you all -- okay.

A. Yeah.

Q. You didn't just happen to run into each other again at Tony's: You all planned on going together. Do you all walk to there together?

A. I believe so, yeah.

Q. Okay. I want to back up just a little bit. There was discussion regarding an order of protection that happened that was taken a couple of months before this. That order -- that order of protection was dismissed by agreement, correct, on January 18th of

2023? And I'm -- there has been testimony in --

A. I can't hear you. Can you repeat that?

Q. That you're aware of an order of protection being dismissed January 18th of 2023?

A. I'm not sure which day it was.

Q. Let me just -- let me just show it to you just to be safe. And this is -- this is an agreed order dismissing an order of protection; correct?

A. Correct.

Q. And you were asked about this earlier.

A. Correct.

Q. And you acknowledged that, yes, you agreed to this.

A. Yep.

Q. And you've actually signed the document; correct?

A. Yep.

Q. Your signature is on the order of protection.

A. Yes.

Q. Okay. And who did you s -- who all did you speak to directly about this order of protection and its dismissal?

A. Well, Cole; and then, Jonathan Turner, my attorney at the time.

Q. Okay. Now, this order makes clear that

petitioner no longer fears the threat of imminent danger or harm from the respondent.

A. Correct.

Q. And you read that before you signed it; correct?

A. I guess.

Q. And you did sign the document?

A. Yep.

Q. And you were asked if Mr. Gordon asked you to sign the document; and you answer was that you believe he did.

A. Yeah. There's emails back and forth of him saying, When are you going to sign it? There's constant pressure to sign this document.

Q. Okay.

A. I did un -- I did sign it.

Q. Okay. And by signing it, you acknowledge that you no longer fear a threat of imminent danger or harm; correct? That's -- at least that's what you were stating to the Court on that day; correct?

A. Yes. When I signed it, yes.

Q. I'm trying not to jump around too much; but going back to the -- to the nights that you spent at the hotel, we saw video of you being interviewed by law enforcement after the alleged assault. Do you recall

that?

A. At the Cool Springs hotel?

Q. Yes.

A. Correct.

Q. Yes. Well, we saw video in the actual hotel room.

A. Correct.

Q. And then, later, there was a second interview; correct?

A. Correct.

Q. Okay. Now, it's true that you were wearing a wedding ring in that -- in that video.

A. I'm wearing a ring.

Q. You're wearing a ring.

A. Mm-hmm.

Q. Okay. And were you wearing that ring to donate that you were married?

A. I'm wearing the ring because I like the ring. It's -- like, I wear rings of many.

Q. Okay. Is this a ring that Mr. Gordon had given you?

A. No.

Q. I'm sorry?

A. No.

Q. It is not.

*BRIGGS & ASSOCIATES 615-482-0037*

A. No.

Q. Okay.

A. He actually ne -- he never gave me a ring.

Q. Okay. And you're -- and you -- again, you're maintaining that during this period you did not hold yourself to be married to Mr. Gordon?

A. Correct. I know that we had never had a ceremony.

Q. Okay. But yet, while Mr. Gordon was in custody he told you he was going to file for divorce. Is that correct?

A. I don't recall that.

Q. You don't recall that?

A. Yep.

Q. Okay. When did you and Mr. Gordon began using the TextNow app?

A. I don't -- I'm not -- I don't recall what that is.

Q. You don't recall a specific app that you'd use so that law enforcement wouldn't know you were communicating with Mr. Cole?

A. I don't recall what it -- the app was called, no.

Q. Okay, let me back up. Do you recall using a specific messaging app?

A.    Yeah, I think it's called WhatsApp.

Q.    WhatsApp?  Okay.

A.    Yeah.

Q.    And the intention of using this app was that so your communications could not be detected.  Is that correct?

A.    So he didn't -- so he doesn't get in trouble, correct.

Q.    Okay.  And you were using this communication app all the way up until him getting arrested; correct?

A.    I don't recall.

Q.    You don't recall?

A.    I don't recall.

Q.    August 19th -- or you were shown some text messages from Mr. Gordon between August 14th and August 20th of 2023 shortly before his arrest.  One of those messages referred to money in a bank account.

A.    Correct.

Q.    Do you recall that?

A.    Mm-hmm.

Q.    So, you two were sharing a bank account at this time?

A.    We had a shared bank account, yes.

Q.    You had a shared bank account, okay.  Would you agree that's something that married people do?

259

A. Anyone can have a shared bank account.

Q. You had a shared bank account, okay. So, your funds were co-mingled. Is that correct?

A. They weren't co-mingled; but yeah, it was acc -- we both had access to it.

Q. You both had access to the --

A. Yeah.

Q. -- to the account.

A. Mm-hmm.

Q. Okay. And this is roughly ten days before Mr. Gordon goes into custody. You're still -- you're still sharing a bank account.

A. I believe the text says, Don't touch the bank account. I'm not sharing anything.

Q. I'm just asking you are you sti -- are you still shari -- do you still have joint access to a bank account at that point?

A. At that time, if I wanted, yes.

Q. Now, who is Terry -- who's Terry Milner?

A. Who's -- sorry?

Q. Terry Milner.

A. I don't recall.

Q. You don't recall who Terry Milner is?

A. Terry Miller?

Q. Terry Milner.

A.    Uh-uh.

Q.    You don't recall reaching out this person multiple times between August 20th and September 1st regarding Mr. Gordon?

A.    I don't recognize that name, but if you give me context.

Q.    Okay.  Well, what was shown was evidence of Mr. Gordon having contact with you prior to his arrest; correct?

A.    Correct.

Q.    But you're not going to deny that you weren't also having contact with him; correct?

A.    With Terry, or Cole, or whoever?  Who are we --

Q.    With C -- whether it's a -- whether it's a WhatsApp, rather it's contacting someone indirectly so they can get messages to Cole:  These are things that you were doing while you were having contact with law enforcement telling them you weren't contacting Cole. Is that true?

A.    I did not use the Wh -- that app when I was contacting law enforcement.

Q.    No, you were contacting Cole through that -- you were contacting Mr. Gordon through that app.

A.    Well, I believe -- I believe he was in jail

at that time, and/or -- I believe he was in jail at that time.

Q. You believe he was in jail at what time?

A. Can you remind me of the dates you're talking about?

Q. Okay. Mr. Gordon went into jail September 1st of 2023.

A. Correct.

Q. Okay. You were having contact with Mr. Gordon through WhatsApp and indirectly through other people all the way up until his arrest.

A. I --

Q. Although, you were telling law enforcement that you weren't.

A. I did not contact him indirectly through anybody.

Q. But you were having contact through WhatsApp?

A. He was in jail though, I know.

Q. No, this is before he was arrested.

A. I don't recall.

Q. Now, you were asked by the State about a message -- about blocking Mr. Gordon while he was in custody.

A. Correct.

Q. Blocking his messages, is that correct?

A.     Mm-hmm.

Q.     Okay.  And you testified that this was so that he could no longer have contact with you?

A.     Correct.

Q.     Okay.  Now, isn't it true that you wanted to block this number because you wanted to use a burner number?

A.     False.

Q.     That's not true?  That's not true?

A.     Say that again.

Q.     You blocked Mr. Gordon; correct?

A.     Correct.

Q.     Okay.

A.     I believe -- I believe --

THE COURT:  Ms. Mishkin, can you sit a little closer to the microphone?  With the rain, it's difficult to hear.

BY MR. BURLISON:

A.     I believe the jail blocked any communication.

Q.     Okay.  But before that, you claimed to have blocked the communication; okay?

A.     I sa -- Yeah.  When I was blocked, I felt safer, correct.

Q.     But it wasn't because you didn't want to have contact:  It's because you wanted to use Jill Chase's

burner number.

A.   False.  False.

Q.   That is false?

A.   That is false.

MR. BURLISON:  Your Honor, if I may have a moment?

THE COURT:  You may.

BY MR. BURLISON:

Q.   I just want to -- Ms. Mishkin, I just want to clarify something real quick going back to the date at the hotel; okay?

A.   Yep.

Q.   You went to Cajun Steamer, it would have been earlier in the day around 11 a.m.; correct?

A.   I -- give or take.

Q.   Okay.  So, that would of been -- that would of been lunch.

A.   Give or take, I don't know the exact time we went.

Q.   Okay.  And Tony's, on the other hand, would have been later in the evening around 5 -- 5 p.m.?

A.   We went directly from Cajun Steamer's to Tony's that day.

Q.   Directly from Cajun Steamer's to Tony's?

A.   Correct.

Q.   Okay.  Ms. Mishkin, I'm going to hand you a document.

MR. BURLISON:  If I could first have it marked for identification?

THE COURT:  So, this will be Exhibit 30 for identification.

(ID Exhibit 30 was marked.)

BY MR. BURLISON:

Q.   Do you recognize this document?

A.   Yes.

Q.   Okay.  And did you -- is this in your handwriting?

A.   Yes.

Q.   Okay.  And do you recall when you wrote it?

A.   Yes.

Q.   And when was that?

A.   I don't know the exact date, but he was at the Spring Hill hotel, I believe.

Q.   Okay.  It said, June of 2023.  Does that sound accurate?

A.   I don't know the exact dates.

Q.   Okay.  And if you could read the -- read the context.

A.   Dear Cole, I love you so much.  You are so handsome.  I like being married to you.  Can we please

have sex today?  Love, Erin.

Q.    Okay.  So, in this letter, you obviously acknowledge being married or at least believing you're married to Mr. Gordon at the time; correct?

A.    I mean, I wrote it.

Q.    Okay.  You tell Mr. Gordon that you love him very much.

A.    Yep, I said that.

Q.    Okay.  Again, you don't deny writing this.

A.    Correct.

Q.    Okay.

MR. BURLISON:  Your Honor, I'd move to have that document entered as the next numbered exhibit.

THE COURT:  Any objection?

GEN. EVANS:  No, Your Honor.

THE COURT:  Exhibit 30 will be admitted. It's the June 23rd letter.

(Exhibit 30  was marked.)

THE COURT:  It will be -- it's already been marked for ID, but it will received as evidence. Anything further, Mr. Burlison?

MR. BURLISON:  No.  I'm sorry, pass the witness.

THE COURT:  Thank you.  Mr. Evans?

RECROSS EXAMINATION BY GEN. EVANS:

*BRIGGS & ASSOCIATES 615-482-0037*

Q.    Ms. Mishkin, --

A.    Yes.

Q.    -- the note that were just passed where it says, I like being married -- I like being married to you, did Mr. Gordon -- to the best of your knowledge, did Mr. Gordon believe that you were married?

A.    He knew we didn't have a ceremony.

Q.    But he repeatedly told you that you were married?

A.    I guess, yes.

Q.    Right.  I mean, he said he owned you because of the quote/unquote marriage.

A.    Correct.

Q.    Okay.  Did he ever use the fact that you were married, did he ever weaponize that against you?

A.    He used the fact that -- well, we knew we never had a ceremony.  But any information was always weaponized against me:  I'm going to loss the house if I don't do this, I'm going to --

Q.    And was that at least in part because of this fake marriage?

A.    Correct.  He said he was going to get half my house and half of everything due to this marriage.

Q.    Did he ever forge any documents either related to you, or from you, or anything like that?

A. Yes.

Q. Can you tell me what those were?

A. It was an affidavit.

MR. BURLISON: I object to speculation.

THE COURT: Does she have first-hand knowledge?

GEN. EVANS: The State's position is yes, Your Honor; I can be more specific.

THE COURT: Well, I'll let you -- I'll take that objection under advisement for now and let you try to lay some foundation.

BY GEN. EVANS:

Q. Ms. Mishkin, tell me about the marriage certificate. We've talked about it a couple of times, but we've never actually talked about the document itself.

A. Sure. So, when you go to the courthouse, you get some sort of certificate; but to have the ceremony, you have to have a witness and a pastor. And when I went down to the courthouse to ask if we really were married and I see the certificate, there's a pastor I never met on there and his father as a witness who was passed away at the time.

Q. Who's father?

A. Cole's father.

Q. And you said he was -- he had already passed away at the time of the --

A. Correct.

Q. -- when that signature would have been put on there.

A. Correct.

Q. Was the marriage annulled?

A. Yes.

Q. Why?

A. Because he forged the document.

Q. So, the Court found that the document had been forged?

A. Correct.

Q. The Court found the document had been forged by Mr. Gordon?

A. Correct.

Q. Which court?

A. It was --

Q. Was it the Williamson County Chancery Court?

A. Yes, Judge Johnson.

Q. Judge Johnson sitting as a chancellor?

A. Yes.

GEN. EVANS: No further questions, Your Honor.

REDIRECT EXAMINATION BY MR. BURLISON:

Q.   Ms. Mishkin, one of the first questions I asked you was, Did you consider yourself to be married after you walked in the clerk's office that day?  Okay?  Now, you explained there wasn't a ceremony.

A.   Right.

Q.   Alright.  It wasn't asked if you believed you were officially married under the eyes of the law.  I asked you, Did you hold yourself out to be married?

A.   No.

Q.   Do you recall that?

A.   Do I recall you asking me that question?

Q.   Yes.

A.   Yes.

Q.   Okay.  Did you refer to Mr. Gordon as your husband?

A.   No.

Q.   Again, I'm not asking if the marriage was legal; I'm not asking how the marriage ended.  I'm asking, Did you hold yourself out to be married?  And your answer was, No.

A.   Correct.

Q.   But yet, you were just handed a handwritten document from June of 2023 which st -- which you admitted to writing that said you liked being married to Mr. Gordon.

A. Correct.

Q. And you're still going to deny the absolute fact that is uncontroverted in multiple locations, police reports and otherwise, that you referred to Mr. Gordon as your husband? You held yourself out to be married to Mr. Gordon.

A. No.

Q. Is that correct?

A. No, I did not hold myself out to be.

Q. Even though that's what multiple documents say --

A. Correct.

Q. -- based on your own statements?

A. Correct.

Q. Correct, then explain that to us. How can you sit -- how can you say that Mr. Gordon is your husband, Mr. Gor -- you are holding yourself out to be married. Okay? There are countless instances of it, and you know, and you were just shown one; and yet, you're going to still sit there and say that's false. Explain that.

A. Can you be more clear with your question?

Q. Yes. Yes. Did you consider yourself to be married to Mr. Gordon?

A. No.

Q. Did you hold yourself out to be married to Mr. Gordon?

A. No.

Q. Did you tell multiple people that he was your husband?

A. No.

Q. Did you tell multiple people that he -- that you were married to him?

A. No.

Q. Did you write on a note, I like being married to you, Cole?

A. Yes.

Q. Okay. So, the one that you were shown, you're going to say, Yes?

A. Right.

Q. But you're going to deny the countless other ones. Is that correct?

A. Correct.

Q. Okay. Now, --

MR. BURLISON: Alright, nothing further.

THE COURT: Thank you, Mr. Burlison.

RECROSS EXAMINATION BY GEN. EVANS:

Q. So, Erin, I kind of want to -- I want to walk through this, hopefully, for the last time. You said you went to the -- to the courthouse to get a marriage

certificate.

A. Correct.

Q. Your intent was to get a marriage certificate.

A. Correct.

Q. Your intent was not to be married.

A. Correct.

Q. Okay. You told us that you're -- you left the courthouse knowing that you did not have a ceremony.

A. Correct.

Q. That you did not intend to have a ceremony.

A. Correct.

Q. And you know, you told us earlier that immediately following leaving the courthouse, the next day, he said he owned you.

A. That night, correct.

Q. That night?

A. Yep.

Q. You said that at that moment from that point forward you never wanted to be married to him.

A. Correct.

Q. You told us that you wrote a letter.

A. Correct.

Q. And you wrote this note that says, I like being married to you.

A.   Correct.

Q.   Why did you write the note?  Did you like being married to Cole?

A.   I did not like being in a relationship with Cole, no.

Q.   Were you married to Cole?

A.   No.

Q.   So, why did you write the letter that says you liked it?

A.   I -- I don't have an explanation.

Q.   Did you write it to placate him?  Did you write it to pacify him?

A.   Perhaps.

Q.   Did you write it because you were afraid?

A.   I'm in constant fear; I don't want that to be downplayed.

Q.   Okay, and I'm not trying to downplay that.

A.   Yeah.

Q.   I want to make sure that we understand that from July of 2021 until -- well, I was going to say until today -- but going forward, you are still afraid.

A.   Correct.

Q.   And you have done things that don't make a whole lot of sense because you were afraid.

A.   Correct.

Q. Including writing a letter that says you like being married to Cole.

A. Correct.

REDIRECT EXAMINATION BY MR. BURLISON:

Q. Dear Cole, I love you so much. You are so handsome. I like being married to you. Can we please have sex today? I love you. Love, Erin. Does that sound like someone who's in fear? Does that sound like someone who's scared?

A. I'm telling you how I feel. I can't say what someone else would feel.

Q. Okay. When you hear that, does that sound like it's written by someone who's in fear?

A. I can't comment on someone else.

Q. I'm asking -- well, you're the one that wrote it.

A. Correct.

Q. Okay. You're saying this was written by someone who was in fear?

A. I'm s --

Q. Someone who voluntarily went to Mr. Gordon's condo multiple days in a row; correct? Who continued to have contact with Mr. Gordon after he went into custody, voluntarily by text message, video. You were initiating some of these contacts; correct?

A. Correct.

Q. Okay.

A. I was stuck in a cycle of abuse.

Q. And the only reason it stopped is because he could no longer get access to video and text messages; correct?

A. False, it stopped because I finally got a voice.

Q. No, video and text stopped. You kept writing mail, and writing letters, and sending it to Mr. Gordon; correct?

A. I did not write -- false.

Q. When's the last time you had contact with Mr. Gordon?

A. I actually can't remember.

Q. Okay. Within the past month?

A. No.

Q. You -- your testimony today is that you're not still having contact with Mr. Gordon?

A. One-hundred percent.

Q. You're not sending letters to Mr. Gordon?

A. No, no.

Q. Have you sent any letters to Mr. Gordon while he's been in custody since September 1st of 2023?

A. No.

MR. BURLISON:  No more questions, Your Honor.

THE COURT:  Thank you, Mr. Burlison.

GEN. EVANS:  The State asks that Ms. Mishkin be released from subpoena.

THE COURT:  Yes.  Any other witnesses?

GEN. EVANS:  Procedurally, I'm unsure where we are at this point.  I know it is technically the Defense's motion at this point, although they're sort of merged.  At this point, the State's going to ask to introduce a couple of documents, certified copies of the indictments.

THE COURT:  Well, let me ask Mr. Burlison. Do you have any other witnesses?

MR. BURLISON:  No, Your Honor.

THE COURT:  What documents would you like to introduce?

GEN. EVANS:  These are the indictments in B-CR230266, 267, and 0248.  The State's introducing these because the allegations contained within the indictment in this case, 230655, required that the coercion occur at a point at which the defendant was under indictment for a particular series of cases. These are the cases to show that he was under indictment for those cases.

THE COURT:  Alright.  Any objection?

Case 3:24-cv-01121    Document 111-1    Filed 08/12/26    Page 276 of 314 PageID #: 2437

MR. BURLISON: No, Your Honor.

THE COURT: So, you want to do this as a collective or individually?

GEN. EVANS: Collective is fine.

THE COURT: So, 31 collective will be indictments in cases ending in 266, 267, and 248.

(Exhibit 31 was marked.)

GEN. EVANS: Your Honor, if the Defense has no further witnesses, the State's going to ask that the Court rule on Mr. Burlison's motion at this time.

MR. BURLISON: And Your Honor, if the Court does that, the Defense will ask the Court to reserve ruling. Based on the testimony today, we anticipate evidence through expert testimony and otherwise that the Court needs to hear that will not be presented at this time; so, we would ask the Court to reserve ruling on the 404b motion as to the -- as to the alleged victim.

THE COURT: And I understand the statement may not be complete; but at this point, I intend to take both of those motions under advisement and do my own research as it relates to 404b specifically in cases involving allegations of aggravated stalking and violations of protective orders. So, --

GEN. EVANS: And just to sort of put it on the record at this point, Judge: The State, as far as

the argument on the witness -- or on the expert witness goes, the State does feel that it's important at this point to notice -- or to note that the Defense notice of introduction of an expert witness, it indicates that the witness is an expert in handwriting analysis.  Ms. Mishkin has indicated that the handwriting at least looks like her's.  She's indicated that she didn't send the letters.

The question is not whether she wrote the letters; the question is, Did she send the letters at this point?  And the expert is not an expert on sending letters, postal procedure, jail receipt, psychology of victims.  So, the -- if the question is whether or not a handwriting expert is going to testify that the handwriting looks like Erin's handwriting, that's not an area that's up for discussion -- up for debate.

MR. BURLISON:  Your Honor, as the Defense said earlier, how the Defense intends to overcome evidentiary hurdles in showing that Ms. Mishkin not only authored those letters but also is the one that sent them into the jail, that is wholly separate as to whether or not Ms. Peterson's, as a handwriting expert's, testimony is reliable and relevant in being able to determine that Ms. Mishkin in fact authored those letters.

Ms. Mishkin denied outright writing the letters, so let's not get confused. Let's not say, Well, she denied sending them, but maybe she didn't -- No. She denied outright that she -- that she's the author of those letters; so, whether or not she wrote them is absolutely at issue. It is important for a jury to hear from someone who's completely impartial and not just a lay witness, but an expert witness who can contradict her testimony.

GEN. EVANS: Judge, to that point, this idea of how this -- how the Defense is going to navigate these issues of admissibility or how they're going to prove that she did in fact author them. Why are we here? We're here for that motion. We're here for the Defense in the 404b to prove to a cle -- as clear and convincing evidence standard that the Defe -- or that the victim in this case did in fact send those letters. There's no proof: They have failed to meet that burden.

THE COURT: Well, it has to be clear and convincing -- the prior bad acts would have to be clear and convincing, and she did deny sending the letters; but based on counsel's statement, he would intend to prove that up through the expert witness. Is that an accurate summary of your statement?

GEN. EVANS: But Judge, I don't think it is

because the Defense has already said that she's an

expert in handwriting and that there are other means by

which they intend to show that she authored it and sent

it.  What are these other means by which she -- that the

Defense is going to prove that she sent?  The State

asserts that the Defense has a burden today and that's

clear and convincing to show that she sent them, and how

-- the Defense has failed to meet that burden.  We talk

about the Defense is going to overcome those hurdles

eventually at some point in the ether, but there's

nothing in the record to suggest that; and that was the

defendant's burden today.

THE COURT:  What do you say to that, Mr.

Burlison?

MR. BURLISON:  The first burden to overcome

is proving that Ms. Mishkin authored those documents;

okay?  Now, we do not believe that we have to -- that it

should get to a jury, but we do not believe it has to be

proven by clear and convincing evidence that Ms. Mishkin

necessarily sent the letters into the jail for that

evidence to go to the Jury.  We can prove that Ms.

Mishkin wrote the letters.  We can prove that Ms.

Mishkin wrote the envelopes with a delivery address, a

return address, on certain dates.  And so, there is

clear circumstantial evidence that if she wrote the

Case 3:24-cv-01121    Document 111-1    Filed 08/12/26    Page 280 of 314 PageID #: 2441

letters she in fact sent the letters in; we believe that through expert testimony we can show by clear and convincing evidence that she in fact did so.

THE COURT: And Mr. Evans is saying, Well, the time -- the time to do that was now; and that hasn't been done, so --

MR. BURLISON: Well, and --

GEN. EVANS: And the State's assertion, to be clear, is that the writing of the letters, whatever, that's fine; but the sending of the letters is in and of itself an act prohibited by 404b unless the Defense is able to prove by clear and convincing evidence that act did happen, and they failed to do that.

MR. BURLISON: Well, I've -- I've already asked the Court to reserve ruling for additional proof to be heard, so I'm telling the Court that we're not meeting the burden by clear and convincing evidence today.

THE COURT: But that by virtue of your expert, you'll be able to?

MR. BURLISON: Correct.

THE COURT: I'm going to take it under advisement.

GEN. EVANS: For clarity on the defendant's motion, Your Honor, can the State also ask another

question of the Defense?

THE COURT: Sure.

GEN. EVANS: So, the Defense talked about a dismissal order out of general sessions court, some allegations that the defendant lied in terms of receiving food stamps, that she sent texts from the defendant's computer, that she sent from a WhatsApp account, and that she intended to use Jill Chase's phone number as some sort of garner account; again, what we have is no proof of any of those. One, those were not noticed to the State in the defendant's 404 motion; and two, there's no proof. So, the State's asking, If they weren't relevant -- or, is it the defendant's intent to introduce these other pieces of evidence? And if so, what's the -- what's the foundation that they're relying on to reach the clear and convincing standard? Or are we going to have another motion?

THE COURT: You can ask the question. I don't know if you're -- if the Defense is in a position to reveal its strategy. I mean, certainly, the Court appreciates motions in limine as they help the Jury process and not prolong a jury trial any longer than necessary. And certain issues have to be taken up outside the hearing of the Jury, such as a 404b motion. But any -- ultimately, matters are subject to -- or

perspective evidence is subject to objection at any time during the course -- or prior to, or during the course of the trial. So, you can certainly ask Mr. Burlison that question, but I would not require him to answer unless he so chooses.

GEN. EVANS: But to -- I want to be -- to be clear for the record, the Court is not ruling today that the dismissal order is admissible under 404b, the Court is not ruling today that the food stamps questions are admissible?

THE COURT: No.

GEN. EVANS: Or the text messages about the computer, or the text messages about WhatsApp, or the use of Jill Chase's burner phone?

THE COURT: No.

GEN. EVANS: Is there any other 404b evidence that the Defense intends to introduce that the State would be required to be noticed on pursuant to rule 404?

THE COURT: Well, that's up to the State. All I can tell you is if the Def -- I mean, that's up to the Defense. If the Defense seeks to introduce evidence that is 404b that has not been previously noticed and had the opportunity to be heard, then under the rules of evidence it would not come in. But I'll -- so, the burden's on the -- on the party who seeks the admission

Case 3:24-cv-01121    Document 111-1    Filed 08/12/26    Page 283 of 314 PageID #: 2444

of evidence to insure that it is both authenticated, and admissible, and in compliance with the Tennessee rules of evidence. So, I'm -- I can't speak for Mr. Burlison in this case in particular; but in general, anything that has not been properly noticed and/or -- and had the opportunity to be heard by the Court would not be admissible as it relates to 404b.

GEN. EVANS: Your Honor, the State has four other witnesses to call. We intend to move through them as quickly as possible. They have been here all day, and --

THE COURT: Four other witnesses on your motion for --

GEN. EVANS: On the 404b motion, Your Honor. The State intends to call Detective Dillon Lipinski, Officer Jonathan Corner, Detective Jill Canovan, and specifically today, the State needs to call Chad Youker from -- Lieutenant Youker from the Williamson County Sheriff's Office to discuss the defendant's actions in the last 48 to 72 hours regarding the package that arrived at Ms. Mishkin's house. That -- the State indicated that we were going to call witnesses; we called at least one. The State feels that to complete the story to prove up our claim we need to call Lieutenant Youker at the very least.

THE COURT: Well, let's start with Lieutenant Youker. I don't anticipate staying late. If we need to have another setting, and I regret any witnesses that have been here all day that we may not get to today. But, I also want to respect the lives of the other folks in the courtroom; so, if we need to set this on another day for a continuation, we can do that as well.

GEN. DUNGAN: And if we're able to call another witness, if we go fast enough through Youker, Officer Corner is a midnight officer and was up all night last night and been sitting here all day waiting to testify. I'm sure the Court can --

THE COURT: Are you -- you may be playing on the Court's sympathies as it relates to midnight officers, but we'll -- well, yeah, let's get him in here. Let's see what we can knock out before 5:30.

GEN. DUNGAN: This is Captain Youker.

Whereupon,

CAPTAIN CHAD YOUKER,

having been first duly sworn, was examined and deposed as follows:

THE COURT: And Detective, there's water in the pitcher on your right. Please answer all questions audibly and speak into the microphone, thank you.

DIRECT EXAMINATION BY GEN. DUNGAN:

Q.   Could you please state your name?

A.   Chad Youker.

Q.   And what is your rank?

A.   I am the Captain of Operations for the Williamson County Sheriff's Office Detention Division.

Q.   Okay.  And so, Captain Youker, in your capacity as the captain of detention, have you -- do you know who Mr. Robert Cole Gordon is?

A.   Yes.  Yes I do.

Q.   And why do you know who he is?

A.   He's an inmate that's in our custody, and I've had several run-ins with him since he's been in our custody.

Q.   Okay.  And is it -- if I -- I'm going to try to go fast.  Did Mr. Gordon come into custody back in September of 2023?

A.   I believe that was his date, yes.

Q.   Okay.  And in September of 2023, were there specific vio -- did he have write-ups in the jail?

A.   Yes.

Q.   And were these bad behaviours that occurred in the jail?

A.   Yes.

Q.   And if I -- If I can pass up -- oh, I think we're missing one of them.  Do you need to see them to

talk about them? Do you have them in front of you?

A. I've got them -- I've got them in front of me.

Q. Okay. It's okay.

GEN. DUNGAN: I'm not going -- unless the Court wants these in the record, I'm not going to put these in the record; but I've passed them to the Defense.

BY GEN. DUNGAN:

Q. Can you explain to the Court what the defendant's first write-up was for?

A. So, September 28th, 2023, the first write-up that he received from me was -- I was made aware that he was utilizing legal mail to try to pass mail to his victim, Ms. Erin Mishkin.

Q. Okay. And at that point, had his contact -- had her number already been blocked through the system?

A. Yes.

Q. Okay. So, had you become aware that he had been contacting her continuously from the jail?

A. Yes, ma'am.

Q. Did you -- were there videos?

A. Yes, ma'am. There was videos of the video chats and phone calls I believe, if I recall correctly, of him contacting her.

Q.   Okay.  And were any of those reviewed?

A.   Yes.

Q.   And what was the nature of those?

A.   They were disrespectful and threatening in manner if I -- if I can recall.

Q.   Okay.  And did Ms. Mishkin ask him repeatedly to stop contacting her?

A.   Yes.

Q.   Okay.  And so, at that point, he was cut off from being able to contact her electronically?

A.   Correct.

Q.   Okay.  And so, at some point, did the jail cut off his ability to write her letters?

A.   Yes.  I was -- I was asked to have his mail suspended going to Ms. Mishkin at the address that was where she lived.

Q.   Okay.  And at that point, it was af -- was it after that point that you found out he was still writing her by marking his mail "legal mail"?

A.   Yeah.  So, he was -- he was addressing them to a -- The Law Offices of John Ballard, but he was utilizing Ms. Mishkin's address.

Q.   Okay.  And that viol -- did that violate the rules of the jail?

A.   Absolutely.

Q.   Okay.  And was he disciplined for that?

A.   He was.

Q.   Okay.  And do you know if he continued to write her after that?

A.   I -- if I recall, I'm pretty sure that he started utilizing other inmates to send messages to her because we, at that point, were only focused on his mail and not necessarily other inmates mail.  So, to my recollection, he was utilizing other inmates to send mail to Ms. Mishkin.

Q.   Okay.  So, at that point, did you have to search -- screening all the mail in his pod to make sure no mail was going out to Ms. Mishkin's address?

A.   Yes.  Yes.

Q.   Okay.  And then, -- since then, -- what is legal mail?  What makes it different from regular mail?

A.   So, legal mail is just mail that's supposed to be privileged between himself and his attorneys; then, there's a couple other areas, the courts and a couple of little legal entities that fall within that realm of legal mail.

Q.   Okay.  So, if a defendant writes legal mail on an envelope, can you open it?

A.   No, not just because.  The only reason that I opened these were because there were brought to my

attention.  And I -- and I cross referenced the addresses to Ms. Mishkin, and it did not match the address of the attorney in which he was claiming to be writing to.

Q.  Okay.  So, right now, if the defendant labels -- if Mr. Gordon is labeling stuff "legal mail", are you all opening it?

A.  No.

Q.  Okay.  But are you keeping track of the items he sends out as legal mail?

A.  Yes.  Yes, we are.

Q.  Okay.  And do you keep track of the items that come in that he -- that he receives that's marked "legal mail"?

A.  Yes.  Yes, we do.

Q.  Okay.  And do you keep track of them on two different systems?

A.  So, yes, we are currently.  It's on our jail management system there is a -- there's a mail portion of the JMS that we can log incoming mail, and that's where we log all inmates incoming legal mail into the system.

Q.  Okay.  So, when inmates legal mail comes in, is it given then directly to them?

A.  No.  So, it'll come in, it'll get logged in

to the system as arriving to the facility, it will be given to one of our deputies who will take it down to the -- to the inmates housing area, we'll pull the inmates out of the housing area, we'll open it up in front of them, and we'll just briefly review it, not really reading in depth about it but just kind of an overview just to make sure that we can tell whether it's legal mail or just not legal mail. And then, we make a photocopy of it right in front on them using a mobile scanner of both the incoming mail as well as the envelopes and stuff. And then, we provide them with a copy, and we shred the original in front of them. And we started doing that a couple years ago to reduce contraband coming into the facility.

Q. Okay. So, -- but for Mr. Gordon, do you also track his outgoing legal mail?

A. We track all of Mr. Gordon's outgoing mail. Anything that Mr. Gordon sends out, we track. We keep a spreadsheet of all that.

Q. And is that because of his behaviour in the jail?

A. Correct.

Q. Okay, but you still don't open his legal mail.

A. Correct.

Q. Okay. Could -- did you prepare for court today, spreadsheets of both his incoming mail and his outgoing legal mail?

A. I did.

Q. And was that the records that you keep in the regular course of your business at the jail?

A. Yes.

Q. Okay. And if I might pass these to you? And are those the -- the logs you made for today?

A. Yeah, so -- so, the one that says "Williamson County Corrections Mail Log" at the top, that's his incoming legal mail that we keep track of; and the other spreadsheets are his outgoing mail.

Q. Okay.

GEN. DUNGAN: And Your Honor, may we mark this as -- I guess, this is an exhibit to -- probably Exhibit No. 1 to the State's oral motion to -- well, Exhibit No. 2. The first motion -- to the Defense -- to the State's oral motion to restrict Mr. Gordon's communication.

THE COURT: Well, since Exhibit 1 was admitted, and it was the collective text messages from the -- through the sheriff's department, let's just continue on with Exhibit 32.

GEN. DUNGAN: Okay. Thank you, Your Honor.

THE COURT: Is there any objection, Mr. Burlison?

MR. BURLISON: No, Your Honor.

THE COURT: So, Exhibit 32 will be the Williamson County Mail Log.

(Exhibit 32 was marked.)

BY GEN. DUNGAN:

Q. And did you, today, go through an email stream of Mr. Gordon's with a ████████?

A. Yes, ma'am, I did.

Q. And were you able to identify the person that was associated -- or in some way identified the account that was associated with that email account?

A. Yes, ma'am. I was able to run the address, the email address, against the visitation profile; and it showed name, ID number, all the -- all the things that they're required to provide when they create a user profile for the software that we have for communication with the inmates.

Q. Okay. And did you certify those texts as well?

A. I did.

Q. Okay.

GEN. DUNGAN: And those texts, Your Honor, are already admitted as Exhibit 1.

THE COURT:  Thank you.

GEN. DUNGAN:  Those are all the questions that I have for Captain Youker.

THE COURT:  Okay.  Mr. Burlison?

CROSS EXAMINATION BY MR. BURLISON:

Q.  Captain Youker, I want to discuss the distinction on legal mail a little bit.  You said there was legal mail and some other classifications that fall under that.  Is that religious mail?

A.  Uh-uh.

Q.  How about -- what else falls under that category?

A.  So, it's been -- it's been told to me by our county attorney that it's anything to the courts.  I know that we've received some stuff from -- like, Department of Child Services that can -- that can fall under that realm.  There's a -- there's a small list of things that can fall under the scope of legal mail.

Q.  Okay, so you've described the process of receiving incoming mail --

A.  Correct.

Q.  -- that's labeled legal; okay?

A.  Correct.

Q.  You've said that -- that piece of mail would be logged; correct?

A.    Yes.

Q.    And then, it would be opened.

A.    Right.

Q.    Taken to the --

A.    Nope.

Q.    Taken to the inmate, then opened.

A.    Taken to the inmate, opened in front of them, photocopied; and then, they would shred -- they will shred the originals in front of the inmates so that they don't keep the originals in case they've been soaked in drugs, or anything like that.

Q.    Okay.  And there was a per -- was there not a period of time where no photo copy was made because of the risk of drugs being brought in to the --

A.    I don't know that I understand your question. Was there a period of time that we didn't photocopy?

Q.    Right.

A.    We started doing this two, or three, or four years ago I believe.

Q.    Okay.  To your knowledge, was there a period of time where the inmate would only be allowed to view the legal mail, not receive it -- not receive a copy, and then that mail be shredded?

A.    No, absolutely not, never.

Q.    There's never been a period of time to your

knowledge?

A. There should -- there should never be a time period when that ever happened: They are entitled to legal mail.

Q. Okay. So, there would not of been a period of time where they did not -- were not at least offered the opportunity for a -- to receive a copy of that mail?

A. Correct.

Q. And are you aware of any, I guess, civil matters -- law suits that Mr. Gordon has pending?

A. Yes.

Q. Okay. Now, I would suspect that mail comes in and goes out that is related to those -- to those cases.

A. I'm not the one that does legal mail, so --

Q. You don't know with legal?

A. I can't -- I can't say whether or not that is a fact.

Q. Okay. But you are aware that he has pending -- he has pending civil litigation?

A. Yes.

Q. Okay. And it's safe to say in your experience in the jail that inmates that do have pending civil matters, or maybe criminal matters outside of the jurisdiction, will receive mail related to those civil

matters?

A. Sure, absolutely.

Q. And they may also send those -- send mail out legitimately related to those -- that pending litigation?

A. Yes.

Q. Okay. And you said you don't work, but are you aware of any situation where Mr. Gordon is in fact sending legitimate legal filings or sending civil correspondence re -- legal correspondence relating to pending civil cases?

A. I don't necessarily know of any specifics in regarding to that. I know that he request a lot of documentation from myself, and I can only assume that is what it's for. But all of his mail does not cross my desk. I don't go through his mail. I have a mail clerk that handles that at this time. So, anything that's incoming and outgoing generally doesn't cross my desk unless I have a specific question.

This in question, the write-ups that I -- the two write-ups that I gave him, I was -- I had informed my mail clerk to pay attention to the addresses in which he was sending stuff out, and that's when it was brought to my attention that he was sending stuff out to the address -- or to the attorney; and that's why I cross

referenced the address because we kept getting complaints that he was still contacting Ms. Mishkin, and we couldn't figure out how.

Q. I guess, my point is -- you know, we look at these spreadsheets, this is a lot of legitimate legal correspondence.

A. I don't know if --

Q. And it's not just -- it's not just to me.

A. Sure, and I don't know if that is or not. Generally, if the inmates seal their envelope and they write legal on it, we will -- we will generally just allow that to go out unless questions are raised; and then, we will start kind of investigating further in regard to cross referencing addresses to attorney's name or verifying that attorneys aren't truly attorneys. With a population of three-hundred and forty inmates, it's hard to do that with every single inmate that tries to send out stuff.

Q. Okay. Alright.

MR. BURLISON: Your Honor, if I may have a moment?

THE COURT: You may.

MR. BURLISON: No further questions, thank you.

THE COURT: Thank you, Mr. Burlison. Any

redirect?

GEN. DUNGAN:  Just briefly.

REDIRECT EXAMINATION BY GEN. DUNGAN:

Q.   I'm sorry, I should have brought this up first just for the Court's knowledge.  Are you aware of the defendant's litigation outside of this because he's suing you currently?

A.   I am aware of that.  I was made aware of that yesterday by the county attorney that -- but we haven't been officially served yet, but we -- yeah, he has filed for it which --

Q.   Okay.  And you get sued periodically by inmates?

A.   Yes.

Q.   Okay.  And that wouldn't affect your testimony today?

A.   Absolutely, not.

Q.   Okay.  And do you have the ability, if the Court asks you to, to lock the system of video, and email, and text to where the only ones he could use would be phone numbers provided by his attorney's office?

A.   Yes, ma'am.

Q.   And email addresses provided by his attorney's office?

A.    Yes, ma'am.

Q.    And you would -- and you do now screen his legal mail anyways.  Could you stop all mail coming in to Mr. Gordon?

A.    Yes, ma'am.

Q.    Okay.

GEN. DUNGAN:  That's all I have, thank you.

THE COURT:  Thank you.  Anything further, Mr. Burlison?

MR. BURLISON:  No.  Nope, no further questions.

THE COURT:  Thank you.

CAPT. YOUKER:  Thank you, Your Honor.

THE COURT:  You may step down.

GEN. DUNGAN:  Thank you, Captain Youker.

CAPT. YOUKER:  Yes, ma'am.

GEN. DUNGAN:  Your Honor, the Court -- either the Defense can agree to let me explain some other stuff that will be important for this motion, or the Court will need to hear from Detective Canovan.  The Court -- the State expects Detective Canovan to go through this list that we just made an exhibit and tell you which -- which letters that are marked legal mail by the defendant are going to people who are not attorneys, which will show the Court that he is still abusing the

legal mail system from the jail. He constantly marks things to even his family, to other defendants, including Kenneth Zebley, who is -- who took possession to the phones that are issue in this matter, as legal mail. The -- and so, the State can certainly put that on.

Also, the State does have certified copies; the defendant is currently indicted for violating the order of protection against the victim because he kept issuing subpoenas for her personal records from other cases that he will file pro se includi -- and the two cases that the State has indicted him on have since already been dismissed in Davidson County. Davidson County, also in the order, put everything under seal related to Ms. Mishkin; and I believe the order says that he was harassing her, but I'll have to pull it and find it, Your Honor. And so, the State's dubious of Mr. Gordon's need to file additional civil suits.

MR. BURLISON: Your Honor, it's the Defense's position that Mr. Gordon is exercising his right to the courts as a pro se litigate in those cases, and it was not for any prejudice or harassment. I mean, we're talking specifically about charges that the State has brought; it is not for the purpose of harassment, but merely to investigate and -- and properly litigate those

pending cases. That's not necessarily what we're -- we're talking about today.

I know the Court's going want to limit something because of the testimony that was presented. I don't necessarily -- I don't necessarily need the State to put on additional proof unless they have concerns with what I'm about to say. I just have a lot of concern with Mr. Gordon's mail privileges to be limited solely to contact with me. He has legitimate -- legitimate issues. His sister is an attorney. So. maybe the St -- maybe the jail is saying, Well, he's putting legal on something that's -- that shouldn't be marked legal. Well, they don't know if his sister is representing him on something. This is how it gets complicated.

So, again, I know the Court's probably going to want to limit to a certain extent; but I'm very -- as Mr. Gordon's advocate in the pending criminal cases, albeit not in the civil cases, I respect his ability to be able to properly litigate those. And I would hate to see his privileges reduced in a way that -- that prevents him from being able to properly exercise his right to the courts.

THE COURT: Alright. The concern that I have is they're -- we have two -- two issues, which I believe

would require a different examination. One, we have just the general first-amendment right; but then, there's also the access to the courts and the right to counsel in a criminal case. And I did some limited research on this already before court today. And so, that -- or during the breaks, excuse me, during lunch. And that is what is concerning because the -- the Court is not inclined to limit his ability to seek redress for whatever grievances through our judicial system.

GEN. DUNGAN: No, Your Honor. But -- I mean, I can tell you right here: On March 13th, 2025, he sent a letter "legal mail" to Drew Hawkins; and he wrote, Esquire, ESQ. And the address is 5105 Long Street in Brentwood, TN. I know who Drew Hawkins is because I prosecuted him, and he was in jail with the defendant; and that is in fact, I think, his parents' address where he's not even supposed to be. And so, he's certainly not an attorney. And I can put Jill Canovan on to go through this list and point out other people who are not attorneys, who are other defendants, that the defendant is writing to and calling attorneys.

So, at a minimum, his mail -- his legal mail needs to be screened because he's abusing the system. And he's finding ways in doing that to continue to threaten, coerce, and harass the victim; and the victim

has rights.  And the jail has a responsibility to protect the victim from the defendant while they house him.

THE COURT:  Well, and -- we also have a coup -- we have mail, we also have the text messaging which I think we can -- we can put a stop to without much debate or discussion, I think.  The Court does find based on the text messages that were introduced as Exhibit 1 taken in conjunction with the testimony and the evidence that was admitted as Exhibit 28, I believe it was, I think the Court can -- excuse me, that was admitted as Exhibit 29.  The Court does find that Mr. Cole's -- or Mr. -- excuse me, Mr. Gordon's ability to send text messages is hereby put to a stop.

GEN. DUNGAN:  Your Honor, would this include emails, phone calls, and video calls?  He is directing people, Your Honor.

THE COURT:  I understand.  The -- the concern that I have is both in his -- in the Defense of this case, as well as other litigation that is pending as evidence by the testimony today, I don't want to interfere with his ability to litigate his cases.  And I'm not sure what counsel he's represented -- or to the extent if he's pro se, limiting his ability to proceed pro se.

GEN. DUNGAN:  That's something else Jill Canovan could talk about is she called several of the attorneys and only found one that currently represents him, Nick -- it's starts with a P, and then the public defender.  Certainly, the defendant, if he's going to be allowed to continue to write legal mail, can correspond through legal mail.  There's no reason that he has to have the convenience of being able to correspond via text, email, video, or phone call when he is abusing that system.

THE COURT:  Mr. Burlison, what are your thoughts on limiting those items to either you or attorneys that you have identified as legitimate attorneys that he needs to reach out to, either his attorneys or opposing counsel if he's pro se?

MR. BURLISON:  I mean, I suspect the Court's leaning that way.  I -- we can provide, I guess, names that should be exempted in the filings.

GEN. DUNGAN:  Sure.  And the State would just like an opportunity for the detective to investigate those names to ensure that they are actually one, attorneys, and two, attorneys that would like to be contacted.  I know that he continues to contact attorneys that do not want him to contact them and continues to subpoena them, and I'm certain they would

Case 3:24-cv-01121    Document 111-1    Filed 08/12/26    Page 305 of 314 PageID #: 2466

rather him not be allowed to; so, if they would like to provide a list for the detective to investigate who is actually an attorney, could we go from there?

THE COURT: Let's do this: I'll ask Mr. Burlison to provide a list after consulting with your client of legal related individuals to whom he will need to correspond, and I ask that you give -- and I'll allow correspondence by mail or email to those individuals. I'm not going to put the defendant or Mr. Burlison in a position where the State has to sign off on that before -- or they have to sign off on it in advance. But once that list is provided, I ask that Mr. Burlison provide it to the sheriff's department as well as to the State. The State can then investigate; and if they have any issues with any of the people on the list, you can submit that to the Court, and I will be glad to -- to take that up.

GEN. DUNGAN: Will this order encompass text, email, phone, video, and legal mail? And it could include allowing him to freely write to different clerk's offices that he likes -- that he files with so it wouldn't restrict his legal access.

THE COURT: Yes, as long as his legal access is not infringed.

GEN. DUNGAN: So, he can continue to write to

Case 3:24-cv-01121    Document 111-1    Filed 08/12/26    Page 306 of 314 PageID #: 2467

the clerk's offices for his civil suits but not write anyone else that's not on this list; and then, if any mail comes in from someone not on the list, the jail will stop it and destroy it. Would that be the best way to go about it?

MR. BURLISON: Hold it.

GEN. DUNGAN: Hold it, put it in evidence?

MR. BURLISON: No, not in evidence. They can hold it.

THE COURT: Yeah, don't want it in evidence. My concern with that is if he is sued by John Q. Smith, and that attorney's not on the list, and they send him a summons through the mail -- I will say the order will apply to the various means of communication being limited except for the names provided to the sheriff and the State by Mr. Burlison; and if there's someone who needs to be added, then just as the State can oppose anyone, I'll allow the Defense to -- to seek leave to allow that communication. And it's -- it's a balancing act to protect the defendant's ability to communicate with counsel in the various cases, criminal and otherwise. But also the evidence before the Court thus far is absolutely inexcusable; and if it is ultimately determined that's what happened, the Court will deal with it accordingly.

*BRIGGS & ASSOCIATES 615-482-0037*

GEN. DUNGAN: Your Honor?

THE COURT: But in any event, go ahead.

GEN. DUNGAN: What about -- I anticipate from talking to the detective that there could be additional mail arriving that is marked legal because there is certainly text messages from the defendant instructing people to send everything that way. Would it be best for the jail to collect it and then notify Mr. Burlison and myself? And then, perhaps Mr. Burlison could collect it and bring it to the Court for an in-camera review? And then, the Court could determine if it's actually legal mail, it goes back to the defendant; and if it's not, the Court can...

THE COURT: I'm not inclined to -- to take on the additional responsibility of going through this defendant's mail. I don't have an issue with it being delivered to Mr. Burlison.

GEN. DUNGAN: The only problem is what if it is criminal in nature? What if it is someone writing the defendant about more plans to contact the victim? That's the State's concern.

THE COURT: What do you say to that, Mr. Burlison? I know you don't want to be in a position to be caught in the middle; but I don't know that there's a perfect solution, so we just have to find the best.

MR. BURLISON:  I think if we can just take it as it comes.  If there is correspondence that falls into this category that is already in the -- in the shoe, if we could just -- the jail's going to set it aside; and if we can just deal with it if it comes in.

GEN. DUNGAN:  May I instruct the jail, as of now, to turn off his access until we get a list of appropriate access?

THE COURT:  Yes, except for Mr. Burlison and his office.

GEN. DUNGAN:  Yes, but they'll still need the list because all of Mr. Burlison's contact -- everything is individual, so everyone from there office --

MR. BURLISON:  Well, you can just write that down.

GEN. DUNGAN:  If he can provide me what he wants right now, I'll give that to the jail and have them turn off the rest; and then, once he provides the list, I'm certain that Captain Youker would be fine if you emailed him.  Is that how the Court would like it done, have him email the list to Captain Youker and myself?

THE COURT:  I believe that would be appropriate.

GEN. DUNGAN:  Do you want that --

MR. BURLISON: But couldn't -- couldn't Captain Youker just -- I mean, can't he tell which ones are -- were already --

GEN. DUNGAN: Marked confidential?

MR. BURLISON: Marked.

GEN. DUNGAN: Maybe, but there's some in there that the attorneys still have it marked confidential. But I don't know that they're --

MR. BURLISON: But not everybody. Yeah, okay.

THE COURT: Yeah. And I just don't want there to be any point where -- now, the sheriff's department, they also have -- based on my review, they also have the duty, and the opportunity, and the responsibility to protect the inmates, and the public, and to maintain law and order. So, whatever the sheriff -- certainly, when someone is put in the hole based on something, that's not something that the Court's involved in; and so, the sheriff -- this does not apply to what the sheriff's office may do on their own.

MR. BURLISON: Right.

THE COURT: But I want to make sure I'm not doing anything that will impact the defendant's ability to correspond and have contact with his attorneys, particularly as we are approaching trial. If we do need

Case 3:24-cv-01121   Document 111-1   Filed 08/12/26   Page 310 of 314 PageID #: 2471

to hear more evidence on this, I have had a day -- September the 2nd has opened up. I had a case that reset, so if we need to revisit this or to hear more on this or any other matters. When is the -- when is this case set for trial?

MR. BURLISON: September 29th; it's one of several.

GEN. DUNGAN: Your Honor, General Evans and I are both obligated in the morning. Can it start at one?

THE COURT: On the 2nd?

GEN. DUNGAN: Yes, Your Honor.

THE COURT: Yes, if need be. So, do we want to come back on the 2nd and continue the hearing?

MR. BURLISON: That's --

GEN. DUNGAN: Yes, Your Honor.

THE COURT: Again, I -- I hate keeping people here late, but I balance that with I do want to give everybody the opportunity to be heard; and so, I'm certainly willing to give the parties the time that they need to -- to present their case so that I can make the best decision I can. So, let's reset any remainder of this hearing: That will be the order of the Court for now.

GEN. DUNGAN: Thank you, Your Honor.

THE COURT: We'll reset this for September

312

the 2nd, and if we can come up with a -- if there's a better way to do it, I'm certainly open to looking at it.

GEN. EVANS: Yes, Your Honor.

THE COURT: I just want to get it right. Ms. Dungan and Mr. Burlison, if you could -- Ms. Dungan, if you could draft the order and try to see if it can -- the form of the order can be agreed to by Mr. Burlison.

GEN. DUNGAN: Yes, Your Honor. I'll do it in the morning.

THE COURT: But if the sheriff department could be notified today about the stop of communication.

GEN. DUNGAN: I'll notify Captain Youker now.

THE COURT: Okay. Alright, we will return on September the 2nd. Thank you, lady and gentlemen. The Court will be adjourned.

(Whereupon, the proceedings were concluded.)

Case 3:24-cv-01121   Document 111-1   Filed 08/12/26   Page 312 of 314 PageID #: 2473

313

## CERTIFICATE

I, NATHAN BRIGGS, do hereby certify that the foregoing, Pages 1 to and including 312, is a true and correct transcription of my court reporting of the proceedings had in the Circuit Court, Williamson County Courthouse, Franklin, Tennessee, on the 20th day of August 2025.

I do further certify that I am neither of kin, counsel nor interest to any party hereto.

IN WITNESS WHEREOF, I have hereunto affixed my hand this 20th day of October 2025.

*Nathan Briggs*
_____
NATHAN BRIGGS
Official Court Reporter
Briggs & Associates
222 Second Avenue, North
Suite 340M
Nashville, Tennessee  37201
615/482-0037

*BRIGGS & ASSOCIATES 615-482-0037*

*BRIGGS & ASSOCIATES 615-482-0037*