IN THE 21ST DISTRICT

CIRCUIT COURT FOR FRANKLIN, TENNESSEE

AT WILLIAMSON COUNTY

----------------------------------------------------------

STATE OF TENNESSEE,          )
                              )
    Plaintiff,           )
                              )
-vs-                      )  Case No. 23-CR-17320
                              )         23-CR-17322
ROBERT COLE GORDON,     )         23-CR-17335
                              )         23-CR-17337
    Defendant.           )         23-CR-17787
                              )         23-CR-17821
                              )         23-CR-17824
                              )         24-CR-17965
                              )         24-CR-17966
                              )         24-CR-18616

----------------------------------------------------------

    BE IT REMEMBERED, that the above-styled cause came on for hearing, on this, the 10th day of July 2026, beginning at 2:55 p.m., before the Honorable David H. Veile, Judge of said Court, when and where the following proceedings were had, to wit:

----------------------------------------------------------

KELLY BEATTY, CER
P.O. Box 351
Spring Hill, Tennessee 37174
(615)588-8936
Kellyb.reporting@gmail.com

1

**A P P E A R A N C E S**

**For the Plaintiff:**

    **MS. JENNIFER DUNGAN**
Senior Assistant District Attorney General
Williamson County Criminal Office
7100 Commerce Way, Suite 295
Brentwood, TN 37027
(615) 794-7275
jkdungan@tndagc.org

**For the Defendant, Robert Cole Gordon:**

    **MR. GEOFFREY COSTON**
Attorney At Law
203 Fourth Avenue South
Franklin, TN 37064
(615) 790-2425
geoffreycstn@aol.com

**\*\*\*Reporter's Note:** All names are spelled phonetically unless otherwise provided to the Reporter by the parties.

2

**W I T N E S S E S**

**CHAD YOUKER**

Direct Examination by General Dungan....................19
Cross-Examination by Mr. Coston........................57

**LIEUTENANT ASHLEY LINDQUIST**

Direct Examination by General Dungan................... 60
Cross-Examination by Mr. Coston........................ 64

**JOSEPH ASHMORE**

Direct Examination by General Dungan................... 66

**LUKE JAMES**

Direct Examination by Mr. Coston....................... 77

**MATTHEW TRIPLETT**

Direct Examination by Mr. Coston....................... 79


Closing Argument by General Dungan..................... 80

Closing Argument by Mr. Coston......................... 81

**E X H I B I T S**

**EXHIBIT NUMBER**                                           **PAGE  #**

1....................................................................23
        Court order entered April 24th, 2026

2....................................................................26
        Notice of legal mail recipients

3....................................................................28
        Photocopies of front and back of each envelope

4....................................................................36
        A photocopy of each envelope

5....................................................................40
        Test message records

6....................................................................45
        First audio played

7....................................................................47
        Second audio played

8....................................................................48
        Third phone call played

9....................................................................56
        Fourth audio played

10...................................................................56
        Mail list from county attorney

*Kelly Beatty Reporting (615)588-8936*
Case 3:24-cv-01121    Document 111-8    Filed 08/12/26    Page 4 of 99 PageID #: 2601

* * *

**P R O C E E D I N G S**

(WHEREUPON, the following matter came on for hearing, as follows:)

THE COURT: All right. Next, we have State versus Robert Cole Gordon. We are here on the State's motion for indirect criminal contempt, alleging violation of the Court's order regarding the defendant's communication. I will note for the record, the Court has received a notice of filing for in camera review and a motion to release that contains what appears to be letters, that appear to be addressed to Mr. Gordon's sister identified as legal mail. I have not reviewed these. I wanted to give Mr. Coston the opportunity to address the Court before I reviewed those.

But I do note for the record that there are 1, 2, 3, 4, 5 letters with the addressee of the Law office of Minon Frye, Esquire, in Oklahoma. Each of these are marked legal mail in multiple locations. And one of which, in addition to being marked through the mail, says attorney client communication. The return address for each of these appears to be: Robert C. Gordon, #65920, 408 Century Court in Franklin, Tennessee. But the Court has not opened

*Kelly Beatty Reporting (615)588-8936*

those individual envelopes at this time.  Are the parties prepared to proceed?

MR. COSTON:  Yes, Your Honor.

GENERAL DUNGAN:  The State's ready, Your Honor.  For the Court to understand where the State thinks we are today, there's several motions filed.  The defendant filed several pro se motions.  The State's filed a motion to strike.  There's also the notice with the letters that the State's asking the Court for an in camera review on.  The State's position on those letters -- and also, the State subpoenaed the jail to bring additional letters that the jail has held, trying to be in compliance with the Court's order.  The State's position is that, once those letters are given to the jail to be mailed, there's no longer a privacy interest if they are in violation of the order.  Because any of his mail can be inspected if it's not legal mail.

So the State's asking the Court for an in camera review.  And if those are in fact not legal mailings to someone who those legal mailings should go to, the State's asking the Court to release -- and the State's biggest concern with these are, this defendant does have a history of using the mail system, and even the legal mail system, to commit

*Kelly Beatty Reporting (615)588-8936*
Case 3:24-cv-01121    Document 111-8    Filed 08/12/26    Page 6 of 99 PageID #: 2603

further offenses. Which is why the State's asking the Court to do an in camera review, rather than just releasing them to defense or releasing them back to the defendant or sending them on their way, because they are in explicit violation of the Court's order -- those five are.

Then beyond that, Your Honor, there's the State's motion for contempt based on those five mailings. And then there's an amended motion for contempt based on additional actions of the defendant. The State's prepared to put on proof for today. And then two days ago, the defense filed their list of allowable contacts for the defendant. And the State has multiple objections to those lists and is prepared to put on testimony today pertaining to those objections. So that's kind of where we are. The State believes that the State does need to ask the Court to rule on the in camera review as well.

THE COURT: All right. I'll rule on the motions first. Any motions that were filed pro se while represented by counsel cannot be considered by the Court; they're invalid motions. And so the motion to strike any motions filed by Mr. Gordon individually is granted without any further discussion. As for the letters -- and that is

because the law is clear, you cannot represent yourself while simultaneously being represented by counsel -- but Mr. Coston, as for the letters that have been filed with the Court with the request for in camera review, they're marked legal mail. They're addressed to an individual that the Court's order, entered April the 24th of this year, specifically prohibited him from sending mail to. On the legal mail list, page 2 of 3, and I quote, "Defendant's sister, Minon Frye, who is an attorney in Oklahoma, may" -- well, this original order said, "may be included on the nonlegal mail list, but will not be included on the legal mail list." So with that, what do you have to say, Mr. Coston?

MR. COSTON: Well, that order did go a little beyond the scope, I think, of what you said in the hearing. All that you said at the hearing on the matter is, General Dungan asked, "Is the Court going to allow him to correspond with his sister, who as far as the State understands, is not representing him?" And the Court said, "Yes, I'll allow him to communicate with his sister." But I guess the written order does supersede that.

But I still object, regardless of that, to you doing the in camera review. I think -- I don't

*Kelly Beatty Reporting (615)588-8936*
Case 3:24-cv-01121    Document 111-8    Filed 08/12/26    Page 8 of 99 PageID #: 2605

think it's unreasonable for somebody to review those, but I'd rather it not be the trial court judge who's going to preside over his two jury trials that we have currently set.  You may find something in there that would prejudice you and require you to recuse yourself or, and I'd rather avoid the possibility.

THE COURT:  Well, there's relatively little that could be in there that would prejudice me under the circumstances of this case.  But if not me, then who?

MR. COSTON:  The General.

THE COURT:  You'd rather the District Attorney General review it?

MR. COSTON:  Well, she hates him already to begin with, so I don't think it's going to add anything.

GENERAL DUNGAN:  Your Honor, for the record, the State has no personal animus towards the defendant.  And also, the State would say that there probably needs to be a mechanism for the future.  The jail is currently holding additional envelopes that are marked legal mail -- that would be the State's position, that those are also in violation of the Court's order.  There's multiple ways this can be handled.

*Kelly Beatty Reporting (615)588-8936*

If the defense -- well, first of all, if the Court finds that these are not legal mail because it's in violation of the order, they can be given back to the jail. The jail can inspect them like they would anything else, and then do with it what they deem fit, as they are not legal mail and not allowed to be mailed out at that point, and the Court wouldn't have to review them. The State would likely -- the jail would need to review them to make sure that more criminal offenses are not occurring through their hands from the defendant. But that is another option as well.

MR. COSTON: I think the only things that they should be read for, is for the purpose of determining whether they're addressing legal issues. And from what I understand, that what he's seeking his sister's advice on, is regarding the Indian Child Welfare Act. We have very few cases in Tennessee interpreting the Indian Child Welfare Act. He has a case in Nashville where it's incidental -- or it's part of the case, it's not incidental. It should be transferred to an Indian court. And he's seeking his sister's advice who's in Oklahoma, who's very familiar with -- because they have a lot of cases in Oklahoma concerning the Indian Child Welfare Act.

*Kelly Beatty Reporting (615)588-8936*
Case 3:24-cv-01121   Document 111-8   Filed 08/12/26   Page 10 of 99 PageID #: 2607

GENERAL DUNGAN: If the Court wants to withhold ruling on this, some of the State's proof today will be that his sister is actively trying to prevent contact from him, which may help the Court.

THE COURT: All right. I'll take this under temporary advisement. I should be able to rule on who will review these -- the letters that have been filed with the Court. So we'll come back to that. I ruled on the motion to strike. That leaves us with the motion and amended motion for indirect criminal contempt.

GENERAL DUNGAN: Sir, the State has proof for the two contempt motions and from Captain Chad Youker from the Williamson County Sheriff's Department. However, Captain Youker will also provide some information going towards the State's objections to the legal list that the defendant has filed. And the State also has investigator Joe Ashmore to give some testimony to that legal list, which will help the Court understand the State's objections to some of those. The State will be treating, obviously, the contempt as a trial.

But those -- that additional evidence, the State looks at as comparable to it's conditions of pretrial determination. So it would fall under kind

11

of the same categories as conditions of pretrial release.  So it would be more of a -- even though it's not bond, it would fall more along those rules of a bond hearing, if that makes sense to the Court. So would the Court like me to present proof just on contempt and then recall the witnesses to go over the filing list, or can the Court take proof as necessary?

THE COURT:  I would prefer to take all the proof together so we're not bouncing back and forth. But Mr. Coston, do you have a preference?

MR. COSTON:  No, Your Honor.

THE COURT:  All right.  We'll take the proof, then I can use the sworn testimony in the hearing for whatever issues are necessary.  I have not seen the list of proposed -- it may have been filed, but I have not -- it was not part of my packet.

GENERAL DUNGAN:  The State has an extra copy that I'll pass up.  I'm going to talk to Captain Youker about it, so I'll identify it, but I can pass one up to the Court now.  I just won't have a copy for the Court then.

THE COURT:  As long as I have it when he's testifying.

12

GENERAL DUNGAN:  Madam Clerk, we're going to have some proof we're going to -- just audio, but it's clear through the system.

MR. COSTON:  Before we get into that, I have one preliminary matter --

THE COURT:  Sure.

MR. COSTON:  -- that may dispose of the whole thing, hopefully.  The first thing to take care of in a motion for contempt is, there has to be a clear court order that's been violated.  And in this case -- let me read to you from the transcript that Your Honor ordered.  It starts -- you go on for a paragraph that's not relevant and which ends at the -- listed in the order, but I'm going to fix that:  "Mr. Gordon may not use text, emails or video calls."  You prohibited him from those three things.

THE COURT:  Where are we on the --

MR. COSTON:  We're on page 77 --

GENERAL DUNGAN:  Your Honor, I didn't get a copy of the transcript.

MR. COSTON:  -- of the transcript from our last hearing, which was on April 17th, 2026.

THE COURT:  I had a copy that was with this.  I had presumed that you had filed it with this.  But this was in my pack.

*Kelly Beatty Reporting (615)588-8936*
Case 3:24-cv-01121    Document 111-8    Filed 08/12/26    Page 13 of 99 PageID #: 2610

GENERAL DUNGAN: I'll look. Perhaps I do.

MR. COSTON: I'm not going to read for very long. You prohibited him from doing three things: text, emails or video calls. And then you say this: "Mr. Gordon may not use text, emails or video calls, period. That means he's enjoined from using text, emails, or video calls." None of the allegations in this contempt regard -- well, one of them involves a text, so that one can go forward. But none of them involve emails or video calls. These are all voice calls that are not prohibited by your order given at the last hearing.

GENERAL DUNGAN: Your Honor, but the written order would supersede any oral order. Beyond that, that's not exactly the State's memory. Give me a minute, see if I have the -- I think that the order came down -- yeah. Because the written order is: "Defendant is prohibited from using any and all forms of electronic communication pending further orders of the Court." But I believe that -- let me look.

THE COURT: Well, it -- Mr. Coston, the copy of the transcript I have is not the final order from the Court. I remember vividly, because I took a recess to gather my thoughts. On page 83, "If my order was working, we wouldn't be here because he

wouldn't have intentionally tried to manipulate the system and use other people's logins.  So I need to take a recess before I say anything else."  And then I took a recess and came back and finalized the Court's announcement as it relates to the communication.  But that's not part of this transcript.

MR. COSTON:  It's on page 77 of that same transcript.

THE COURT:  Well, I addressed it initially on page 77, but as I recall, when we -- when I came back from recess after gathering my thoughts, General Dungan had further concerns about your clients repeated efforts to thwart the jail's rules and regulations regarding communication.  And I believe my final order was that he may only send mail to specific legal entities that did not include his sister.

GENERAL DUNGAN:  The State's -- it's in the written order where the State's memory is also that -- and I believe it may have even been the county attorney that brought it to the Court's attention, that the sister was not currently representing him, and asking if the Court meant he could write his sister personal mail or write his

15

sister legal mail. And the Court clarified he could write personal mail to his sister, but not legal mail to his sister.

THE COURT: That is my recollection. That was the Court's intent. So while I do understand that on page 77, the Court had initially allowed him to have the communication with his sister, I do recall vividly taking that recess and coming back and then making a final pronouncement of the Court's ruling. And there is a written order, which the Court -- the law is clear, the Court speaks to its written orders. Do you have a copy of the transcript of the final ruling?

MR. COSTON: No, Your Honor. My transcript stops at page 85. But what I'm recalling -- to tell you the truth, I wouldn't have remembered this part if I didn't have a transcript. What I recall you telling him is, "No electronic communication." You said, "No electronic communication. You're going to have to talk to communicate with people the way we did back in the old days." But that's a vague order. Arguably, a telephone is not electronic communication. Clearly, a text message is. But a telephone is the way that we used to communicate in the old days. Or it's the way I always remember

using to communicate.  And you're younger than I am, so it's got to be the way you always remember in the old days, talking to people on the phone, and that's what you told him: "No electronic communication. You've got to do it the way we did in the old days." And that could -- your order was vague enough that I believe it's unenforceable.

GENERAL DUNGAN:  Your Honor, except for there is a written order that is clear, which is why this Court does written orders.

THE COURT:  If there was not a written order, that -- and again, it's impossible to contrast the order or the ruling that was announced in court with the written order, because we don't have the final -- I know for a fact that there was a final pronouncement after I came back from this recess. But even with what was said on page 77, "Mr. Gordon may not use text, email, or video calls, period.  He may communicate the way we all used to communicate, which is by mail, in writing."  That's at the bottom of page 77.  So I appreciate counsel's position, but there is a written order that was entered by the Court following that hearing that specifically stated that he could not send legal mail to Ms. Frye and thereby escape the watchful eye of the sheriff's

*Kelly Beatty Reporting (615)588-8936*

department, who are charged with the duty of inspecting nonlegal mail.

MR. COSTON:  If that's the case, that may resolve your issue about the in camera review, because your previous order already gave the jail the right to open his mail to his sister.

THE COURT:  Well, it ordered him -- it precluded him from sending legal mail to his sister. Well, it attempted to preclude him from sending legal mail to his sister, which he may or may not have completely ignored.  But we'll come back to the inspection of the records -- of the letters, excuse me.  All right.  Ms. Dungan?

GENERAL DUNGAN:  Yes.  If the Court's ready, the State will call Captain Chad Youker.

CHAD YOUKER

was called as a witness, and after having been first duly sworn, testified as follows:

GENERAL DUNGAN:  Captain Youker, could you please state your name and spell it?

THE WITNESS:  Chad Youker.  C-H-A-D, Y-O-U-K-E-R.

*Kelly Beatty Reporting (615)588-8936*
Case 3:24-cv-01121    Document 111-8    Filed 08/12/26    Page 18 of 99 PageID #: 2615

DIRECT EXAMINATION

BY GENERAL DUNGAN:

Q. And Captain Youker, where are you currently employed?

A. Williamson County Sheriff's Office in the detention center.

Q. And how long have you been employed there?

A. Eleven years.

Q. And what is your current job there?

A. I'm the captain over operations and security.

Q. Okay. And does that include the jail?

A. Yes.

Q. And the detention center? Okay. So over the detention center?

A. Yes. Yes.

Q. Okay. And so what are kind of your -- in short form, your responsibilities?

A. I oversee basically all the daily operations, booking, and classifications. I have people under me that manage them much closer than I do, but I'm just kind of the overseer of everything to make sure everything is getting completed.

Q. Okay. And so are you the direct supervisor of every sheriff's department employee that works inside the

detention center?

A.   Yes.

Q.   Okay.  And does the Williamson County Detention Center keep records?

A.   We do.

Q.   Do those records include videos?

A.   They do.

Q.   Okay.  Do they have paper records?

A.   Yes.

Q.   What about, like, records of any communications coming in and out of the jail?

A.   Yes.  Phone records, text messages, video chats, video visits, CCTV, all the records.

Q.   Okay.  And are those records all kept in the normal course of your business?

A.   Yes.

Q.   Are there certain policies that regulate the keeping of those records?

A.   Yes.

Q.   Okay.  And are you the custodian of those records?

A.   I'm one of them, yes.

Q.   Okay.  And in your capacity as a captain at the Williamson County Sheriff's Department, do you know the defendant, Robert Cole Gordon?

*Kelly Beatty Reporting (615)588-8936*
Case 3:24-cv-01121     Document 111-8     Filed 08/12/26     Page 20 of 99 PageID #: 2617

A.   I do.

Q.   And do you see him here in the courtroom?

A.   I do.

Q.   And where is he?

A.   Sitting to your left in the orange jumpsuit.

Q.   Okay.  And how do you know him?

A.   He's an inmate in our custody facility.

Q.   Approximately how long has he been an inmate in the Williamson County Jail?

A.   Two years, three years.

Q.   Okay.  And so, is he currently now living at the Williamson County Jail?

A.   Yes, he is.

Q.   Okay.  And he has been for at least two to three years?

A.   Yes.

Q.   And do you know of any restrictions from this Court on his ability to correspond outside the jail?

A.   Yes, from my understanding, the Court's order specifically states that he's not supposed to have any electronic communication outside of the jail.  And to my knowledge, that includes the text messages, emails, video chats, telephone calls, and we were supposed to be getting a list from his attorney of approved people that he was supposed to be able to contact with via the mail.

21

GENERAL DUNGAN: Okay. If I can pass up a document to him. Thank you. Well, I guess -- does the Court want it marked first or identified first?

THE COURT: It's got to be identified before it can be admitted. We could mark it for identification, but let's pass it to him, see if he can identify it.

(WHEREUPON, Exhibit 1 was tended to the witness.)

BY GENERAL DUNGAN:

Q. Do you recognize what's been handed to you?

A. Yes. This is a copy of the Court order that was issued.

Q. Okay. And was that issued back in April of this year?

A. It was.

Q. Why are you familiar with it?

A. Because it was -- well, because I sat here that day and we went through this hearing for it. And then this got issued to me so that I could make sure -- so that we could oversee to make sure that he wasn't using electronic means of communication.

Q. Okay. So are you tasked with enforcing the Court's order?

A. Yes.

Q.  This particular order?

A.  Yes.

GENERAL DUNGAN:  Okay.  And Your Honor, at this point, could I have it marked and identified -- or marked and entered as Exhibit 1?

THE COURT:  Any objection?

MR. COSTON:  No, Your Honor.

THE COURT:  All right.  Exhibit 1 will be the order entered April 24th of 2026.

(WHEREUPON, Exhibit 1 was marked and entered.)

GENERAL DUNGAN:  And if it can be passed back to him.

(WHEREUPON, Exhibit 1 was tended to the witness.)

BY GENERAL DUNGAN:

Q.  And you previously -- you just testified that this order prohibits the defendant from using any and all electronic forms of communication?

A.  Yes.

Q.  Okay.  And does the jail -- what types of electronic communications does the jail have for inmates to use typically?

A.  We have the phones, we have text message, we have email, and we have video visit.

Q.  Okay.  And if someone wants to use text, email,

*Kelly Beatty Reporting (615)588-8936*

or video visit, what do they use it through?

A. They use it through either the kiosk that's on the wall or the tablet, which is just basically a mobile kiosk that they can use handheld, sitting in the day room, somewhere.

Q. Okay. And telephones, where are they?

A. Those are mounted on the wall in the pods.

Q. Okay. And all of those devices, are they all recorded?

A. They are.

Q. And all of that information is stored?

A. Everything except for attorney client privilege.

Q. Okay. And this -- so for your understanding, this order, did it only allow the defendant to communicate outside the jail via U.S. Mail?

A. Correct.

Q. Traditional written mail?

A. Correct.

Q. Okay. And you were waiting on, you said what from the defense? From the defendant?

A. Oh, we were waiting for an approved list of names of who he could communicate with via the mail.

Q. Okay.

A. Both legal and personal.

Q. And did you eventually receive this list?

24

Case 3:24-cv-01121    Document 111-8    Filed 08/12/26    Page 24 of 99 PageID #: 2621

A.   Yes.

GENERAL DUNGAN:  And if I can pass up something else for him to look at?

THE COURT:  You may.

THE WITNESS:  Thank you, sir.

(WHEREUPON, Exhibit 2 was tended to the witness.)

BY GENERAL DUNGAN:

Q.   And did you -- do you recognize what's been handed to you?

A.   I do.

Q.   And what is this?

A.   This is the list that we were provided from his attorney.

Q.   Okay.  And is this the approved communication list?

A.   This is the approved communication list.

Q.   Okay.  And so this list, does it include both legal and nonlegal persons?

A.   It does.

Q.   And are they separated into categories?

A.   They are.

GENERAL DUNGAN:  Okay.  And at this point, Your Honor, I'd like to introduce this as Exhibit 2 and then wait to talk about it again until later.

THE COURT: Any objection, Mr. Coston?

MR. COSTON: No, Your Honor.

THE COURT: All right. Exhibit 2 will be -- is this the notice of --

GENERAL DUNGAN: Yes, the notice of --

THE COURT: -- the first line is notice of legal mail recipients?

GENERAL DUNGAN: Yes.

THE COURT: Okay. Thank you.

(WHEREUPON, Exhibit 2 was marked and entered.)

BY GENERAL DUNGAN:

Q. Now, after the order in April that restricted the defendant's mail, did the defendant attempt to send out any mail that you believed to be in violation of the Court's order?

A. Yes.

Q. And originally, were there five pieces of mail that you held onto?

A. Yes.

Q. And why did you believe those five pieces of mail violated the Court's order?

A. Because the Court order says that he was not supposed to send items of mail to his sister, Minon Frye, as attorney mail, and that's exactly what he did.

Q. Okay. And so, did you turn those envelopes over

to the DA's office?

A. I did.

GENERAL DUNGAN: Okay. And if I might pass up -- I'd like to do two things, Your Honor. If we can pass him this document?

THE COURT: You may.

GENERAL DUNGAN: If the Court can also show him, so we can properly identify the envelopes, the envelopes that are filed under seal that the Court has? Yes. Could we pass that to the witness?

THE COURT: You may.

(WHEREUPON, Exhibit 3 was tended to the witness.)

BY GENERAL DUNGAN:

Q. Now, Captain Youker, if you could look at what's been handed to you that is in a manila envelope.

A. Yes.

Q. Could you go ahead and open it and look inside? Now, what is that?

A. These appear to be the envelopes in which I -- that we stopped and have turned over to the district attorney's office.

Q. Okay. And the other document that has been passed up to you, could you look at that?

A. Uh-huh (affirmative). This one here?

27

Q. Yes.

A. Okay.

Q. And what is the document that's just pages that's been passed to you?

A. It's photocopies of the envelopes, or photocopies of envelopes.

Q. Okay. And so, Your Honor, for the record, the State would like to just introduce the photocopies -- the envelopes front and -- are they front and back?

A. They are front and back, yes.

GENERAL DUNGAN: As Exhibit 3 for the contempt trial --

THE COURT: Any objection?

MR. COSTON: No, Your Honor.

GENERAL DUNGAN: -- with the understanding that the witness has identified the physical envelopes that are filed under seal as these envelopes that are pictured here.

THE COURT: The record will reflect.

GENERAL DUNGAN: Thank you.

(WHEREUPON, Exhibit 3 was marked and entered.)

BY GENERAL DUNGAN:

Q. And these envelopes that are stopped, how do you know -- first of all, all five. Were they all five written to Minon Frye?

28

A. They were, yes.

Q. What's the address on all five of the envelopes?

A. This says, "Law Offices of Minon Frye, Esquire, 2005 North Broadway Street, Poteau, Oklahoma, 74953."

Q. Okay. And that's on all five of the envelopes?

A. Yes, ma'am.

Q. And are all five envelopes marked in some way legal mail?

A. They are.

Q. And these were all stopped by you after the April order prohibiting the defendant from writing Minon Frye legal mail?

A. They were.

Q. And one more question. Could you -- oh, how do you know this came from the defendant? These envelopes?

A. Got his name and his number on this, on the top left corner of it. And it's -- I mean, it's his handwriting. We've --

Q. Okay. Have you seen the defendant's handwriting before?

A. Yes.

Q. And so, do you recognize the handwriting in this envelope as his?

A. Yes.

Q. And what procedures does the jail have in place

*Kelly Beatty Reporting (615)588-8936*

Case 3:24-cv-01121   Document 111-8   Filed 08/12/26   Page 29 of 99 PageID #: 2626

to make sure that an envelope that has a defendant's name on it and has legal mail written on it actually came from that defendant?

A. Say that one more time, I'm sorry.

Q. What's your legal mail process to get legal mail out of the jail? Could you explain that to the Court?

A. Well, so generally they'll do exactly what they did, and then they'll turn it over to a deputy. The deputy is supposed to make sure that the legal mail is coming from the individual that it's being turned over from.

Q. Okay.

A. In his case, he's in a very small unit with only one or two other people at times, so it's very easy to know that it's coming from him.

Q. Okay. So for an inmate -- for Mr. Gordon to send legal mail out, he puts it inside, seals it, and writes his name on it and gives it to a deputy, and it says legal mail?

A. Correct.

Q. And if it's not legal mail, it would be opened?

A. Correct.

Q. And the deputy --

A. If it's not legal mail, they're not supposed to seal it shut. And if they do, we kick it back to them.

Q. Okay. And so, if it says legal mail, then the deputy's job is to make sure that the envelope that's been handed to him has the same inmate name and identification as the inmate handing it to him?

A. Correct.

Q. And the defendant is housed in a housing unit with maybe one to two other people at any given time?

A. Correct.

Q. Okay. And then, if you could look for a moment back to Exhibit 2, the notice of legal mail recipients. If you could go to page 2 under legal mail representatives. Is there a Minon Frye --

A. There is.

Q. -- on that list? And what's the address on that list?

A. 2005 North Broadway Street, Poteau, Oklahoma.

Q. And is that the same address that's on these envelopes?

A. It is.

Q. Okay. Now, since you've held those five pieces of mail, have you held additional pieces of mail?

A. I have.

Q. And do you have those with you?

A. I do.

31

Case 3:24-cv-01121    Document 111-8    Filed 08/12/26    Page 31 of 99 PageID #: 2628

GENERAL DUNGAN: Okay. So at this point, I guess we can just -- would the Court -- I guess we can introduce these envelopes into evidence in this case, and ask that the Court also add them to the request of an in camera review.

THE COURT: So they won't be added to the petition for contempt because there wasn't a proper notice and citation. But you're asking that they be added to the -- whatever happens with the other sealed envelopes?

GENERAL DUNGAN: And this is part of what the State needs the Court to clarify. The sheriff's department is holding on to the mail now, instead of handing them over to either counsel. I know both counsel have received mail.

BY GENERAL DUNGAN:

Q. I think that -- has the sheriff's department released mail to Mr. Coston as well --

A. We have, yes.

Q. -- that was not stuff -- mail you believed you could really mail?

A. Correct.

GENERAL DUNGAN: Okay. And so --

MR. COSTON: I have not opened that mail, by the way. I still have it.

32

GENERAL DUNGAN:  And so -- yes, Your Honor.
So the State is going -- the State and the sheriff's
department are going to need some clarification on
what the sheriff's department can do.  Because the
State, obviously, anytime we have these letters,
would like to seek contempt filings.  But if we don't
have them, we can't give notice of them.  So at this
point, the State is not asking for contempt on these,
but will be filing for contempt on these at a later
date.

THE COURT:  Let's keep them separate in a
separate envelope just so that we can keep --

GENERAL DUNGAN:  Your Honor, we'll get a
separate manila envelope and put them all inside of
it.  And can we mark -- okay, first of all, let's go
through them.

BY GENERAL DUNGAN:

Q.   Do you have different categories of mail before
you that you brought with you today?

A.   So -- yes.

Q.   What did you bring?

A.   So I've got two here that are for Minon Frye.

Q.   Two more for Minon Frye?

A.   Correct.

Q.   Okay.  And is that the same address that the

*Kelly Beatty Reporting (615)588-8936*

first ones are for?

A. Yes, ma'am.

Q. And are those marked legal mail?

A. They are.

Q. Okay. And those came to you since this order went into place?

A. Correct.

Q. And do they have the defendant's name on them?

A. They do.

Q. Okay. Set those to the side, please.

A. Side set.

Q. And then, do you have others?

A. I do have others.

Q. And what do you have?

A. So I've got one to Choctaw Nation Tribal Council, at 1805 Chukka Hina Drive. And then I've got Choctaw Nation Elders, c/o Joan Cooper, at 34319 Ridge Road. Then I've got a Choctaw Tribal Council, c/o Jess Henry, P.O. Box 1210, Durant, Oklahoma. And then I've got another one going to a Terri Chitwood.

Q. Okay. And is the Terri Chitwood mail marked legal mail?

A. It is not.

Q. Okay. And were you only holding on to that mail because you had not yet received an approved list?

A.   Correct.

GENERAL DUNGAN:  Okay.  So if you could continue to hold that piece, and we'll not put that piece into evidence, Your Honor.  Because I believe after today, that piece will be able to go out.

BY GENERAL DUNGAN:

Q.   So of the four -- you have four pieces of mail, correct?

A.   I have -- brought with me today, I have five.

Q.   But if we --

A.   Two to Minon Frye, three to Choctaw Nation Elders, Tribal Council, and Tribal Council.  And then --

Q.   Terri?

A.   Terri.

Q.   Okay.  So we have -- there's five pieces of mail then, that are going to all go into an envelope --

A.   Correct.

Q.   -- two to Minon Frye, one that's to Choctaw Elders in care of Joan Cooper?

A.   Correct.

Q.   Do you know who that is?

A.   I do, I believe it's his grandmother.

Q.   Okay.  And then you said one's just to Choctaw Nation?

A.   Choctaw Nation Tribal Council.

35

Case 3:24-cv-01121    Document 111-8    Filed 08/12/26    Page 35 of 99 PageID #: 2632

Q. Okay. Is that in care of anyone?

A. No, not that one.

Q. Okay. And the other one's Choctaw Nation --

A. In care of Jess Henry.

Q. And do you know -- have you checked to see if any of those addresses match anything to Choctaw Nation?

A. I did not, no.

Q. Okay. But they're all marked legal mail?

A. They are all marked legal mail, yes.

GENERAL DUNGAN: Okay. So if you can put those five pieces -- if we can hand those to the clerk to be placed in an envelope as Exhibit, I think, 4? Are we on Exhibit 4?

THE COURT: Well, are we making them an exhibit, or are they going to be handed back to -- let's do what we did on the previous one --

GENERAL DUNGAN: Make copies?

THE COURT: Late filed. Exhibit 4 will be a photocopy of the front and back of each. And then, if we'll put those in a separate envelope and I'll take both envelopes, or whomever is ultimately directed to review will take those envelopes.

GENERAL DUNGAN: Thank you, Your Honor.

(WHEREUPON, Exhibit 4 was marked and entered.)

GENERAL DUNGAN: I'll make copies of them

Case 3:24-cv-01121   Document 111-8   Filed 08/12/26   Page 36 of 99 PageID #: 2633

after the hearing and late file that exhibit.

THE COURT: Thank you.

BY GENERAL DUNGAN:

Q. Okay. So after this order went into place, did you become aware that the defendant was also still using electronic communications?

A. I did.

Q. And when was the first -- when did you become aware of that?

A. A few weeks ago.

Q. Okay. And has the defendant, to your knowledge, used text messaging?

A. He did use text messaging, yes.

GENERAL DUNGAN: And how do you know -- well, first of all, if I can pass this up?

THE WITNESS: Thank you, sir.

(WHEREUPON, Exhibit 5 was tended to the witness.)

BY GENERAL DUNGAN:

Q. Do you recognize what's been handed to you?

A. I do.

Q. What is it?

A. It's a report for text message and emails that we have on our system at the jail for the inmates --

Q. Okay.

37

A.  -- that we can run reports to find out what was sent, when it was sent, where it was sent.

Q.  Okay.  And when -- is this report for a particular text stream?

A.  Yes.

Q.  And when was the date for this text stream?

A.  So the text stream was between 4:17 and 6:22.

Q.  Okay.  Was that the whole time frame that was searched?

A.  That is the search time frame.

Q.  Okay.  If we can go to page 2.

A.  Okay.

Q.  Is the actual text at the bottom of page 2, the text in question?  Or part of it, the beginning of the information about the text?

A.  Yes.

Q.  Okay.  And when was this text?

A.  June 15, 2026 at 2:11 p.m.

Q.  Okay.  Is that an incoming or outgoing text?

A.  This appears to be an outgoing text.

Q.  Okay.  And what account did that come from?

A.  It came from inmate Anthony Pope.

Q.  And do you know who Anthony Pope is?

A.  Not personally, no, but I know of him as being an inmate in our jail.

38

Q. Okay. Do you know if he was ever housed with the defendant?

A. Yes.

Q. He was housed with the defendant?

A. (No verbal response.)

Q. Okay. And did you -- what does this text message say?

A. This is says, "Yo, you get the message?"

Q. And was that message replied to?

A. It was.

Q. What was the reply?

A. It said, "Got a V mail" -- I'm assuming it means voice mail -- "saying you were doing fine. I spoke to the court clerk the other days [sic] since I haven't been able to get in contact with you. They told me you have court July 10th, and you have a jury trial set for April 12, 2027. Your attorney is Geoffrey Coston."

Q. Okay. And if you can go on to page 4. Does the system identify the person that this text message exchange is with?

A. It is -- it does.

Q. And what is the name of that person?

A. For this phone number that he's communicating with, it's Kyle Price.

*Kelly Beatty Reporting (615)588-8936*

GENERAL DUNGAN:  Okay.  And at this point, can we ensure this is Exhibit 5, Your Honor?

THE COURT:  Any objection?

MR. COSTON:  No, Your Honor.

THE COURT:  Exhibit 5 will be the text message records.

(WHEREUPON, Exhibit 5 was marked and entered.)

BY GENERAL DUNGAN:

Q.   Were you able to view video related to this text message?

A.   Yes.

Q.   Or did anyone review --

A.   Yes, Lieutenant Lindquist has reviewed the video.

Q.   Okay.  And did the video show the defendant using --

A.   Yes.

MR. COSTON:  Objection, Your Honor.  That's hearsay.

THE COURT:  Sustained.

BY GENERAL DUNGAN:

Q.   Okay.  Were there other uses of the -- by the defendant, of the different systems within the jail that he wasn't allowed to use?

A.   Yes.

40

Q. What else did he use?

A. He used the phone system.

Q. Yes, he used the phone system?

A. Correct.

Q. Okay. And how many times do you know of that he placed phone calls?

A. That I know he placed phone calls? Four times.

Q. Four times. What were the dates of those phone calls?

A. They were last -- what are we in right now, July? They were in June. I don't know the exact date of which they were -- I want to say, if I recall, it was the 22nd.

Q. Okay. And did you listen to these calls?

A. I did.

Q. And do you -- do these calls come from your system?

A. They did.

Q. Okay. And did you listen to each call in its entirety?

A. Yes.

Q. Okay. And were there three calls on one day?

A. Yes.

Q. And another call on a second day?

A. I think it was -- that's how it was, yes.

41

Case 3:24-cv-01121   Document 111-8   Filed 08/12/26   Page 41 of 99 PageID #: 2638

Q. Do you know who the defendant placed these phone calls to?

A. So two of them were to his -- he spoke to his father, but his mother was in the background. And then the other one was to the same individual in which he was text messaging, which was Kyle Price.

Q. Okay. And in the conversation with Kyle Price, did the defendant admit anything about his ability to use the system?

A. Yeah, he said that there's a court order, or something to that effect, that he's not supposed to even be on these communications -- or using these for communications.

Q. Okay. And so you listened to four separate calls placed over two days?

A. Correct.

Q. Okay. One moment. All right, so I'm going to play you the beginning of -- were these calls preserved?

A. Yes.

Q. And were they provided to the district attorney's office?

A. They were.

Q. Okay. And the preservations, were they fair and accurate preservations of the calls themselves?

A. Yes.

*Kelly Beatty Reporting (615)588-8936*

GENERAL DUNGAN:  Okay, I'm going to play --

THE COURT:  General, are these just audio?

GENERAL DUNGAN:  They are just audio.  I'm trying to make sure I know the best way to identify them, I'm sorry.  One moment.  The first call is going to be marked 6/20/2026.  All right.

(Exhibit 6 audio played.)

BY GENERAL DUNGAN:

Q.  Captain, do you recognize the beginning of this call, what this is?

A.  Yeah.  So that's the announcement -- anytime an inmate makes a call from our facility, that's the announcement that the person receiving the phone call hears so they know that it is, in fact, a phone call coming from the jail.

Q.  Okay.  And do all your jail calls begin that way?

A.  Yes.

Q.  Okay.

(Exhibit 6 audio played.)

BY GENERAL DUNGAN:

Q.  Captain Youker, do you recognize any of the voices on this call?

A.  Yes, I recognize Robert Gordon's voice.

Q.  Okay.

43

Case 3:24-cv-01121   Document 111-8   Filed 08/12/26   Page 43 of 99 PageID #: 2640

A.   He is not the one who answered the phone originally, but the individual talking.

Q.   Okay.  And you've spoken to Robert Gordon on other occasions?

A.   Yes, on other occasions.

GENERAL DUNGAN:  Your Honor, I'd like to now move this first call into evidence.  And if the Court -- we can do a collective.  I'm going to have four calls.  I can do it all as a collective exhibit and wait to the end, if the Court would prefer.

THE COURT:  Are they on one thumb drive?

GENERAL DUNGAN:  They will be, Your Honor.

THE COURT:  Let's designate them individually just for the clarity of the record.  So we'll do them one at a time, but they can all be on the same thumb drive.

GENERAL DUNGAN:  Okay.

THE COURT:  Just if the -- when it's saved to the thumb drive, if you can make sure to put the specific exhibit number for the file.

GENERAL DUNGAN:  Yes, Your Honor.  I'll label it exhibit -- I'll relabel them as Exhibit numbers 6, 7, 8, and 9.  So if I can move this in now as Exhibit 6 to be late filed.

THE COURT:  Any objection, Mr. Coston?

44

MR. COSTON: No, Your Honor.

THE COURT: All right. Exhibit 6, I'll just list it as, "The first audio played."

(WHEREUPON, Exhibit 6 was marked and entered.)

GENERAL DUNGAN: Your Honor, I'm going to, at this point, play the call. It's another eight minutes.

(Exhibit 6 audio played.)

BY GENERAL DUNGAN:

Q. Captain Youker, was that one of the phone calls that you preserved?

A. It was.

Q. Okay. And did you preserve other calls?

A. Other calls were preserved, yes.

Q. Okay. And did you listen to a second call from June 20th that came right after this call --

A. Yes.

Q. -- that we just listened to? All right. I'm going to play the beginning -- maybe not the right one.

(Exhibit 7 audio played.)

BY GENERAL DUNGAN:

Q. Captain Youker, do you recognize the beginning of this call?

A. I do.

Q. And what is this?

*Kelly Beatty Reporting (615)588-8936*

A.   It's the message that is given to those being called from people inside the jail, allowing them to know that it's a phone call coming from an inmate in our custody.

Q.   Okay.

(Exhibit 7 audio played.)

BY GENERAL DUNGAN:

Q.   Captain, you do recognize the voice on this call?

A.   I do.

Q.   And what is the voice you recognize?

A.   I recognize Mr. Robert Gordon's voice.

Q.   And have you listened to this call in its entirety?

A.   I have.

Q.   This is a call that the defendant made after the order went down in April, prohibiting him from using the phone?

A.   It is.

GENERAL DUNGAN:  Your Honor, can I introduce this as Exhibit 7?

THE COURT:  Objection?

MR. COSTON:  No, Your Honor.

THE COURT:  All right.  Exhibit 7 will be the second audio played.

(WHEREUPON, Exhibit 7 was marked and entered.)

GENERAL DUNGAN:  Would defense like me to play it in full?

MR. COSTON:  No.

GENERAL DUNGAN:  No?  So at this point, I have stopped the recording at 00:46, and the State will clip the recording at that point for the late filed.  And it -- (unintelligible) right.

BY GENERAL DUNGAN:

Q.  This clip that you've heard does have the defendant's voice on it?

A.  Correct.

Q.  Okay.  And were there additional phone calls from the defendant?

A.  There was.

Q.  Okay.  And I'm going to play another.

(Exhibit 8 audio played.)

BY GENERAL DUNGAN:

Q.  Captain, do you recognize the beginning of this call?

A.  I do.

Q.  And what does it tell you?

A.  It is a message that is given to those being called by inmates inside our jail to let them know that they are being contacted by an inmate inside our jail.

47

Q. Okay. And I will...

(Exhibit 8 audio played.)

BY GENERAL DUNGAN:

Q. Captain Youker, do you recognize any of the voices on this call?

A. I do.

Q. And whose voice do you recognize?

A. Robert Gordon's.

Q. And was this call placed in June of 2026?

A. It was.

Q. And was that after the order went down that said you could -- that he was not to place phone calls?

A. It was.

Q. And during the investigation at the jail, from that investigation, do you know who the other person on the call is?

A. To my knowledge, it was the same individual in which he was texting, which was Kyle Price.

GENERAL DUNGAN: Your Honor, at this point, can I enter this as Exhibit 8?

THE COURT: Objection?

MR. COSTON: No, Your Honor.

THE COURT: Exhibit 8 will be the third phone call.

(WHEREUPON, Exhibit 8 was marked and entered.)

48

GENERAL DUNGAN: One moment. Your Honor, we're just going to continue to play this call.

(Exhibit 8 audio played.)

BY GENERAL DUNGAN:

Q. And was that phone call one of the calls that the defendant made after this order went into place, prohibiting him from using the phone?

A. Correct.

Q. Okay. And was there one more?

A. There was one more that I can recall, yeah.

Q. Okay. I'm going to play from the beginning.

(Exhibit 9 audio played.)

BY GENERAL DUNGAN:

Q. Captain Youker, do you recognize what I just played?

A. Yes.

Q. And what is it?

A. It is the beginning message of our phone system. When the called party picks up, it notifies them that they're receiving a phone call from an inmate at the Williamson County Sheriff's Office.

Q. And did you recognize any voices on that call?

A. I did. It was Mr. Robert Cole Gordon.

Q. Okay. And is this call from the day after the first three calls were made?

49

A.   Yes.

Q.   And was this call also to Kyle Price?

A.   It was.

Q.   Okay.  I'm going to play the rest now, Your Honor.

(Exhibit 9 audio played.)

BY GENERAL DUNGAN:

Q.   Captain, you heard -- was this call placed after the restrictions were in place?

A.   It was.

Q.   And does this call reference that the defendant was making other phone calls?

A.   Yes.

Q.   And also, Captain, did the defendant report to the jail any emergency that -- because he's saying in here that his grandmother fell.  Did he ask the jail at any point to contact authorities in Oklahoma?

A.   Not to my knowledge, no.

Q.   Okay.  And would that have been documented if it was done?

A.   Yes.  It should have been documented if it was done, yes.

Q.   And to your knowledge, that was never done?

A.   Correct.

GENERAL DUNGAN:  And if -- now we can move

50

on to this -- Your Honor, we're going to kind of shift out of the contempt proof into this approved list proof.

THE COURT:  All right.  Before we do that, let's take a brief recess.  We've been going hard for almost two and a half hours, and I'm sure there are folks in the courtroom that need to take a break.  So let's take a seven-minute recess.  We'll return at 4:15 to shift gears.  We'll be in recess until that time.

(Recess taken)

THE COURT:  All right, before we pick this back up, I do want to step back on the case of State versus Memory Hall.

(Proceedings held in the matter of State versus Memory Hall, reported but not herein transcribed.)

THE COURT:  All right.  Ms. Dungan?

BY GENERAL DUNGAN:

Q.  Captain Youker, do you still have Exhibit 2 up there, the Notice of Legal Mail Recipients?

A.  I do.

Q.  Okay.  And were you waiting for this, so you could enforce the Court's order?

A.  I was.

51

Q. And are there any issues with this notice that would make it difficult for you to enforce the Court's order?

A. Yes.

Q. Let's talk about first -- are there names on here that don't have addresses?

A. Yes.

Q. Okay. And would you be able to enforce the Court's order without addresses?

A. No.

Q. Okay. And do you -- will the jail look at these names that do have addresses and see if the address actually matches the person's name?

A. Yes, we will.

Q. Okay. So if there's an attorney's name and then it has an address, you'll look to see if that address is associated with the attorney?

A. Correct.

Q. And same with the people --

A. Correct.

Q. -- that he's -- anyone he's trying to mail to?

A. Correct.

Q. Okay. But you've not had a chance to do that yet?

A. No.

52

Q. Okay. So if there isn't an address, you wouldn't be able to make sure that who the defendant is sending the mail to is actually that person?

A. Correct.

Q. Okay. And in the past, has the defendant mailed things to addresses with somebody's name on there that doesn't actually live at that address?

A. Yes.

Q. And did the defendant do that to harass his victim in this case?

A. He did.

Q. Okay. Do you also -- do you see any names on this list that you recognize?

A. I do.

Q. What names do you recognize?

A. So I personally -- of course, we've already discussed Ms. Minon Frye, but also Knox Gordon --

Q. Okay.

A. -- who is listed under legal representatives, but is his 11-year-old son.

Q. Okay. And then with Minon Frye. Is Minon Frye listed under the legal representatives?

A. She is.

Q. And is that in violation of the order from April?

A. It is.

Q. And do you know who Minon Frye is?

A. His sister.

Q. And have you checked your system to see if his sister allows contact from him?

A. Yes, we checked the system and she, herself, blocked her Gmail account from 2025, from wanting him to be able to reach out to her.

Q. Okay. And did you block more today from the defendant to be able to reach out to her?

A. Yes, I had her known cell phone number blocked at her request.

Q. Okay. Are there any other individuals on the list that you know or concern you in any way?

A. The private investigators, maybe. Not only are there not addresses, they're just names, but also they're under legal representatives. But I wouldn't think that we would approve them to be under legal representatives unless they were assigned through an attorney.

Q. Okay. Would the jail's preference be that the mail that needs to go to any investigators go through the attorney to the investigator?

A. I would suggest that, yes.

Q. Okay. Did you speak with the county attorney, and do you know if the county attorney has prepared a list

54

of counsel that the county attorney knows the defendant

needs to be able to correspond with because of his various

civil suits?

A.   Yes.

GENERAL DUNGAN:  Okay.  Can I pass up a
list, Your Honor?

THE COURT:  Yes.

(WHEREUPON, Exhibit 10 was tended to the
witness.)

BY GENERAL DUNGAN:

Q.   Do you recognize what's been handed to you?

A.   I do.

Q.   What is this?

A.   This is the list that our county attorney has
prepared for us -- or for him, in regard to acceptable
addresses and courts and attorneys that he needs to be
able to reach out to.

Q.   Okay.  And the first three on the list, are
those opposing counsel in cases where the defendant
represents himself pro se, that you're aware of?

A.   Yes.

Q.   Okay.  And the others are clerk's offices?

A.   Correct.

GENERAL DUNGAN:  Okay.  Your Honor, if I
could just introduce this as Exhibit 10, just for

55

ease of the Court for doing some of these restrictions more clearly.

THE COURT: Any attorney objection, Mr. Coston?

MR. COSTON: No, Your Honor.

GENERAL DUNGAN: Those are all my questions for Captain Youker. Thank you.

THE COURT: Well, I did not have an Exhibit 9.

GENERAL DUNGAN: Oh, I'm sorry, Your Honor, if I did not enter Exhibit 9. Exhibit 9, I would ask it be entered at this time. It's the fourth phone call.

THE COURT: All right. Any objection to the fourth phone call?

MR. COSTON: No, Your Honor.

THE COURT: Exhibit 9 will be the fourth audio played. And 6, 7, 8, and 9 will be on one thumb drive. And then Exhibit 10 will be the list from the county attorney.

(WHEREUPON, Exhibits 9 and 10 were marked and entered.)

GENERAL DUNGAN: Thank you, Your Honor.

THE COURT: Thank you. All right. Mr. Coston, your witness.

*Kelly Beatty Reporting (615)588-8936*

MR. COSTON: Thank you, Your Honor.

CROSS-EXAMINATION

BY MR. COSTON:

Q. What's the routine for using the phone or the kiosk? Are they always turned on?

A. They are always turned on. If the day room is open, they're generally turned on unless there's a necessary security reason as to why they would be shut down.

Q. Okay. So they are shut down sometimes, right?

A. Yeah, periodically.

Q. So what would be the routine if an inmate walked in there and they were shut down and they want to make a call, what would you do? What would the inmate do?

A. Wait until they came back on.

Q. Just wait until they came back on? You couldn't ask somebody, "Hey, can you turn them back?"

A. They could, but if they're shut down for security reasons or because it's locked down or what have you, they wouldn't be turned back on.

Q. Okay. Do you know how Mr. Gordon found out that his nephew had passed away?

A. I believe it was through the mail.

*Kelly Beatty Reporting (615)588-8936*

Q. Okay. Somebody else outside the system sent him a piece of mail that told him that?

A. Correct. Yeah, one of my deputies had conversed with him about that.

Q. Okay. And generally, when somebody -- when a family member passes away, aren't inmates even like Mr. Gordon able to make some calls to family about the --

A. So the deputy did come to me when she found out about this and asked me, because she had a conversation with him, and said she would see if that's something we could do. And generally, if there's a death in the family, I will allow it to happen. And because there was a death in the family, I even reached out to our county legal and asked them what their thoughts were. Because I'm not as cold-hearted as some would believe me to be. But even the county attorney advised against it due to the court order. Even with the death in the family, we would be violating the Court's order.

Q. Okay. Isn't Mr. Gordon supposed to be in a medical pod?

A. No.

Q. Does he have something from Vanderbilt indicating he has a hip injury and needs grab bars?

A. He has something from Vanderbilt stating that he does need those items, and we have temporarily given him a

58

shower chair and a toilet chair to be able to utilize.
And we have -- I've instructed our maintenance team to go
ahead and get those bars ordered to get them installed
ASAP, but we have accommodated his need at this time.

Q.   Okay, thank you.

A.   Yes, sir.

MR. COSTON:  That's all the questions I
have.

THE COURT:  All right.  Thank you, Mr.
Coston.

GENERAL DUNGAN:  Nothing further from the
State for Mr. Chad Youker.

THE COURT:  Captain, you may step down.
Thank you, sir.  Next witness.

GENERAL DUNGAN:  Your Honor, the State
would call Ashley Lindquist.

ASHLEY LINDQUIST

was called as a witness, and after having been first duly
sworn, testified as follows:

GENERAL DUNGAN:  Could you please state
your name and spell it for the court reporter?

THE WITNESS:  Ashley, A-S-H-L-E-Y,
Lindquist, L-I-N-D-Q-U-I-S-T.

DIRECT EXAMINATION


BY GENERAL DUNGAN:

Q.   And what is your job?

A.   I'm the lieutenant over operations for the detention center.

Q.   Okay.  And so, Lieutenant Lindquist, how long have you worked at the Williamson County Detention Center?

A.   Eight years and a few months.

Q.   Okay.  And as part of your job as a lieutenant there, do you investigate offenses within the jail?

A.   Yes, ma'am.

Q.   And do you know the defendant?

A.   Yes.

Q.   And do you know Robert Cole Gordon?

A.   Yes, ma'am.

Q.   And can you identify him for the Court?

A.   He's sitting right there, ma'am.

Q.   And did you investigate the defendant's actions that have occurred since April of 2026?

A.   Yes, ma'am.

Q.   Okay.  And are you aware of a court order from April of 2026?

A.   Yes, ma'am.

Q.   And what does that order do, to your

*Kelly Beatty Reporting (615)588-8936*

understanding?

A.   That he's not to have contact with certain individuals.  He's able to send mail and correspond with his attorney and clerk's office, things like that relating to his case.

Q.   Okay.  And did you find in your investigation evidence that the defendant sent text messages?

A.   Yes, ma'am.

Q.   Okay.  And did you provide those texts to Captain Youker?

A.   Yes.

Q.   And did that happen within the Williamson County Jail?

A.   Yes.

Q.   And what about phone calls?  Did you find that he made phone calls?

A.   Yes.

Q.   And did you provide those to Captain Youker?

A.   Yes.

Q.   And did those happen within the Williamson County Jail?

A.   Yes.

Q.   And is the Williamson County Jail in Williamson County?

A.   Yes.

GENERAL DUNGAN: Okay. And then, Lieutenant Lindquist, in your investigation, did you investigate specifically a text message -- and now I apologize, because I did just say the court officer could take it back. But --

THE COURT: Exhibit 5?

GENERAL DUNGAN: Yes. If we could pass her Exhibit 5.

(WHEREUPON, Exhibit 5 was tended to the witness.)

BY GENERAL DUNGAN:

Q. Did you investigate a text message that you believe the defendant to have sent?

A. Yes.

Q. And is Exhibit 5 that text message?

A. Yes.

Q. And did you save that text message?

A. I did.

Q. Okay. And why do you believe the defendant sent that text message? How did you become aware of his court case?

A. I was unaware of his court case.

Q. Okay. How did you come across the text message? What were you doing?

A. I was researching the numbers of inmate Gordon,

*Kelly Beatty Reporting (615)588-8936*

and that had popped up.

Q. Okay. So this phone number is a phone number that Robert Gordon has contacted before?

A. Yes, ma'am.

Q. Okay. And contextually, is the information within the email related to things you know about inmate Gordon?

A. Yes.

Q. Okay. Have you before seen inmate Gordon -- have you read a lot of his correspondence?

A. Yes, ma'am.

Q. And have you seen him correspond with someone named Kyle Price before?

A. I've never physically seen him do it. I've reviewed camera footage that links with these text message times, and I've seen him typing on the kiosk or a tablet.

Q. Okay. But corresponding -- have you seen text messages before the defendant's communications were restricted, where he was communicating with Kyle Price?

A. Yes, ma'am.

Q. Okay. And that's how you got this phone number?

A. Yes.

Q. Okay. And this particular text message, did you look to see if you could determine who actually was sending out a message at this point in time?

63

Case 3:24-cv-01121    Document 111-8    Filed 08/12/26    Page 63 of 99 PageID #: 2660

A.   Yes, ma'am.

Q.   Okay.  Because this is not going through the defendant's jail system, is it?

A.   No, ma'am.

Q.   Okay.  Whose jail system was this going through?  Which inmate?

A.   Anthony Thomas Pope.

Q.   Okay.  So what did you do to figure out who actually sent the message?

A.   I reviewed camera footage for Pod 110.  I saw the inmate Pope log on to a tablet and pass it to inmate Gordon, where he was seen typing on that device, and eventually passed that back to inmate Pope.

Q.   Okay.  And that's during the time that this message was sent?

A.   Yes, ma'am.

GENERAL DUNGAN:  One moment.  That's all I have.  Thank you.

THE COURT:  Thank you.


CROSS-EXAMINATION


BY MR. COSTON:

Q.   Are you aware that Mr. Gordon helps other inmates send messages on their behalf?

64

A.   No, I'm unaware of that.

Q.   You're not aware that he helps, like, non-English speakers type English messages?  You're not aware of that?

A.   No, sir.

MR. COSTON:  Thank you.

THE COURT:  Thank you, Mr. Coston. Any redirect?

GENERAL DUNGAN:  Nothing further, thank you.

THE COURT:  All right.  You may step down, Lieutenant.  Thank you.  Next witness.

GENERAL DUNGAN:  That's all the State has for the contempt portion.  The State does have another witness for the attorney list.

THE COURT:  Let's call them up.  And If I could take a look at Exhibit 10, please.

(WHEREUPON, Exhibit 10 was tended to the Court.)

GENERAL DUNGAN:  Your Honor, the State will call Joe Ashmore.

JOSEPH ASHMORE

was called as a witness, and after having been first duly sworn, testified as follows:

GENERAL DUNGAN:  Could you please introduce yourself for the Court?

THE WITNESS:  Joseph Ashmore.  J-O-S-E-P-H, A-S-H-M-O-R-E.

DIRECT EXAMINATION

BY GENERAL DUNGAN:

Q.   What's your current occupation?

A.   I'm the Criminal Investigator for the District Attorney's Office for the 21st Judicial District.

Q.   How long have you been the criminal investigator?

A.   Just going on a little over three years.

Q.   And what's your prior law enforcement experience?

A.   I've been a law enforcement officer since 1998.

Q.   And did you -- have you seen a list in this case of legal representatives of the defendant?

A.   Yes.

Q.   And were you asked to investigate that list?

A.   I was.

GENERAL DUNGAN:  And if we could pass him Exhibit 2.

(WHEREUPON, Exhibit 2 was tended to the

66

Case 3:24-cv-01121    Document 111-8    Filed 08/12/26    Page 66 of 99 PageID #: 2663

witness.)

BY GENERAL DUNGAN:

Q.   And, Investigator Ashmore, is this the list that you investigated?

A.   It is.

Q.   And if we can start, there's a section labeled "Legal Representatives Attorneys."  Do you see that section on the first page?

A.   I do.

Q.   And did you investigate Nick Perenich?

A.   I did.

Q.   And is he an attorney?

A.   He is.

Q.   And did you speak with him?

A.   I did.

Q.   And does he represent the defendant?

A.   He currently does represent the defendant regarding a parental rights issue that's under appeals.

Q.   Okay.  And what about Mike Hills?  Were you able to find out -- first of all, is there an address for Mike Hills?

A.   There is.  Well, it just states Mike Hills with the State of Michigan listed.

Q.   Okay.  Were you able to identify Mike Hills?

A.   I did identify Mike Hills in Kalamazoo.

Q.   Okay.  And is he one of the defendant's attorneys?

A.   I was not able to make contact with that individual.  I spoke with a receptionist and he was unavailable, and I have not received a return call.

Q.   Okay.  And -- but he is an attorney?

A.   Yes.

Q.   And were you able to determine if he has represented the defendant sometime in the past?

A.   I was from speaking with another individual, yes.

Q.   Okay.  When did he represent him?

A.   He represented the defendant in 2018, I believe it was.  On a domestic -- yes, in 2018, he represented him in Michigan on a domestic charge.

Q.   Okay.  And what about Vernon and Aubrey Gordon, Dallas, Texas?  Were you able to identify who these two individuals were?

A.   I was not.  Obviously, it just states their name, "Vernon and Aubrey Gordon in Dallas, Texas."  I did locate two individuals by that name that share the same address in Dallas, Texas.  Unsure if it's the same ones because both of those were deceased.

Q.   Were you able to find anyone by that name in Dallas, Texas, that was an attorney?

*Kelly Beatty Reporting (615)588-8936*
Case 3:24-cv-01121   Document 111-8   Filed 08/12/26   Page 68 of 99 PageID #: 2665

A.   No.

Q.   Okay.  If we can go back to Nick Perenich, is that the correct address for Mr. Perenich as well?  The first one on the list?

A.   He did not provide his address during the time I talked to him.

Q.   And if we can go to the last person on this page, Knox Gordon.  Do you know or did you investigate who Knox Gordon is?

A.   Yes.  Upon talking to a couple of individuals, he is the 11-year-old son of the defendant.

Q.   The 11-year-old son of the defendant?

A.   Yes.

Q.   Okay.  And did you talk to this child's mother?

A.   I did.

Q.   And what information did you find out about this child?

A.   Obviously, she confirmed he was not an attorney, that he is the child of her and the defendant.  His date of birth -- he is 11-years-old.  His parental rights of this child were terminated --

Q.   Whose parental rights?

A.   The defendant's --

Q.   Okay.

A.   -- were terminated approximately two years ago.

69

There was a no contact order that has been in place since 2021, and that her wishes were that that order stay in place and that the defendant not have any contact of any sort with the child.

Q. Okay. And if we can go to the next page, this page has a Russell and Bella Rarbor. Were you able to find anyone close to that name?

A. In searching that name, no, I was unable to find anybody by that name. There were some close similarities. I did find a Russell and Bella Rarbor in Poteau -- if I'm saying that correctly -- Oklahoma, both of which who are attorneys.

Q. Okay. And did you speak with one of them?

A. I spoke with Ms. Bella.

Q. And is she married to Russell?

A. She is.

Q. And are they still practicing attorneys?

A. She described them as semi-retired.

Q. And do they know the defendant?

A. They do.

Q. Are they his attorney?

A. No, they are not.

Q. Have they ever been his attorney?

A. No, they have not.

Q. Okay. And is 123 Caldwell Drive their address?

A. It is not.

Q. Did you look to see who that address associates with?

A. Yes. It is associated to an individual by the name of Kyle Price.

Q. Okay. And what about Namitia Sharma? Did you locate a Namitia Sharma in Michigan?

A. I did, in Kalamazoo.

Q. Okay. But that one does not have an address with it, correct?

A. Correct.

Q. And was Ms. Sharma an attorney?

A. She was an attorney and she is presently a circuit court judge.

Q. Okay. And did you speak with Ms. Sharma?

A. I did not.

Q. And did you find out if Ms. Sharma ever, in some way, represented the defendant?

A. Yes. Ms. Sharma had previously represented the defendant while in Michigan for a charge I was not advised of. However, I was advised that the defendant fired her and then turned around and hired her husband.

Q. Okay. And the Jim B -- the name underneath of it. Were you able to find anyone by that name?

A. I was not.

*Kelly Beatty Reporting (615)588-8936*

Q. Did it -- is that name somewhat similar to what you believe to be Ms. Sharma's husband's name?

A. That's what I was advised when I presented that name.

Q. Okay. And do you know when that representation would have been?

A. They couldn't recall, but it's been a number of years.

Q. Okay. And Ms. Lauri Jewett on the list, did you speak with Ms. Jewett?

A. I did.

Q. You did not speak --

A. I did.

Q. You did speak with Ms. Jewett?

A. Uh-huh (affirmative).

Q. And is she an attorney?

A. She is.

Q. And did she know the defendant?

A. She does.

Q. And does she represent the defendant?

A. No, she does not.

Q. Has she ever represented the defendant?

A. No, she has not.

Q. Okay. And then Ms. Minon Frye, were you able to speak with Ms. Minon Frye?

A.   I did.

Q.   And is she an attorney?

A.   She is.

Q.   Does she represent the defendant?

A.   No, she does not.

Q.   How did she describe their relationship?

A.   She is the sister of the defendant.

Q.   Okay.  And do they have a good relationship where they speak?

A.   No, they do not.

Q.   Okay.  Did she describe it as estranged?

A.   She did.

Q.   What did she tell you about contact with him?

A.   She stated that she had gotten into the Williamson County system and established where -- that he could not contact her via mail or phone, and that she had been receiving, over a period of time, correspondence from him.  But mostly, it was in regards to just questions involving his son.  However, she says she's not responding to any of the mail, it basically just stacks up.

Q.   Okay.  And did she ask you today to make sure that all of her phone numbers were blocked?

A.   She asked that her mobile phone be blocked. However, she said she was fine with her business phone remaining active.

73

Case 3:24-cv-01121    Document 111-8    Filed 08/12/26    Page 73 of 99 PageID #: 2670

Q. Okay. And this address, this 2005 North Broadway --

A. Yes.

Q. Is that her address?

A. It's not.

Q. And does she live in this city of Poteau, Oklahoma?

A. She does not.

Q. Where does she live, do you know?

A. Inola, Oklahoma.

Q. Okay. And do you know what is at this 2005 North Broadway address?

A. It's the address to his stepfather's insurance business.

Q. Okay. So Ms. Frye does not work or live at this address?

A. No.

Q. Okay. And then, were you able to find a Mr. Philip Henry?

A. I was not.

Q. Okay. And this address that isn't written here for Mr. Philip Henry, is that 123 Caldwell --

A. Correct.

Q. -- drive? Is that the same address that's on this list for Russell and Bella Rarbor?

A. It is.

Q. And that address is associated with Kyle Price?

A. Correct.

Q. Do you know anything about Philip Henry from your investigation?

A. I was just advised that he was a friend of the defendant.

Q. Do you have any reason to believe he's an attorney?

A. I was unable to find anything that referenced in connection to him being an attorney.

Q. Okay. One moment, please. Is there a list of physicians on here? Do you see it on the Exhibit 2, page 2?

A. A list of conditions?

Q. Physicians, sorry.

A. Physicians or investigators?

Q. Physicians.

A. Oh, yes. Okay. I'm sorry.

Q. And do you see a Kayla Price on that list?

A. I do.

Q. Did you come across that name anywhere else in your investigation?

A. I did.

Q. Where?

75

A.   She appears to be the wife of Kyle Price.

Q.   Okay.  And then I -- if we can go to the private investigators.  Were you able to make contact with any of these private investigators on this list?

A.   I spoke with Mr. Carl Clatnerbuck.

Q.   And what did he say?

A.   He confirmed he is a private investigator in Kalamazoo, Michigan, and he did do some work for the defendant.  However, it was about five or six years ago.

Q.   And is he currently doing any work for the defendant?

A.   He is not.

GENERAL DUNGAN:  Okay.  I think that's all I have, thank you.

THE COURT:  Thank you, General.  And Mr. Coston?

MR. COSTON:  No questions.

THE COURT:  No questions?  All right.  You may step down, sir.  Thank you.

GENERAL DUNGAN:  That's it for the State, your Honor.

THE COURT:  Thank you.  Mr. Coston, proof?

MR. COSTON:  Thank you, Your Honor.  I'd like to call Lieutenant James.

76

LUKE JAMES

was called as a witness, and after having been first duly sworn, testified as follows:

DIRECT EXAMINATION

BY MR. COSTON:

Q. Lieutenant James, do you work at the Williamson County Jail for the Williamson County Sheriff's office?

A. Yes, sir, I do.

THE COURT: And if you could start by saying your first and last name and then spelling your first and last name.

THE WITNESS: Yes. Luke James. L-U-K-E. Last name, J-A-M-E-S.

THE COURT: Okay. Thank you. Mr. Coston?

BY MR. COSTON:

Q. And do you know Robert Gordon?

A. Yes, sir.

Q. And have you discussed with him the death of his nephew at all?

A. No, sir. I have not.

Q. Okay. Do you sometimes turn the telephones and the kiosks on and off?

A. No, sir, I do not.

*Kelly Beatty Reporting (615)588-8936*
Case 3:24-cv-01121    Document 111-8    Filed 08/12/26    Page 77 of 99 PageID #: 2674

Q. You never do?

A. No, we would only turn them off if there was, like, a security reason, but that would be --

Q. Have you ever turned them on for the defendant?

A. I have not. No, sir.

MR. COSTON: No? Thank you.

THE WITNESS: Yes, sir.

THE COURT: Thank you, Mr. Coston.

GENERAL DUNGAN: Nothing, Your Honor. Thank you.

THE COURT: You may step down, Lieutenant. Thank you.

MR. COSTON: I'd like to call Deputy Triplett.

MATTHEW TRIPLETT

was called as a witness, and after having been first duly sworn, testified as follows:

MR. COSTON: Would you state your name and spell your name for the record, please?

THE WITNESS: Matthew Triplett. M-A-T-T-H-E-W, T-R-I-P-L-E-T-T.

///

///

///

*Kelly Beatty Reporting (615)588-8936*

DIRECT EXAMINATION

BY MR. COSTON:

Q. Do you work for the Williamson County Sheriff at the Williamson County Jail?

A. Yes, sir.

Q. And do you sometimes turn the telephones and the kiosks on and off for the inmates?

A. When appropriate.

Q. Okay. Do you know Robert Gordon?

A. Yes, sir. I do.

Q. Have you ever turned the phones or the kiosks on or off for him?

A. No, sir.

Q. Never?

A. No, sir.

MR. COSTON: Okay. Thank you.

THE COURT: Thank you, Mr. Coston.

GENERAL DUNGAN: Nothing. Thank you.

THE COURT: All right. You may step down, Deputy. Thank you.

MR. COSTON: No more proof.

THE COURT: All right. Any rebuttal proof?

GENERAL DUNGAN: That's proof.

THE COURT: All right. The proof is

Case 3:24-cv-01121   Document 111-8   Filed 08/12/26   Page 79 of 99 PageID #: 2676

closed. And I will allow brief -- ever, ever so brief argument, should the parties choose. Let's start with the State. Would you like -- excuse me, closing argument? Brief closing argument?

GENERAL DUNGAN: Just brief, Your Honor, just to tell the Court -- just on the contempt, Your Honor, if that's okay. The State's just asking that the Court find the defendant guilty of, I believe, five counts of contempt for the letters from the original motion, and then for five additional counts of contempt for the texts and calls, Your Honor. And the State is asking the Court sentence the defendant to 10 days, as allowed by statute, on each count, each count consecutive to each other, for a total of 100 days at 100% to serve in the Williamson County Jail. The State is asking for consecutive sentencing.

There certainly is case law that would support consecutive sentencing. The Court has even found before, in cases -- it would meet the factor for excessive criminal activity. This can be found even on contempt cases where the contempt is excessive and the defendant has no other history. There was a case that the Court upheld, I believe it was multiple contempts from the same hearing,

sentenced over 100, I believe, all consecutive to each other. Additionally, Your Honor, this would go to the extensive criminal history based just on the excessiveness of the defendant's continued behavior, showing a willfulness to continue to violate the Court's orders.

THE COURT: All right. Thank you, General. And Mr. Coston?

MR. COSTON: Well, to start with, on the phone calls. Clearly, if you hold that he is enjoined from using the phone against my original argument, they've made a pretty good argument, pretty good case for the phone calls. The letters, I think, are more dubious. There's no proof about what the letters contained or that they were sent in violation of the orders. But the phone calls, we do have a problem there. Except one of the phone calls, I would plead the affirmative defense of necessity. He called Kyle Price and said, "My grandma --" it was a less than one minute phone call. All he said was, "My grandmother fell down and can't get up. Could you please get over there?" And I would say that the potential harm from having his grandmother laying on the floor, who's innocent and who's not part of this case, but she needed medical attention,

*Kelly Beatty Reporting (615)588-8936*

potentially -- there could have been great harm from that.  And the harm of him violating Your Honor's order -- which I get, he's not supposed to violate -- but the harm that would result from that specific violation is significantly counterbalanced by the potential harm of an old person laying on the floor where they've fallen and can't get up.  So I believe he should be found innocent on that charge.

The letters -- there just wasn't enough admitted to indicate that those weren't legal mail or something.  Finally, each of these charges, they're asking for 10 days, which is the max.  And there's mitigation in each one of these.  Even though he's technically in violation in those phone calls that he's made, there's no real harm that's been done. You can hear the stress in that father's voice.  I'm kind of happy that the dad got a phone call for Father's day.  You can hear the undertones of the man's voice that he's stressed about his son.  You might fault Mr. Gordon, but you can't fault his father for all of this.  So there was no real harm done by calling him for Father's Day.

The underlying purpose of this order is to keep him from harassing potential victims.  And there's nothing in all of the proof that the State

has introduced to indicate that any of these calls or letters were intended or would have resulted in any harm or threat to any of the victims in this case. So they should be considered mitigated.

Second, they shouldn't be sentenced consecutive. There's two provisions of law for consecutive sentencing. The first are the rules of criminal procedure, which says there's mandatory consecutive sentence if he's on probation, parole, or bond. And clearly he's in jail, so he's not on bond. He's not been convicted of anything, so he's not on probation or parole. So we go to 40-35-115 for consecutive sentencing. And I could go through each one of those, but the State hasn't pointed out any of the factors of 40-35-115. Like he's a dangerously psychotic person with an extensive history of violent criminal behavior, or he's criminally psychotic or a career criminal, meaning somebody who's made a significant amount of their money through their career criminality. None of those factors are met in this, so what he should be sentenced to is concurrent time.

GENERAL DUNGAN: Your Honor, just briefly in response. The defense still has to prove -- they've not shown any proof that what the defendant

said, that his grandmother fell, is actually true. And the defendant has shown a continuous behavior of disobeying orders, which would certainly reflect on his credibility.

Also, Your Honor, just for the Court to note, the defendant did admit in one of those calls that he knew he wasn't supposed to be on the phone. He knew he wasn't allowed to do it, yet he was still doing it. These are blatant violations of the order. This isn't just a no contact order with the victim, because the Court has already tried that and it didn't work. And the defendant went around every which way multiple times to contact the victim. So now the Court is stuck in a position where it has to restrict all of his mail, all of the time. And the State would just ask --I mean the State's asking to enforce all the restrictions all the time, because enforcing just the "don't contact the victim" wasn't enough.

And then, as for consecutive sentencing, the State would certainly argue that he's an offender whose record of criminal activity is extensive. Courts have found that before in situations where it was only the acts that happened that the Court is sentencing to. But if the court wants to also look

*Kelly Beatty Reporting (615)588-8936*

to 40-35-115(7), the defendant is sentenced for criminal contempt.  That is a specific reason for consecutive sentencing laid out in the statute.

THE COURT:  Thank you, General.  All right.  And do the parties have any further argument as it relates to the list of persons and/or what to do with the letters that were sent to -- or attempted to be sent to Ms. Frye as legal mail?  And that was clearly prescribed and prohibited by the prior order of the Court.

GENERAL DUNGAN:  I apologize again --

THE COURT:  Any further argument as it relates to the list and/or what to do with the orders -- or the letters that were attempted to be sent to Ms. Frye as legal mail contrary to the Court's order?

GENERAL DUNGAN:  The State's asking the Court to release the letters that are clearly not legal mail, pursuant to the Court's order.  And also, the proof that the Court heard today, that Ms. Frye doesn't represent the defendant -- in fact, doesn't even want contact with him.

So the State would ask the Court to just release those letters to both parties, and then an order from the Court from now  on -- I don't know, I

85

guess the best thing for the jail to do is, if the defendant is trying to send legal mail out to an individual that is not on the legal mail list, then perhaps the jail just hands him back the letters for now on and refuses to take possession of them. And that will avoid further issues with having to have hearings on it. But I would like to be heard on who should be on this legal list.

THE COURT: Well, I won't need argument on that. That will -- the Court has made a determination subject to Mr. Coston's statements.

GENERAL DUNGAN: Thank you.

MR. COSTON: I've made my argument. I don't have any addition -- the only thing I would like to say is, the inclusion of Knox Gordon on there was my mistake, not his. I have a hard time reading his handwriting, and I got it on the wrong side.

THE COURT: I'll address the legal notice list first, then I'll do the contempt, and then we'll talk about the letters. So as for to whom Mr. Gordon may send legal mail, he may send legal mail to Nick Perenich at the address stated, and he may send mail to Geoffrey Coston at his address, and that is all. In the event there's other legal matters he needs to send mail for, it can go through one of those two

*Kelly Beatty Reporting (615)588-8936*
Case 3:24-cv-01121    Document 111-8    Filed 08/12/26    Page 86 of 99 PageID #: 2683

lawyers.  But in what is -- what the Court receives as a clear attempt to yet again circumvent the Court's orders and the restrictions placed.  He included Russell and Melva Rarvor [sic], believed to be Russell and Bella Rarbor, at the address for Kyle Price, who was also the individual to whom he made multiple calls in direct violation of the Court's order.  Additionally, the Philip Henry that was listed as legal mail as an attorney had the same address as Kyle Price.

So the Court has made great attempts to try to allow Mr. Gordon to maintain correspondence with his attorneys.  And by virtue of this notice of legal mail recipients, he has yet again thumbed his eye -- or stuck his thumb in the eyes of justice by attempting to circumvent it.  So we're going to stop that.  He can send mail to -- legal mail to Nick Perenich, who has been confirmed to represent him, and he may send legal mail to Mr. Coston.  He may send legal mail to any court clerk, but that will be the limitation of his legal mail.  Any legal mail that is not -- that is sent or addressed to anyone other than that, in direct violation of this Court's order, shall be returned to him and not mailed.

GENERAL DUNGAN:  Your Honor, will the Court

*Kelly Beatty Reporting (615)588-8936*

consider adding the three attorneys that the Court -- that the county attorney is asking for, that he currently has lawsuits and he is representing himself pro se?  These are suits against the county that are represented by multiple attorneys and he would be required to correspond with those opposing counsels.

THE COURT:  Then, yes, the Court will allow him to -- those weren't on his list, but --

GENERAL DUNGAN:  They're on the county attorney's list.

THE COURT:  He'll be allowed.  If he would like to correspond with those attorneys on the opposite side of whatever cases he has, those specific attorneys and those addresses, he may do so as well.

GENERAL DUNGAN:  Thank you.

THE COURT:  Any other mail shall, obviously, be monitored and copied.  So that should resolve the notice of legal mail recipients.  As for the criminal contempt, in order to make a finding of criminal contempt, the Court must consider first and foremost, whether or not there was a lawful enforceable order.  The Court does find beyond a reasonable doubt there was a lawful and enforceable order entered by the Court on April 24th, 2026.

*Kelly Beatty Reporting (615)588-8936*

The Court further finds that this order is not vague or ambiguous, it is a clear order. And while there's been a suggestion it may have contradicted with what the Court stated in open court based on a partial transcript, the Court does note that that is not the complete transcript, that there was an additional ruling made by the Court after the Court returned from recess that is not included in the transcript. But in any event, to the extent that a written order conflicts with the orally announced order, the written order, by law, controls. And this order specifically provided that Minon Frye, who was an attorney in Oklahoma, will not be included on the legal mail list.

In reviewing the order -- this is paragraph 4 on page 2 -- "The approved person list is to be organized into legal and nonlegal persons." It specifically provides that she will not be listed on the legal mail list. So the Court does find that for the letters that are included in the envelope that was previously provided to the Court, that includes five letters that were addressed to Ms. Minon Frye, yet marked legal mail, thereby attempting to escape review by the sheriff's department and to which the captain testified that each of those was done after

the entry of the order.  The Court does find beyond a reasonable doubt that the defendant willfully violated this Court's order, that Ms. Frye not have mail addressed as legal mail.  So I will find him guilty of those five counts of contempt.

Next, on the amended motion for indirect criminal contempt, the Court heard evidence and testimony and notes.  The same order previously announced or previously discussed, entered April 24, 2026, in the very first numbered paragraph: "The defendant is prohibited from using any and all forms of electronic communication pending for the order of the Court."  There is testimony that on four occasions as listed on page 1 of the amended motion for indirect criminal contempt, that phone calls were made.  There were multiple phone calls made to his father, and all four -- we have four recordings that were introduced, in which Mr. Gordon's voice was recognized.  And from the discussion between the parties, the Court does find beyond a reasonable doubt that that was Mr. Gordon and that he was in violation of the Court's order.  Can I see Exhibit 1 and Exhibit 5?  And you can take back Exhibit 10.

(WHEREUPON, Exhibits 1 and 5 were tended to the Court, and Exhibit 10 was retrieved.)

*Kelly Beatty Reporting (615)588-8936*

THE COURT: So the Court does find that Mr. Gordon willfully violated the Court order on the four phone calls that are included in Exhibit 6 through 9, and in which, on at least one occasion, he admitted he was not permitted to make phone calls. The Court finds he did so willfully beyond a reasonable doubt and will convict him of those four counts.

Then the final count is that the defendant used Anthony Pope's inmate account to send a text message to Anthony Thomas Pope [sic], as testified to by Lieutenant Lindquist, who verified that she observed the video and observed him -- Mr. Pope -- logging into a tablet and then passing it to Mr. Gordon at the time that that text message was sent. Again, the same order admitted as Exhibit 1 specifically precluded Mr. Gordon from engaging in any electronic communication. Yet again, he completely ignored the Court's order. And the Court will find him in willful criminal contempt beyond a reasonable doubt for that count as well.

So this is a total of 10 counts of criminal contempt: five, one for each letter; four, one for each phone call; and one, one for the text message. The Court does find Mr. Gordon in willful criminal contempt. The Court will sentence -- the Court has

considered all of the principles and purposes of sentencing set forth in our statutory scheme and does sentence him to 10 days per count.

The question as to whether or not those counts should be served concurrently or consecutively -- I note counsel's argument that one of those counts, the phone call regarding his Mamaw, they pled the defense of necessity. The Court rejects that defense. Obviously, if Mr. Gordon was able to illegally speak with his Mamaw on the phone, contrary to this Court's order, that by very definition would indicate that she had the ability to speak on the phone. In any event, there's no indication that based on the captain's testimony that Mr. Gordon requested any assistance from the sheriff's department regarding his grandmother. So that defense is respectfully rejected.

The Court does note that under 40-35-115, dealing with multiple convictions, there is a statutory scheme set forth with considerations that the Court may -- and should refer to, in most cases, in order to run cases consecutively versus concurrently, the Court notes that generally cases run concurrently unless otherwise specified. However, under (b)(7), our legislature has set forth

that all the Court need find is that the defendant is being sentenced for criminal contempt in order to require that the sentences be run consecutively.

In this case, it is evident that Mr. Gordon has absolutely no concern for following the rules and orders of this Court.  He has done what appears to be his very best to circumvent the rules, going so far as to include -- I'll credit Mr. Coston for taking accountability for listing his 11-year-old son -- or the defendant's 11-year-old son on the legal representatives.  But again, he's listed as attorneys -- individuals who are not attorneys, and listed Kyle Price's address.  Just the number of repeated, clear, obvious efforts of this defendant to completely ignore and directly contradict the orders of this Court is somewhat astonishing.  And so, based on the totality of these circumstances, taking all of the purposes and principles of sentencing into effect, the Court will absolutely sentence Mr. Gordon to 100 days to serve at 100% based on these violations.

As for the letters, they are marked legal mail, so they were not reviewed.  They were sent to Ms. Frye contrary to the Court's order.  I'm going to order that those letters be returned to Mr. Coston.

*Kelly Beatty Reporting (615)588-8936*

I do not want to review them.  They may be legal mail.  The fact that he sent them in direct contravention of the Court's order does not in and of itself defeat the fact that they may contain attorney client privileged information.  The Court does not want any of that information to be revealed to the Court.  So I will return those to Mr. Coston to do with as he sees fit.  But I do ask that they not be forwarded to Ms. Frye.

MR. COSTON:  I'm going to ask, if I review them and find that they do have requests for legal advice or are legitimate legal letters, can I forward them to her?

THE COURT:  Here's what you can do.  I want you to take them.  If you would like to review them, you may.  If you would like to give them back to the defendant or otherwise deal with them as you may, you may do so.  If they are going to be sent to Ms. Frye, then they need to be treated the way that any nonlegal mail would be treated, which would be to give copies to the State.  Otherwise, they need to go back to Mr. Gordon.  But I don't -- despite the fact that he was clearly and intentionally and willfully violating the Court's order by doing that, at this point, the Court will not find that that defeats the

*Kelly Beatty Reporting (615)588-8936*
Case 3:24-cv-01121   Document 111-8   Filed 08/12/26   Page 94 of 99 PageID #: 2691

attorney-client -- the possible attorney-client privilege that might attach -- although based on the information before the Court, she certainly does not represent him and has asked to block her email and her personal phone number from him. So that will be the order of the Court. And the same with the additional letters to Ms. Frye --

GENERAL DUNGAN: We'd ask that the Court hold those as part of the record so the State can file for additional contempt charges. Because we weren't able to file that motion because we didn't have it until today. The State would have added that.

THE COURT: Well, they were in the possession of the sheriff's department. If you would prefer for the Court to hold them, just so there's no question that they're not going to be --

GENERAL DUNGAN: They won't be opened, if you want to give them back to the sheriff's department. I just need to be able to make copies of the fronts so that I can file my motion and they can bring them back in. Because we'll have to go through that whole process where they identify the letter and identify it as a copy of the --

THE COURT: The late filed exhibit?

*Kelly Beatty Reporting (615)588-8936*

GENERAL DUNGAN: Yes, Your Honor. And so, I need to copy them anyways for the late filed exhibit, and then I can just place them back into the file for now. And then the State will file a motion for contempt on those for additional counts prior to -- well, the next court date is the trial in September. The State will do it soon and that way the Court doesn't have to tag that piece. Is it okay with the clerk or -- they're not physical files, so if the clerk doesn't want to keep up with it, perhaps?

THE COURT: Well, so the five letters for which Mr. Gordon has been convicted of criminal contempt will be returned to Mr. Coston, but these are the additional ones for today?

GENERAL DUNGAN: Yes, Your Honor.

THE COURT: Since they were in the custody and control of the sheriff's department, I would prefer them to go back to the sheriff's department.

GENERAL DUNGAN: Yes, Your Honor. And the letter that is to Terri Chitwood, I believe? That one is not marked legal mail. So the sheriff's department can go ahead and give that back to the defendant. And if he wants to mail that out not as legal mail, he can go through that process.

THE COURT: Well, anything that's not marked legal mail, they can open and scan and follow their normal process. If it is not marked legal mail, that is clearly within their -- my understanding of their process, is they scan it and record it. So if it's not marked legal mail, I'm not --

GENERAL DUNGAN: Thank you, Your honor.

MR. COSTON: I just want to be clear. He can still correspond with his sister, just not in legal mail? Is that what the ruling is here?

THE COURT: That is the ruling and I was hesitant on that. But the investigator testified that she indicated she did not want him blocked from her business number, I believe?

GENERAL DUNGAN: Yes, I believe that's correct.

THE COURT: So I'll allow him to send nonlegal mail to Ms. Frye.

GENERAL DUNGAN: Yes, Your Honor. And we will instruct people as they reach out that if they do not want contact from him, just to let the jail know they have an internal process and they can take care of all of that.

THE COURT: That will be fine.

*Kelly Beatty Reporting (615)588-8936*

GENERAL DUNGAN: And Your Honor, the State will keep track of these dates, as the State believes that contempt is not pretrial credit. So the State, in the event that defendant is convicted on the offenses that he is currently being housed pretrial on, the State will keep track of the dates for the judgment orders. Because this time would not go towards his pretrial in those cases.

THE COURT: That is correct. This is separate and apart from the underlying charges. So credit would -- we don't allow double dipping on credit for separate cases unless by agreement. Are there any other matters that we need to address on this case?

GENERAL DUNGAN: No. Thank you, Your Honor.

THE COURT: Thank you. And General, can you prepare the orders?

GENERAL DUNGAN: We will.

THE COURT: Thank you.

END OF PROCEEDINGS

*Kelly Beatty Reporting (615)588-8936*

REPORTER'S CERTIFICATE

STATE OF TENNESSEE

COUNTY OF WILLIAMSON

I, Kelly M. Beatty, Court Reporter with State of Tennessee, hereby certify that I reported and transcribed the foregoing hearing from electronic recording of the proceedings held 07/10/2026 to the best of my skills and ability in the matter of State of Tennessee vs. Robert Cole Gordon, Case Numbers 23-CR-17320, 23-CR-17322, 23-CR-17335, 23-CR-17337, 23-CR-17787, 23-CR-17821, 23-CR-17824, 24-CR-17965, 24-CR-17966, 24-CR-18616 on the docket of the Circuit Court of Williamson County, Tennessee. I am not related to any of the parties named herein, nor related to their counsel, and have no interest, financial or otherwise, in the outcome of the proceedings.

-----------------------------------------
KELLY M. BEATTY, CER

*Kelly Beatty Reporting (615)588-8936*
Case 3:24-cv-01121    Document 111-8    Filed 08/12/26    Page 99 of 99 PageID #: 2696